**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PIRINATE CONSULTING GROUP, LLC, AS TRUSTEE OF THE LOYALTY VENTURES LIQUIDATING TRUST, | )<br>)<br>)<br>)   Case No. 24-_____<br>) |
| Plaintiff, | )<br>) |
| - against - | )<br>) |
| BREAD FINANCIAL HOLDINGS, INC. f/k/a Alliance Data Systems Corporation, in its own name and as successor-in-interest to Alliance Data International LLC, Alliance Data Foreign Holdings, LLC, and ADS Foreign Holdings, LLC; and JOSEPH L. MOTES III; RALPH J. ANDRETTA; ROGER H. BALLOU; JOHN C. GERSPACH, JR.; KARIN J. KIMBROUGH; RAJESH NATARAJAN; TIMOTHY J. THERIAULT; LAURIE A. TUCKER; SHAREN J. TURNEY; and PERRY S. BEBERMAN, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

Pirinate Consulting Group, LLC, as Trustee of the Loyalty Ventures Liquidating Trust, established pursuant to the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 200] (as amended, the "Combined DS and Plan" or the "Plan") and the order confirming the Plan (the "Confirmation Order") [Docket No. 218] entered in the United States Bankruptcy Court for the Southern District of Texas in the bankruptcy cases captioned *In re LOYALTY VENTURES INC., et al.*, Case No. 23-90111 (CML) (Bankr. S.D. Tex.) herein alleges for its complaint in action, upon knowledge of its own acts and upon information and belief as to all other matters, as follows:

## I.      NATURE OF THE ACTION

1.      This action seeks redress for the substantial harm the defendants—Bread Financial Holdings, Inc. f/k/a Alliance Data Systems Corporation ("Bread" or "ADS"),[1] Joseph L. Motes III, Ralph J. Andretta, Roger H. Ballou, John C. Gerspach, Jr., Karin J. Kimbrough, Rajesh Natarajan, Timothy J. Theriault, Laurie A. Tucker, Sharen J. Turney, and Perry S. Beberman—caused to Loyalty Ventures Inc. ("Loyalty Ventures" or "LVI") through a leveraged spinoff and related transactions completed on November 5, 2021 (the "Spinoff Transaction"), which rendered LVI balance sheet insolvent (i.e., in which LVI's liabilities exceed a reasonable market value of its assets), and with unreasonably small capital to operate its business.

2.      LVI's balance sheet insolvency was caused primarily by the $675 million in loans it was forced to incur, the net proceeds of which were transferred to ADS as consideration for the receipt of the stock of certain operating subsidiaries. Critically, LVI's business prospects were not as bright as what was represented to (i) the rating agencies, (ii) Ernst and Young Capital Advisors, LLC ("E&Y") who prepared a post-spin debt capacity study for ADS in order to justify the Spinoff Transaction, and (iii) the lenders who funded the Spinoff Transaction. Because LVI's business prospects were overstated to these non-insider third parties, LVI was able to borrow far more money than its business was worth, and more than its businesses could reasonably support. While it would be easy for Defendants' to try to pass the blame to the lenders who funded the Spinoff Transaction, it is undisputed that the Defendants and the "Spin

---

[1]      Plaintiff names Bread as a defendant herein both in its own capacity and in its capacity as the successor-in-interest to Alliance Data International LLC ("ADILC"), Alliance Data Foreign Holdings, LLC ("ADFH"), and ADS Foreign Holdings, LLC ("ADSFH") by reason of the successive mergers of those entities into Bread on or about May 31, 2022. Plaintiff also names Bread as a defendant herein in its capacity as the successor-in-interest to ADI Crown Helix Limited and as the successor-in-interests to ADS Foreign Holdings, LLC.

Team" members (officers and employees of ADS who were appointed, and served simultaneously as, officers of LVI) did not tell the lenders who funded the Spinoff Transaction the whole truth about LVI's business prospects.

3.     Though headquartered in the United States of America, one of LVI's two primary business segments was in Canada, where it operated the AIR MILES® Reward Program ("AIR MILES") through wholly owned subsidiary LoyaltyOne, Co. ("L1 Canada"). The AIR MILES business segment had been suffering consistently declining revenue and earnings since 2014. ADS unsuccessfully tried to sell the AIR MILES business and its other business segment known as the BrandLoyalty business in 2019 and 2020. The AIR MILES business was distressed as a result of losses of their major customers in 2020 and 2021 with known intended terminations in 2022.

4.     A key AIR MILES customer (known in the AIR MILES business as "sponsors") was Sobeys Capital Incorporated (with its affiliates and subsidiaries, "Sobeys"), the second largest supermarket chain in Canada. For the years ended December 31, 2019 and 2020, Sobeys was the second largest AIR MILES sponsor, representing approximately 28% of air miles issued by the AIR MILES program. During the year ended December 31, 2020, Sobeys represented 23% of AIR MILES' gross revenue. To support the Spinoff Transaction, ADS's management projected that for the years ended December 31, 2021, through December 31, 2025, Sobeys would represent 28% to 30% of all AIR MILES issued by the AIR MILES program.

5.     The problem for ADS and what would become LVI's problem was that Sobeys' AIR MILES contract was due to expire in February 2023, with an early termination period opening in July 2022. Well in advance of the November 2021 Spinoff Transaction, ADS, Motes (then ADS's General Counsel, Secretary, Executive Vice President, and Chief Administrative

Officer), the members of the ADS Board of Directors (the "ADS Board"), and certain of ADS's officers were made aware that *Sobeys would not renew its contract in February 2023, and that Sobeys would terminate its contract by the end of 2022.*

6.     On January 6, 2021, Charles Horn, then ADS's Executive Vice President and Senior Advisor, and previously ADS's acting Chief Executive Officer, and earlier ADS's Executive Vice President and Chief Financial Officer, wrote to Michael Medline, Sobeys' President, Chief Executive Officer, and Director, to thank Medline for "giving us the early 'heads up' that you plan to exit the [AIR MILES] program."[2] Horn then indicated that he believed that Medline had "indicated that it is not yet a final decision" and offered to discuss with Medline "how [ADS] can make the AIR MILES better for both Sobey's and the collectors."[3]

7.     The fact that Sobeys had expressed its intention to exit the AIR MILES program was communicated to the ADS Board and ADS's management on January 8, 2021.[4] This occurred during a January 2021 'strategy retreat' of the ADS Board where the ADS Board was advised by ADS's management that "*Sobey[s'] relayed its intention to terminate by the end of 2022.*" Sobeys' intention to terminate was known to Chesnut, ADS' Senior Vice President and Treasurer.[5]

8.     Thus, at all relevant times, it was known or knowable to ADS, ADS's senior management, namely Andretta, Motes, Horn, and John Jeffrey Chesnut, and Beberman when he joined ADS in mid-2021, as well as the ADS Board members, that any AIR MILES projections

[2]     BREAD-LVI-00023670.

[3]     *Id.*

[4]     *See* BREAD-LVI-00114612.

[5]     *See* LVR-001-0000006.

prepared in conjunction with the Spinoff Transaction which included Sobeys as a sponsor during the 5-year projection period were inflated and materially inaccurate.

9.      Critically, the fact that Sobeys would not renew its contract in February 2023 and intended to terminate the contract by the end of 2022 was withheld from Moody's, Standard and Poor's ("S&P"), E&Y and Bank of America in connection with the eventual Spinoff Transaction. This key fact was also withheld from potential lenders during 'roadshow' presentations through which ADS procured the debt-financing that provided LVI with proceeds in order to transfer $650 million to ADS as part of the Spinoff Transaction.

10.      Consistent with this, Chesnut, acting on behalf of ADS and at the direction of Perry Beberman, ADS's Executive Vice President and Chief Financial Officer, coached two then ADS "Spin Team" members on talking points for meetings with Moody's and S&P, to act as if ADS did not know that "***Sobey[s] relayed its intention to terminate by the end of 2022***." These "Spin Team" members were told that Sobeys had to provide formal written notice of such termination, and that Sobeys ***would*** formally let them know as early as April 1, 2022 whether it ***would*** terminate its AIR MILES contract. But Andretta, Motes, the ADS Board Audit Committee (as defined herein), and the ADS Board knew Sobeys' answer: Sobeys was going to terminate its AIR MILES contract by the end of 2022 and Sobeys' executives had not taken back that statement. Further, Andretta, Motes, the ADS Board Audit Committee, and the ADS Board had not been informed by Sobeys that it was even open to changing its mind.

11.      Every aspect of the Spinoff Transaction was coordinated, managed and dictated by ADS, by the ADS Board Audit Committee, as well as by Motes, Andretta, and Beberman (after he joined ADS as its Executive Vice President and Chief Financial Officer in July 2021). The leadership at what would become LVI was told to get with the program, or they would no

longer be employed by ADS or LVI. Among other things, on August 29, 2021, Beberman pressured Chesnut to complete the Spinoff Transaction on the terms that ADS demanded, with Beberman telling Chesnut that "you need to get your guy [*i.e.*, Horn, LVI's incoming Chief Executive Officer] on board or else you won't like where this goes." Chesnut, Horn, and Cynthia Hageman, ADS's corporate assistant secretary and LVI's eventual general counsel, understood this to be a threat that they would no longer be employed by ADS or LVI if the Spinoff Transaction was not completed as ADS dictated.

12.     But certain lenders, referred to as "investors" by ADS/Bread and its advisors, who were asked to fund the Spinoff Transaction were spooked by the prospect that major sponsor contacts, namely BMO and Sobeys, were up for renewal in 2023, as the AIR MILES business had already then recently lost RONA/Lowe's, the Liquor Control Board of Ontario, and Rexall as sponsors. Beberman, Andretta, and the members of the ADS Board knew that prospective lenders who were asked to fund the Spinoff Transaction were spooked by the prospect that the contracts for BMO and Sobeys were up for renewal in 2023 and the news that Sobeys planned to terminate in 2022, before the renewal date in 2023, was withheld from those prospective lenders. On September 24, 2021, Beberman advised the members of the ADS Board Audit Committee and Ralph Andretta, ADS's President and Chief Executive Officer, that "[b]ased on the feedback, investors were concerned about the customer concentration in Canada (BMO, Sobey's), the near-term contract maturities and the lingering impact of Covid. Several sizable investors declined to participate."[6] Nonetheless, acting at the direction of Andretta, Beberman,

---

[6]     LVR-001-0000308.

and the members of the ADS Board, BofA Securities, Inc. ("BofA Securities")[7] and the members of the Spin Team (under duress) pushed forward with the marketing and sale of what would become the financing for the Spinoff Transaction. In the process they forced LVI to agree to financing under far more onerous economic terms (through a much higher annual amortization payment of 7.5%) than had been originally contemplated by ADS/Bread (1% annual amortization payments) in a hollow attempt to alleviate the educated, but deliberately uniformed, concerns of potential lenders.

13.    In the final Spinoff Transaction, ADS mandated and caused LVI, the entity that would 'acquire' the AIR MILES business, as well as ADS's separate BrandLoyalty business, (i) to borrow $675 million[8] from third-party lenders and use $650 million of it (nearly all of the net proceeds of those loans) to pay ADS for the stock of the subsidiaries who conducted the AIR MILES and BrandLoyalty businesses (the "$650M Transfer"), (ii) to cause Debtor Rhombus Investments L.P. ("Rhombus") to pay $100 million purportedly due under a promissory note to an ADS wholly owned subsidiary (the "$100M Transfer"), with $50 million to repay principal and $50 million to pay interest due under that note, (iii) on behalf of L1 Canada, to purport to transfer to ADS/Bread the right to receive the proceeds of an ongoing litigation between L1 Canada and Canada Revenue Agency, which, if successful could result in proceeds of up to CAD[9] 75-80 million to which L1 Canada may become entitled (the "Tax Litigation Proceeds Transfer Obligation"), and (iv) to assume liability for certain class action lawsuits consisting of

---

[7]    BofA Securities, Inc. is the global banking and global markets divisions of Bank of America Corporation. "Bank of America, N.A." refers to one of the banking affiliates of Bank of America Corporation.

[8]    All dollar figures in this Complaint are in U.S. dollars, unless otherwise noted.

[9]    "CAD" references the Canadian Dollar Currency.

claims that were based on and arose from actions that the ADS Board had directed prior to the Spinoff Transaction (the "Liability Assumption").

14.     Yet, the Spinoff Transaction was not in the best interests of LVI or its creditors. The Spinoff Transaction was made when, and/or resulted in LVI being balance sheet insolvent and inadequately capitalized. As noted at the outset, the fair value of LVI's business (and thus its assets) at the time of the Spinoff Transaction was less than the value of LVI's obligations incurred in the Spinoff Transaction, at fair value. Plaintiff believes that the LoyaltyOne Business was worth less than $450 million, at a fair valuation, at the time of the Spinoff Transaction. LVI could not support $675 million in secured indebtedness. ADS forced LVI to incur obligations in the Spinoff Transaction that contained overly burdensome economic terms which, in combination with LVI's diminishing prospects, would foreseeably deprive LVI of the necessary capital to run its business. For example, the Credit Agreement for the loans that funded the $650M Transfer required LVI to pay burdensome amortization payments equal to 7.5% of the initial $675 million principal balance per annum plus additional annual prepayments equal to up to 50% of LVI's excess cash, all of which severely strained LVI's available cash flows. These required amortization payments deprived LVI of the cash it needed to remain viable after the Spinoff Transaction, a fact that was never disclosed to lenders or to the ratings agencies.

15.     Throughout the lead up to the Spinoff Transaction, ADS, the ADS Board, ADS's senior executives, and LVI's sole director Motes, did nothing to ensure that the Spinoff Transaction was in the best interests of LVI. Rather, they ignored the evidence that clearly showed that the Spinoff Transaction was not in LVI's best interests, would render LVI balance sheet insolvent at the time of the Spinoff Transaction, and would leave LVI with unreasonably small capital to operate its business.

16.     ADS used all the money it obtained in the Spinoff Transaction from the $650M Transfer and the $100M Transfer to pay down *ADS's* debts, which provided no benefit to LVI. In this regard, ADS, the ADS Board, ADS's senior executives, and Motes were single-mindedly focused on bolstering ADS's balance sheet, and improving ADS's card services-only business prospects. Since 2016, ADS and the ADS Board had undertaken a campaign to return capital to ADS's shareholders, while, at the same time, transforming ADS from a conglomerate with three business divisions, LoyaltyOne (including the AIR MILES and Netherlands-based BrandLoyalty business ("BrandLoyalty")), Epsilon, and ADS's United States-based "Card Services," business, to a streamlined bank / bank holding company with a single business division, Card Services. This transformation required that, in addition to the Epsilon business sold in mid-2019, the declining AIR MILES and BrandLoyalty businesses be jettisoned since they had limited and diminished prospects.

17.     To effectuate this streamlining, ADS had to address *its* balance sheet, which was overleveraged and had too much goodwill for a financial services company. These two problems stood in the way of ADS's success and the Spinoff Transaction provided ADS with the opportunity to address both issues without the risk of counterparty demands for ADS. The card-services business, standing alone, would only succeed if it could increase its Tangible Common Equity to Tangible Assets ratio ("TCE/TA"), commonly used by analysts and investors to evaluate the financial health of banks.[10] Tangible Common Equity shows realizable equity in a liquidation.[11] Because Tangible Common Equity is measured by subtracting goodwill and other intangible assets, ADS need to offload as much of the $1.36 billion in pre-spin goodwill as it could from ADS's balance sheet. Ultimately, through the Spinoff Transaction, ADS was able to

---

[10]     *See* LVR-001-0000103, at 48.

[11]     *Id.*

reduce its goodwill from $1.36 billion to $634 million, a reduction of $726 million, which resulted in ADS's TCE/TA Ratio going from 0.3% (as of December 31, 2020) and 3% pre-spin, to 6.2% post-spin. ADS also used the $650 million midnight dividend from LVI and the $100 million from the Rhombus' promissory note paydown to reduce ADS's post-spin leverage. ADS management and the ADS Board wanted to increase shareholder returns, but the TCE/TA had to be improved first because shareholder returns such as dividends and share repurchases, diminish TCE. Additionally, the FDIC had already warned ADS that ADS's Card Services' weak balance sheet had instigated increased FDIC scrutiny.[12]

18.     In contrast to the cornucopia of benefits ADS/Bread received in the Spinoff Transaction, LVI received relatively little. LVI was effectively stripped of the $675 million of cash raised in the debt financing, $100M Transfer, the Tax Litigation Proceeds Transfer Obligation, and LVI all it received were businesses worth nowhere near as much. As a result, LVI could not, in the long run, support its debt-service obligations under its $675 million secured financing. Moreover, LVI was also stripped of a plum asset, its alleged right to L1 Canada's CAD 75-80 million in potential tax litigation proceeds.

19.     This lawsuit alleges breaches of fiduciary duties against Motes and ADS, the latter as LVI's controlling shareholder, related to (a) the $650M Transfer, (b) the $100M Transfer, (c) the incurrence of the Tax Litigation Proceeds Transfer Obligation, and (d) the incurrence of the ADS Indemnification Obligation. Further, this lawsuit alleges aiding and abetting breaches of fiduciary duties against the members of the ADS Board, namely Andretta, Ballou, Gerspach, Natarajan, Theriault, Tucker, and Turney related to (I) the $650M Transfer, (II) the $100M Transfer, (III) the incurrence of the Tax Litigation Proceeds Transfer Obligation,

---

[12]     LVR-001-0000224, at p. 96.

and (IV) the incurrence of the ADS Indemnification Obligation. This lawsuit also alleges aiding and abetting breaches of fiduciary duties against the ADS's senior officers, namely Andretta and Beberman related to (A) the $650M Transfer, (B) the $100M Transfer, (C) the incurrence of the Tax Litigation Proceeds Transfer Obligation, and (D) the incurrence of the ADS Indemnification Obligation.

## II.     THE PARTIES

20.     Plaintiff Pirinate Consulting Group, LLC ("Pirinate") is the Trustee of the Loyalty Ventures Liquidating Trust. Pirinate was formed under the laws of the State of New Jersey.

21.     The Loyalty Ventures Liquidating Trust was established pursuant to the Plan and the Confirmation Order. The Trustee is authorized under the Plan and the Liquidating Trust Agreement to investigate, prosecute and liquidate claims against Defendants on behalf of the Liquidating Trust. The Plan authorized the creation of the Liquidating Trust for the express purpose of, among other things, pursuing all "Claims and Causes of Action" held by the Debtors, and their Estates against the Defendants.

22.     Defendant Bread (f/k/a ADS) is a Delaware corporation. On or about May 31, 2022: (i) Alliance Data International LLC ("ADILC"), an indirect, wholly-owned subsidiary of Bread, was merged with and into Alliance Data Foreign Holdings, LLC ("ADFH"), another indirect, wholly-owned subsidiary of Bread, with ADFH as the surviving entity; (ii) ADFH was merged with and into ADS Foreign Holdings, LLC ("ADSFH"), a direct, wholly-owned subsidiary of Bread, with ADSFH as the surviving entity; and (iii) ADSFH was merged into Bread, with Bread as the surviving entity. Bread is named as a defendant herein both in its own capacity and in its capacity as successor-in-interest to ADILC, ADFH, and ADSFH. As the successor-in-interest to each of those entities, Bread is liable for their respective actions alleged

11

in this Complaint. Bread maintains an office in Plano, Texas and its corporate headquarters is located in Columbus, Ohio.

23. Defendant Motes served as the sole director of LVI from June 21, 2021, to November 4, 2021. Starting in July 2015, Motes served as General Counsel, and Secretary of ADS. Starting in June 2019, Motes also served as the Executive Vice President and Chief Administrative Officer of ADS. As of the date of the initiation of this Action, Motes held all these same positions at Bread. In 2021, Motes was the President of Alliance Data Foreign Holdings, Inc. Motes also serves as an officer or managing director in several other subsidiaries, as discussed more fully herein. As of the date of the initiation of this Action, Motes resided and regularly conducted business in Dallas, Texas.

24. Defendant Ralph J. Andretta was ADS's President, Chief Executive Officer, and a member of the ADS Board from February 3, 2020 through all other times relevant to this action.

25. Defendant Roger H. Ballou was a member of the ADS Board during all times relevant to this action. Ballou served as a member of the ADS Board's Audit Committee (the "ADS Board Audit Committee") during all times relevant to this action. Ballou served as Chairman of Bread's Board of Directors through at least February 28, 2023. Thus, Ballou is a "Bread Party" (as defined in the Plan) and is not a "Released Party" (as defined in the Plan).

26. Defendant John C. Gerspach, Jr. was a member of the ADS Board during all times relevant to this action. Gerspach served as the chairman of the ADS Board Audit Committee during all times relevant to this action.

27. Defendant Karin J. Kimbrough was a member of the ADS Board from May 27, 2021, through all other times relevant to this action.

28.     Defendant Rajesh Natarajan was a member of the ADS Board during all times relevant to this action.

29.     Defendant Timothy J. Theriault was a member of the ADS Board during all times relevant to this action. Theriault served as a member of the ADS Board Audit Committee during all times relevant to this action.

30.     Defendant Laurie A. Tucker was a member of the ADS Board during all times relevant to this action.

31.     Defendant Sharen J. Turney was a member of the ADS Board during all times relevant to this action.

32.     Defendant Perry S. Beberman was ADS's Executive Vice President and Chief Financial Officer starting on July 6, 2021, through all other times relevant to this action. Before joining ADS, Beberman served in various leadership roles at Bank of America for 15 years, with the most recent as Senior Vice President and Finance Executive of Bank of America's consumer and wealth management lending products from October 2019 to June 2021.

## III.   NON-PARTIES

33.     LVI was a Delaware corporation. From November 3, 2021, through November 5, 2021, LVI did not have any agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) of title 11 of the United States Code of a gross dollar value of $1 billion or more in notional or actual principal amount outstanding.

34.     LVI Lux Holdings S.àr.l. was a Luxembourg private limited liability company (*société à responsabilité limitée*). LVI Lux Holdings S.àr.l. was a wholly-owned, direct subsidiary of LVI.

35.     LVI Sky Oak LLC was a Delaware limited liability company, and was a wholly-owned, indirect subsidiary of LVI, whose sole member was LVI Lux Holdings S.àr.l.

36.     Rhombus was a Bermuda limited partnership, whose general partner was LVI Lux Holdings S.àr.l. and whose sole limited partner was LVI Sky Oak LLC. Rhombus was the indirect parent of the entities that conduct the former LoyaltyOne Business defined and described more fully below. From October 25, 2021, through November 5, 2021, Rhombus did not have any agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) of title 11 of the United States Code of a gross dollar value of $1 billion or more in notional or actual principal amount outstanding.

37.     From June 21, 2021, through November 5, 2021, Alliance Data International LLC ("ADILC"), a Delaware Limited Liability Company. During that time period, ADILC was managed by its sole member, ADFH (defined below). From November 3, 2021, through November 5, 2021, ADILC did not have any agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) of title 11 of the United States Code of a gross dollar value of $1 billion or more in notional or actual principal amount outstanding.

38.     From June 21, 2021, through November 3, 2021, Alliance Data Foreign Holdings, Inc. was a Delaware Corporation. Sometime between November 3, 2021, and November 5, 2021, Alliance Data Foreign Holdings, Inc. converted to a Delaware Limited Liability Company, Alliance Data Foreign Holdings, LLC. At all times from June 21, 2021, through November 5, 2021, ADFH was a direct wholly owned subsidiary of ADS Foreign Holdings, Inc. and an indirect wholly owned subsidiary of ADS.

39.     From June 21, 2021, through November 5, 2021, ADS Foreign Holdings, Inc. was a Delaware corporation until its conversion into ADS Foreign Holdings LLC (collectively with ADS Foreign Holdings, Inc., "ADSFH") was a Delaware limited liability company. During that period, ADSFH was a direct wholly owned subsidiary of ADS.

40.     Charles L. Horn, served as Executive Vice President and Chief Financial Officer of ADS through his intended retirement date of June 2019, and stayed on in an advisory capacity after June 2019 at the request of the ADS Board. Horn was ADS's acting Chief Executive Officer from November 2019 until February 3, 2020. Following Andretta's appointment, Horn continued to serve as Executive Vice President and senior advisor at ADS through 11:59 p.m. (Eastern Time) on November 5, 2021. Horn served as LVI's Chief Executive Officer from June 21, 2021 through the "effective date" of the Plan.

41.     John Jeffrey Chesnut, served as ADS's Treasury & Corporate Development Vice President from October 2010 to May 2015, before serving as ADS's Senior Vice President and Treasurer from May 2015 until the Spinoff Transaction. From June 21, 2021, through 11:59 p.m. (Eastern Time) on November 5, 2021, Chesnut was the named, but not yet effective, Executive Vice President, Chief Financial Officer of LVI. From June 21, 2021, through the "effective date" of the Plan, Chesnut served as Executive Vice President, Chief Financial Officer of LVI.

42.     L1 Canada was not and never was a "debtor" in the Debtors' chapter 11 cases. Rather, contemporaneously with the commencement of the Debtors' Chapter 11 Cases, L1 Canada applied for and obtained relief under the Companies' Creditor Arrangement Act (Canada) R.S.C. 1985, c. C 36, as amended (the "CCAA") in Canada. KSV Restructuring Inc. is the monitor for L1 Canada. L1 Canada has no interest in the Liquidating Trust.

## IV.    JURISDICTION

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), (2) because (A) either a Defendant is (i) a citizen of the United States of America, but not a resident of the State of New Jersey, or (ii) is not a citizen of the United States of America, and (B) the amount in controversy exceeds $75,000.

44.     This Court has personal jurisdiction over Defendant Bread (f/k/a ADS), a Delaware corporation, in its capacity as the entity in ultimate control over LVI, and therefore is subject to the personal jurisdiction of this court pursuant to 10 Del. C. §§ 3104, 3111. Additionally, in its capacity as the entity in ultimate control over LVI, ADS/Bread regularly conducted business throughout the United States, including in the State of Delaware.

45.     This Court has personal jurisdiction over Defendant Joseph L. Motes III, in his capacity as an Officer and Director of ADS/Bread and as a Director of LVI, pursuant to 10 Del. C. §§ 3104, 3114(a), (b). Additionally, in his capacity as an Officer and Director of ADS/Bread and as a Director of LVI, Motes regularly conducted business throughout the United States, including in the State of Delaware.

46.     This Court has personal jurisdiction over Defendant Ralph J. Andretta, in his capacity as an Officer and Director of ADS/Bread and for his actions in connection with the Spinoff Transaction, pursuant to 10 Del. C. §§ 3104, 3114(a), (b). Additionally, in his capacity as an Officer and Director of ADS/Bread, Andretta regularly conducted business throughout the United States, including in the State of Delaware.

47.     This Court has personal jurisdiction over Defendant Perry S. Beberman, in his capacity as an Officer of ADS/Bread, and for his actions in connection with the Spinoff Transaction, pursuant to 10 Del. C. §§ 3104, 3114(b). Additionally, in his capacity as an Officer of ADS/Bread, Beberman regularly conducted business throughout the United States, including in the State of Delaware.

48.     This Court has personal jurisdiction over Defendants Roger H. Ballou, John C. Gerspach, Jr., Karin J. Kimbrough, Rajesh Natarajan, Timothy J. Theriault, Laurie A. Tucker, and Sharen J. Turney, in their capacities as Directors of ADS/Bread, and for their actions in

connection with the Spinoff Transaction pursuant to 10 Del. C. §§ 3104, 3114(a). Additionally, Ballou, Gerspach, Kimbrough, Natarajan, Theriault, Tucker, and Turney, in their capacities as Directors of ADS/Bread, regularly conducted business throughout the United States, including in the State of Delaware.

49.     Venue is proper in this district because a substantial part of the events or omissions giving rise to this action occurred in this district, including, among other things, the incorporation of LVI in Delaware and use of LVI to conduct and complete the Spinoff Transaction.[13]

## V.     FACTUAL ALLEGATIONS

### A.     ADS'S CORPORATE HISTORY

50.     From 2015 to July 1, 2019, ADS operated the following reportable segments: LoyaltyOne, Epsilon, and Card Services. The LoyaltyOne business segment consisted of the Canadian-based AIR MILES and Netherlands-based BrandLoyalty business ("LoyaltyOne").

51.     In the 2015 / 2016 timeframe, ADS explored the spinoff of its Card Services business from the 'Epsilon' business and the LoyaltyOne businesses. This initiative was code-named "Project Legacy". ADS abandoned Project Legacy because that proposed spin transaction would leave Card Services' balance sheet with too much debt, and it would have required bank regulatory approval.

52.     Beginning in 2018, the ADS Board undertook a series of strategic initiatives based on an evaluation of the ADS portfolio of businesses.

53.     In November 2018, ADS announced the exploration of strategic alternatives for Epsilon, including a potential sale of the business. In January 2019, ADS received preliminary

---

[13] *See* 28 U.S.C. § 1391(b).

bids for Epsilon. On April 12, 2019, ADS entered into a definitive agreement to sell Epsilon, and on July 1, 2019, ADS sold the Epsilon segment to Publicis Groupe S.A. for $4.4 billion in cash. As part of the sale of the Epsilon business, ADS agreed to indemnify Epsilon's buyer for all costs and settlement amounts with then active investigations by the U.S. Department of Justice.

54.    ADS used the proceeds of the Epsilon sale to pay off $1.9 billion in ADS's then outstanding senior notes, and to make a mandatory payment of $500 million on ADS's revolving credit facility. The payoff of ADS's senior notes was required in order for ADS to use the remaining proceeds of the Epsilon sale to buyback ADS shares from its shareholders. ADS then conducted a "Dutch Tender" in August 2019, where it used $750 million in proceeds from the Epsilon sale in order to buy back ADS common stock.

55.    The Dutch Tender in August 2019 was just one part of a sustained campaign by ADS to return capital to ADS's shareholders, rather than reinvest in the business and/or incur a taxable liability for ADS. During the period 2016 through 2019, ADS repurchased approximately $2.8 billion of its common stock. During 2016, ADS repurchased $805 million of its common stock. During 2017, ADS repurchased $554 million of its common stock. During 2018, ADS repurchased $443 million of its common stock. During 2019, ADS repurchased $976 million of its common stock.

56.    Following the July 1, 2019 conclusion of the Epsilon sale, ADS's remaining reportable segments were LoyaltyOne and Card Services.

57.    At the direction of the ADS Board, ADS continued to undertake "[a]dditional initiatives to further simplify [ADS's] business structure as well as focus capital on [ADS's] highest earning and growth assets remain ongoing."[14]

---

[14]    ADS Form 10-K for the year ended December 31, 2020, at 2.

58.     In ADS's words, "[t]hese investments also further [its] objective to make [its] Card Services segment the best payment and lending solution for traditional retail partners and emerging digital players, growing sales and credit card and loan receivables by making it easier for consumers to finance purchases and make payments wherever they occur— online, in store and in-app."[15]

59.     In December 2020, "ADS completed the acquisition of Lon Inc., a technology-driven digital payments company operating under the trademark Bread, offering an omnichannel solution for retailers and platform capabilities to bank partners."[16] "Bread's offerings and on-boarding capabilities enhance the growth prospects of [ADS's] Card Services' verticals and increase the addressable market of small- and medium-sized merchants. Bread also offers [ADS's then] existing partners a broader digital product suite and additional white-label product solutions."[17] the aggregate consideration for the Bread acquisition was approximately $491 million.[18]

60.     ADS announced that it "also intend[ed] to rebalance [its] portfolio, prioritizing and investing in profitable, strong performing partners, targeting core and new verticals by improving our cost base and becoming a more efficient cost provider."[19] It was clear that, in 2020, following ADS's sale of the Epsilon business in 2019 and its purchase of Bread in 2020, the ADS Board essentially committed itself to running its Card Services as a standalone business, focused on payment services.

---

[15]     *Id.*

[16]     *Id.*

[17]     *Id.*

[18]     *Id.*, at 35.

[19]     *Id.*

**B.     ADS's LoyaltyOne Segment: The AIR MILES® Reward Program**

**1.     AIR MILES Overview and Background**

61.     AIR MILES is a Canadian coalition loyalty program. It is an end-to-end loyalty platform that combines technology, data/analytics and other solutions to help its clients drive increased engagement by consumers with their brands. When consumers participating in the AIR MILES program (known as "collectors") make purchases from participating sponsors, they are issued "miles" that can be redeemed for travel rewards, select merchandise, or cash credits on purchases from sponsors. Sponsors pay a fee per mile issued (and in limited cases, a fee per mile redeemed), at rates that are separately negotiated with each sponsor. In exchange, LoyaltyOne bore the expense of administering the AIR MILES program and the cost of rewards redeemed by collectors.

62.     The AIR MILES business—and consequently, LoyaltyOne's business segment as a whole—was, however, subject to significant client concentration risk. AIR MILES's top ten sponsors generated more than 90% of the AIR MILES reward miles issued under the AIR MILES program in 2019 and 2020, and represented approximately 46% and 55%, respectively, of LoyaltyOne's revenue for the years ended December 31, 2019 and 2020.

63.     For the years ended December 31, 2019 and 2020, the largest AIR MILES sponsor, the Bank of Montreal ("BMO"), represented approximately 12% and 15% respectively of LoyaltyOne's revenue. During that same period, BMO represented approximately 42% of AIR MILES issued by the AIR MILES program and during the year ended December 31, 2020, BMO represented approximately 41% of AIR MILES' gross revenue. ADS's management projected that for the years ended December 31, 2021, through December 31, 2025, BMO would represent 44% to 45% of all AIR MILES issued by the AIR MILES program.

64.     For the years ended December 31, 2019 and 2020, the second largest AIR MILES sponsor was Sobeys, the second largest supermarket chain in Canada. During that same period, Sobeys represented approximately 28% of AIR MILES issued by the AIR MILES program and during the year ended December 31, 2020, Sobeys represented 23% of AIR MILES' gross revenue. ADS's management projected that for the years ended December 31, 2021, through December 31, 2025, Sobeys would represent 28% to 30% of all AIR MILES issued by the AIR MILES program. Accordingly, Sobeys would also represent a similar portion of AIR MILES' revenue for fiscal years 2021 through 2025.

65.     Typically for the AIR MILES business, each sponsor, such as BMO and Sobeys, is granted exclusivity in their market category.[20] This exclusivity limits AIR MILES ability to sign new sponsors in existing categories. It also makes contract renewals or planning for a substitute or replacement upon contract expirations a critical part of the AIR MILES business and limited ADS's ability to project revenues that would be generated from new sponsors in the event that an existing sponsor indicated an intent to terminate its contract.

### 2.     Pre-Spin Sponsor Exits from AIR MILES Plagued LVI's Business Prospects

66.     In 2020 and early-2021, AIR MILES lost several of its top sponsors, (i) RONA/Lowe's, (ii) the Liquor Control Board of Ontario, and (iii) Rexall. These three sponsors accounted for 7.9% of total issuances and more than 5% of AIR MILES' gross revenue during the year ended December 31, 2020.

67.     The losses of RONA/Lowe's, the Liquor Control Board of Ontario, and Rexall as sponsors reflected recognized shifts in the loyalty program industry. Retailers were increasingly moving loyalty program operations in-house or alternatively becoming more willing to switch

---

[20]     *See* LVR-001-0000103, at 13.

between competing coalition or other outsourced loyalty programs. And consumers were increasingly preferring cash-back rewards cards to in-kind rewards programs such as AIR MILES. Declining retailer and consumer participation in coalition loyalty programs such as AIR MILES, as well as increased competition in the coalition program market, indicated that more losses and strain on AIR MILES could be on the horizon, making the continued participation of Sobeys and BMO even more important. As a result, the loss of any major sponsor could severely impact the AIR MILES' business and LoyaltyOne as a whole. Any sponsor departure would also have the effect of empowering any remaining major sponsor (like BMO) to demand more favorable pricing terms, greater service levels, and more desirable rewards, which would further cut into the bottom line of AIR MILES. Those risks were particularly acute at the time of the Spinoff Transaction, because of the then recent loss of three of AIR MILES's top sponsors between 2020 and 2021 (namely RONA/Lowe's, the Liquor Control Board of Ontario, and Rexall), and because L1 Canada's existing contracts with its three largest sponsors, BMO, Sobeys, and Shell Canada, were set to expire in 2022 and 2023. Specifically, BMO and Shell Canada's sponsor contracts were due to expire in 2022.Moreover, the Sobeys sponsor agreement, defined herein as the "Sobeys PPA," was subject to early termination rights in 2022 and expiration in 2023.

68.     In addition to the direct impact from the loss of revenue and earnings attributable to these major sponsors, a departure of any of them would have a broader "network effect" on the value of the entire AIR MILES program to the remaining sponsors and collectors. The value of a coalition loyalty program such as AIR MILES depends on the number and quality of sponsors. If there are fewer sponsors from whom consumers can earn or redeem rewards, the

AIR MILES program's value decreases to consumers and drains incentives for retailers to become or remain sponsors.

### 3.      The Sobeys Contractual Relationship

69.      Much like an anchor tenant in a mall, Sobeys was critical to the AIR MILES program because consumers tend to visit grocery stores on a weekly basis, creating regular and frequent opportunities for collectors to earn and redeem reward miles. Sobeys' participation in the AIR MILES program dated back to Safeway (Canada), which was one of the original 13 sponsors when the AIR MILES program was launched in 1992. Safeway was acquired by Sobeys in 2013. Further, Sobeys (East) joined the AIR MILES program in 2001, Sobeys (West) joined the AIR MILES program in 2014, and Sobeys (Ontario) joined the AIR MILES program in 2015.

70.      Sobeys Capital Incorporated and L1 Canada were party to the Program Participation Agreement dated May 1, 2014 (the "Sobeys PPA"), as amended September 29, 2015 ("Sobeys PPA Amendment No. 1"), January 9, 2019 ("Sobeys PPA Amendment No. 2"), February 11, 2020 ("Sobeys PPA Amendment No. 3"), May 14, 2020 ("Sobeys PPA Amendment No. 4"), March 12, 2021 ("Sobeys PPA Amendment No. 5"), and March 25, 2022 ("Sobeys PPA Amendment No. 6").

71.      The term of the Sobeys PPA was from May 1, 2014 through April 30, 2024, on which date the Sobeys PPA was to terminate without a notice requirement or any action on the part of either party, unless previously terminated by either party in accordance with the terms

thereof.[21] The Sobeys PPA permitted either party to trigger a meet and confer during April 2023 for the purpose of discussing a possible renewal.[22]

72.     Sobeys PPA Amendment No. 2 added a new subsection 4(c) which provides for an early termination right.[23] Pursuant to this clause, beginning in May 2020, either L1 Canada or Sobeys could request a meeting to "consider[] possible terms and conditions applicable to continued participation by [Sobeys] in the [AIR MILES] program for the duration of the term."[24] The new subsection 4(c) provided that "[Sobeys] may in its sole discretion terminate this Agreement effective April 30, 2021, by giving written notice of termination to [L1 Canada] not later than October 31, 2020."[25]

73.     Sobeys PPA Amendment No. 3 deleted and replaced then then existing subsection 4(c) with a new version of subsection 4(c).[26] Pursuant the new text, "… [Sobeys] may in its sole discretion terminate this Agreement on at least six months' prior written notice, provided that such notice is given to [L1 Canada] only between January 15, 2021, and March 15, 2021."[27] Sobeys' termination right was conditioned upon Sobeys requesting and having met with L1 Canada to discuss Sobeys continued participation by in the AIR MILES program, unless L1 Canada refused or was unwilling to meet with Sobeys for that purpose.[28]

---

[21]     *See* Sobeys PPA, § 4(a).

[22]     *Id.*

[23]     *See* Sobeys PPA Amendment No. 2, ¶ 7 (adding subsection 4(c) to the Sobeys PPA).

[24]     *Id.*

[25]     *Id.*

[26]     *See* Sobeys PPA Amendment No. 3, ¶ 2 (deleting and replacing subsection 4(c) to the Sobeys PPA).

[27]     *Id.*

[28]     *Id.*

### 4. ADS's Unsuccessful Attempt to Sell AIR MILES in Project Angus

74.     Beginning in mid-2019 and throughout 2020, ADS unsuccessfully attempted to sell the AIR MILES business. The code name for the attempted sale of LoyaltyOne was "Project Angus." Project Angus resulted in a bidding process that culminated in mid-November 2020 and resulted in bids from two private equity funds. The lead contender, private equity bidder #1, requested to speak with AIR MILES' key clients, and in particular, the largest client—BMO, who represented ~40% of AIR MILES reward miles issuance. Private equity bidder #1's non-binding offer dated December 17, 2020, was contingent upon (i) BMO's acquisition of a minority equity stake in AIR MILES, alongside private equity bidder #1 as the majority shareholder, (ii) private equity bidder #1 and BMO's agreement that BMO would acquire the AIR MILES business from private equity bidder #1 within the three to five years of the original transaction date, and (iii) the existing AIR MILES / BMO contract would be extended with the possibility of a modest pricing concession to BMO as an inducement. BMO was unwilling to make any such commitments.

75.     BMO had been approached before the opening of the bidding process and declined to make a bid for the AIR MILES business during Project Angus. However, after Project Angus concluded, on January 13, 2021, BMO submitted their own "bid" to acquire the AIR MILES business. This "bid" valued the purchase price of AIR MILES based on a multiple of L1 Canada's EBITDA (with "EBITDA" undefined). BMO's offer letter lacked precision in key areas, including valuation. For example, BMO's eventual proposal of x times to y times "normalized 2020 EBITDA" was not viewed as a real offer by ADS since BMO was unwilling to define "normalized 2020 EBITDA" or even provide direction on what it believed "normalized 2020 EBITDA" would be. BMO's Amended and Restated Program Participation Agreement, as amended (the "BMO PPA"), permitted the termination of the contract upon at least twelve

months, but not more than eighteen months, prior written notice. Thus, while the BMO PPA's term was due to end on October 31, 2023, BMO could give notice of termination between April 30, 2022 and October 31, 2022.

76.     A second bidder, private equity bidder #2, made an offer as part of Project Angus. That offer was contingent upon Sobeys signing a seven-year extension, which Sobeys refused. However, after Project Angus concluded, Sobeys relayed that it intended to terminate the Sobeys PPA contract with L1 Canada by the end of 2022.

**5.     Sobeys was transparent about its intention to terminate the Sobeys PPA, with the full knowledge of the employees of L1 and ADS**

77.     In the first half of 2020, the ADS and the L1 Canada teams recognized that Sobeys could terminate the Sobeys PPA and took steps to try to eliminate that known risk.

78.     On February 11, 2020, L1 Canada and Sobeys executed the Sobeys PPA Amendment No. 3 which permitted Sobeys to terminate the Sobeys PPA on at least six months' prior written notice, provided that such notice is given to L1 Canada between January 15, 2021, and March 15, 2021.

79.     In June 2020, the ADS Board was advised by ADS management that L1 Canada was "[w]orking with Sobey's [sic] to eliminate early termination clause, which opens in January and February 2021."[29] That risk remained for the duration of 2020 and the ADS Board was well aware of it. During a November 18, 2020 ADS Board meeting, the ADS Board was advised that a risk to the AIR MILES business include that "Sobey's exercises early termination option in Q1,

---

[29]     *See* BREAD-LVI-00007600.

2021 (option expires at end of March 2021) – approximately 27 percent of total issuances."[30] ADS management added that a Sobeys exit would result in a loss of "$4.6m in margin."[31]

80.     After Project Angus ended in December 2020, the known risk that Sobeys would exit the AIR MILES program remained.

81.     On January 6, 2021, Charles Horn, then ADS's Executive Vice President and Senior Advisor, and previously ADS's acting Chief Executive Officer, and earlier ADS's Executive Vice President and Chief Financial Officer, wrote to Michael Medline, Sobeys' President, Chief Executive Officer, and Director, to thank Medline for "giving us the early 'heads up' that you plan to exit the [AIR MILES] program."[32] Horn then indicated that he believed that Medline had "indicated that it is not yet a final decision" and offered to discuss with Medline "how [ADS] can make the AIR MILES better for both Sobey's and the collectors."[33] The fact that Sobeys had expressed its intention to exit the AIR MILES program was expressed to the ADS Board and ADS's management on January 8, 2021.[34]

82.     During a January 2021 'strategy retreat' of the ADS Board, the ADS Board was advised by ADS's management that "***Sobey[s'] relayed its intention to terminate by the end of 2022***." On two occasions during January 2021, ADS' management provided the ADS Board with presentations that stated that "Sobey[s'] relayed its intention to terminate by the end of 2022."[35]

---

[30]     BREAD-LVI-00010906.

[31]     *Id.*

[32]     BREAD-LVI-00023670.

[33]     *Id.*

[34]     *See* BREAD-LVI-00114612.

[35]     BREAD-LVI-00114612 ("Project Legacy Update" dated January 8, 2021); BREAD-LVI-00115858 ("Project Legacy Update" dated January 19, 2021).

ADS' management provided the ADS Board Audit Committee with an identical statement in a January 22, 2021 "Audit Committee Update" presentation.[36]

83.     Sobeys' intention to terminate was known to Chesnut, ADS' Senior Vice President and Treasurer.[37] Not only did ADS know of Sobeys' intention to terminate, but they also began taking steps to replace Sobeys, an acknowledgement that they understood Sobeys likely would leave the program. Additionally, Morgan Stanley's "Project Legacy Update" dated January 2021 prepared for ADS referenced "Replacement of Sobey's" and "Renew BMO contract" when referencing "Timing Considerations" relative to an "Illustrative Timeline" concerning a spinoff to be completed during Q4 2021.[38] ADS' management had already told the ADS Board that "[AIR MILES] pursuing a new grocery sponsor – potentially Loblaws or a combination of Metro and Save-on-Foods."[39]

84.     On January 22, 2021, the ADS Board Audit Committee held a meeting.[40] The members of the ADS Board Audit Committee, namely Ballou, Gerspach, and Theriault, participated in that meeting along with Andretta, Motes, and others.[41] The minutes of that ADS Board Audit Committee meeting state "Mr. Horn indicated management then received notice of Sobey's intent to terminate by the end of 2022, …; management is identifying options for a new grocery sponsor."[42]

---

[36]     *See* BREAD-LVI-00116033.

[37]     *See* LVR-001-0000006.

[38]     *See* LVR-001-0000008, at 9.

[39]     BREAD-LVI-00114612; BREAD-LVI-00115858.

[40]     BREAD-LVI-00856448.

[41]     *Id.*

[42]     BREAD-LVI-00256450.

85.     On February 18, 2021, Todd Gulbransen, L1 Canada's Senior Vice President, Client Services, emailed Sandra Sanderson, a Sobeys employee, articulating "some high level talking points that [Gulbransen] will be communicating to [his] team that is responsible for the Sobeys/IGA relationship as well as the broader [AIR MILES] organization."[43] That email stated that

- Sobeys current arrangement was scheduled to expire in '24

- However, there is a term that allows Sobeys to provide notice and exit sooner so long as that right is exercised in Q1 '21

- Unfortunately, Sobeys has made a decision to exercise this right.

- Blair [Cameron] and I have had very open discussions with Sandra [Sanderson] and Doug and have agreed the following:

    o New expiration date for contract will be February '23

    o AMRP will provide a further discount to the annual fee paid by Sobeys …[44]

86.     With that context, the best that L1 Canada (and ADS) could do was to postpone Sobeys' inevitable and preordained exit from the AIR MILES program.

87.     On March 12, 2021, L1 Canada and Sobeys executed the Sobeys PPA Amendment No. 5, which reset the termination date for the Sobeys PPA to between July 1, 2022 and February 1, 2023.[45] Sobeys PPA Amendment No. 5 required that Sobeys provide L1 Canada with "not less than three months' prior written notice" of such a termination. Sobeys PPA Amendment No. 5 also provided that the term of the PPA would end on February 28, 2023, and replaced the prior end date of April 30, 2024. In return for these concessions, Sobeys PPA Amendment No. 5 memorialized L1 Canada's and Sobeys's agreement to reduce the annual fee

---

[43]     *See* LYO2583601.

[44]     LYO2583601.

[45]     Sobeys PPA Amendment No. 5, ¶ 3 deleted and replaced subsection 4(c) to the Sobeys PPA.

payable by Sobeys pursuant to section 8 of the Sobeys PPA "by 50 percent." Those concessions memorialized in Sobeys PPA Amendment No. 5 did not, however, cause Sobeys to change its mind about exiting the AIR MILES program. And ADS's, the Spin Team's and L1 Canada's behavior reflect that the focus was on "winning Sobeys back." Rather, Sobeys subsequent written communications confirm that Sobeys' exit was happening, and it was just a question of when. For example, on July 19, 2021, Cameron wrote to Horn about a number of topics, including Sobeys.[46] Cameron wrote "I know what Air Miles needs to do. We need to sign Home depot and a Triangle to make waves in the marketplace and then go at Sobeys. We are redoing and launching the brand that will have a younger feel to it and so far the key players are very happy with the look."[47]

88.     Sobeys PPA Amendment No. 6 deleted and replaced the then existing subsection 4(c) with a new version of subsection 4(c).[48] Pursuant the new text, Sobeys could terminate the Sobeys PPA, upon a date no earlier than July 15, 2022 and no later than February 1, 2023.[49] Sobeys PPA Amendment No. 6 required that Sobeys provide L1 Canada with 30-70 days' prior written notice of such a termination.[50] The following **Table 1** summarizes the end date of the Sobeys PPA, the exit notice window opening and closing dates, and the exit window opening and closing dates.

---

[46]     LYO3504690.

[47]     *Id*.

[48]     *See* Sobeys PPA Amendment No. 6, ¶ 2 (deleting and replacing subsection 4(c) to the Sobeys PPA).

[49]     *Id.*

[50]     *Id.*

**Table 1**

|  | Agreement Date | End of Contract Term | Exit Notice Window Opens | Exit Notice Window Closes | Exit Window Opens | Exit Window Closes |
|---|---|---|---|---|---|---|
| Program Participation Agreement | 5/1/2014 | 4/30/2024 |  |  |  |  |
| Amendment No. 2 | 1/9/2019 |  |  | 10/31/2020 | 4/30/2021 |  |
| Amendment No. 3 | 2/11/2020 |  | 1/15/2021 | 3/15/2021 | 7/15/2021 | 9/15/2021 |
| Amendment No. 5 | 3/12/2021 | 2/28/2023 | 4/1/2022 | 11/1/2022 | 7/1/2022 | 2/1/2023 |
| Amendment No. 6 | 3/25/2022 |  | 5/6/2022 | 1/2/2023 | 7/15/2022 | 2/1/2023 |

89.     The ADS Board Audit Committee was advised during an August 30, 2021 meeting that "BMO and Sobeys operate under contracts that expire in 2023; Sobeys in February 2023 and BMO in October 2023" that "[a]s contract end dates near, raising debt will be more difficult for SpinCo due to lender and rating agency concerns around renewal risk."[51] The presentation delivered to the ADS Audit Committee went on to explain that "…both contracts are key strategically due to … their place as anchor sponsors (~68% of total issuance) with long tenure in the coalition."[52]

90.     Despite multiple internal acknowledgements by ADS that (i) they understood Sobeys to be terminating its contract, and (ii) internal acknowledgements of how important Sobeys role as an anchor sponsor was to the viability of the program, the fact that **Sobeys would not renew its contract in February 2023, and Sobeys would terminate the contract by the end of 2022** wasn't incorporated into the financial projections that were considered by Moody's, S&P, E&Y, and Bank of America in connection with what became a Spinoff Transaction because it was concealed from the market. For example, on February 1, 2021, Jeffrey Tusa, then

---

[51]     LVI-001-0000224, at 14.

[52]     *Id.*

an employee of ADS, prepared a presentation to the ADS Board related to the spin of LoyaltyOne that made no reference to Sobeys' decision to terminate its AIR MILES contract.[53]

91.     Thus, it was known to ADS, Motes, and the ADS Board members that any LoyaltyOne and AIR MILES projections that included Sobeys as a sponsor after 2022 were inflated and completely ignored the fact that Sobeys was going to leave AIR MILES. And yet, ADS, Motes, and the ADS Board members allowed Moody's, S&P, E&Y, and Bank of America to rely on just such projections during the Spinoff Transaction.

92.     This reality was in plain sight to the Defendants when, on September 20, 2021, a L1 Canada employee wrote an email to Todd Gulbransen, and others at L1 Canada, with a subject line that read "Sobeys Exit Impact…"[54] The author went on to write that "Todd [Gulbransen] brought me up to speed on the discussion you three had on Sobeys. See attached and below that outlines the impact of a Sobeys exit."[55] During the period September 20, 2021, through October 12, 2021, various L1 Canada employees refined their internal financial models reflecting the impact of a Sobeys exit.[56] The models reflected that Sobeys' departure would have a devastating impact on the AIR MILES business.[57]

93.     One L1 Canada employee gamed out five different scenarios, "No Impact," "Low Impact," Mid Impact," "High Impact" and "100% loss."[58] The "No Impact" scenario assumed the loss of the Sobeys business, but no loss of other sponsor business, resulting in a reduction of

---

[53]     *See* LVR-001-0000010.

[54]     LYO0219281.

[55]     *Id.*

[56]     *See, e.g.,* LYO0204036; LYO0222560.

[57]     *Id.*

[58]     *See* LYO0222560.

$32 million in gross margin.[59] The "Low Impact" scenario assumed the loss of the Sobeys business and the loss of 8% of business at other sponsors, resulting in a reduction of $42 million in gross margin.[60] The "Mid Impact" scenario assumed the loss of the Sobeys business and the loss of 13% of business at other sponsors, resulting in a reduction of $46 million in gross margin. [61] The "High Impact" scenario assumed the loss of the Sobeys business and the loss of 27% of business at other sponsors, resulting in a reduction of $56 million in gross margin.[62] The "No Impact" scenario assumed the loss of the Sobeys business and the loss of 100% of business at other sponsors, resulting in a reduction of $127 million in gross margin.[63]

94.    None of this modeling that was done by the L1 Canada employees showing the effect of Sobeys' departure was incorporated into the financial models provided to E&Y, or to the Rating Agencies, or to the lenders.

### C.    ADS's LoyaltyOne Segment: The BrandLoyalty Business

95.    BrandLoyalty, based in the Netherlands, was a global provider of purpose-driven, tailor-made, campaign-based loyalty solutions for grocers and other high-frequency retailers. In particular, BrandLoyalty designed, implemented, conducted, and evaluated innovative loyalty campaigns to reward key customer segments based on their spending levels during defined campaign periods. BrandLoyalty was a relatively low margin business.

96.    BrandLoyalty was purchased in a series of transactions from January 2014 through April 2016. On January 2, 2014, ADS purchased a 60% ownership interest in

---

[59]    *See id.*

[60]    *See id.*

[61]    *See id.*

[62]    *See id.*

[63]    *See id.*

BrandLoyalty in return for $259.5 million in cash. Effective January 1, 2015, ADS acquired an additional 10% ownership interest in BrandLoyalty for approximately $87.4 million, bringing its total ownership interest to 70%. Effective January 1, 2016, ADS acquired 10% ownership interest in BrandLoyalty Group B.V., or BrandLoyalty, for approximately $102.0 million, which brought its ownership interest to 80%. Effective April 1, 2016, ADS acquired the remaining 20% ownership interest in BrandLoyalty for approximately $258.8 million, which brought its ownership interest to 100%. In sum, ADS paid $707.7 million to acquire BrandLoyalty.

97.     ADS purchased its stake in BrandLoyalty primarily from Robert van der Wallen. In connection with the 2015 sale van der Wallen's 60% ownership interest in BrandLoyalty to ADS, van der Wallen entered into a four-year non-compete agreement. By 2019, however, van der Wallen had started a new venture, a company now called 'L Founders,' which started competing with BrandLoyalty. ADS alleged that van der Wallen had disparaged BrandLoyalty, and asked van der Wallen to cease and desist from poaching BrandLoyalty employees, which poached employees had numbered 30 at the time.

98.     In mid-2019, ADS began to explore a potential sale of the BrandLoyalty business. The code-name for the attempted sale of BrandLoyalty was "Project Bicycle." ADS's efforts to sell BrandLoyalty were not successful.

99.     Horn, then an executive with ADS, met with van der Wallen in the Netherlands in mid-2019 at van der Wallen's request. During that meeting, van der Wallen expressed an interest in re-acquiring the BrandLoyalty business, but at a low cost, in the tens of millions of dollars. ADS perceived significant risk to running a process to sell BrandLoyalty due to this interference (described herein) and abandoned its efforts.

D.   **FINANCIAL PERFORMANCE OF THE LOYALTYONE SEGMENT HAD BEEN CONSISTENTLY DECLINING FOR YEARS PRIOR TO THE SPINOFF TRANSACTION**

100.   Prior to the Spinoff Transaction, the LoyaltyOne segment had experienced consistent declines in revenue and earnings for several years, including well before any impacts from the COVID pandemic. The AIR MILES business, in particular, was and had been suffering the effects of an ongoing shift in the loyalty programs market, with industry analysts noting that it had "become increasingly cheaper for retailers to launch their own in-house loyalty programs," and that the major client departures from the AIR MILES program in 2020 and 2021 only "add[ed] fuel to the topic of [AIR MILES'] coalition program model dying a slow death in Canada." By early 2021, one of LoyaltyOne's own major sponsors acknowledged the AIR MILES program's declining relevance over the last several years, which it attributed to ADS's lack of investment in the AIR MILES program. These long-term trends had an outsized impact on the LoyaltyOne segment, as the AIR MILES business accounted for 67% of LoyaltyOne's adjusted EBITDA in 2019 and 77% in 2020.

101.   Among the issues that plagued the AIR MILES business were (i) the devaluation of points, (ii) AIR MILES's inability to truly benefit from the "big data" that AIR MILES possessed, (iii) the lack of marketing technology implementation, (iv) the inability to mix miles with money when booking travel, (v) the digital capabilities (i.e., website, app.) trailed competitors, and (vi) the inability to transfer points between "DREAM" and "CASH" programs.

102.   Prior to the COVID pandemic, between 2014 and 2019, LoyaltyOne's gross revenues (revenues before deduction of AIR MILES' cost of redemptions) decreased from $1.366 billion to $1.262 billion, with year-over-year declines in four out of five of those years. After the onset of the COVID pandemic in early 2020, gross revenue dropped to $973 million for

the fiscal year ended December 31, 2020 and further down to $959 million for the twelve months ending June 30, 2021.[64]

103.    Prior to the COVID pandemic, between 2014 and 2019, LoyaltyOne's adjusted EBITDA decreased from $339 million to $230 million, with year-over-year declines in four out of five of those years. After the onset of the COVID pandemic, adjusted EBITDA dropped to $171 million for the fiscal year ended December 31, 2020 and further down to $150 million for the twelve months ending June 30, 2021. Throughout these periods, adjusted EBITDA margins followed a similar trend prior to COVID, steadily declining from 24.1% in 2014 to 18.2% in 2019, and continued to decline after the pandemic began, falling to 17.6% for fiscal year ended December 31, 2020 and 15.6% for the twelve months ended June 30, 2021.

104.    As discussed herein, in late 2020, Sobeys informed ADS that it would elect to discontinue its participation in the AIR MILES program, and would exercise its early termination rights in 2022, prior to the expiration of its contract in 2023. At the same Sobeys informed ADS of its intent to terminate its contract, AIR MILES and LoyaltyOne were in the throes of a multi-year financial decline. Sobeys confirmed its intent to terminate in early 2021, and at no point thereafter did Sobeys indicate that it would change its mind notwithstanding ADS management's attempts to persuade Sobeys to renew its contract by making concessions on pricing. It was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination.

105.    Unfortunately, ADS turned a blind eye to the problem and did nothing to improve AIR MILES' prospects.

---

[64]    All figures in Paragraphs 30 and 31 are exclusive of contributions from the LoyaltyOne segment's Precima® retail analytics business, which was sold in January 2020, and inclusive of allocated corporate overhead expenses.

### E.   AFTER ADS UNSUCCESSFULLY ATTEMPTED TO SELL THE AILING BRANDLOYALTY AND AIR MILES BUSINESSES, ADS DEVISED A PLAN FOR A LEVERAGED SPINOFF OF THE LOYALTYONE BUSINESSES

#### 1.   ADS Focused its efforts to Spin-out the LoyaltyOne Businesses, allowing the Card Services business to improve its position

106.   After failing to sell the AIR MILES business as part of Project Angus, and failing to sell the BrandLoyalty business as part of Project Bicycle, ADS re-focused its efforts to separate the LoyaltyOne business from the Card Services business. Because the respective sales efforts had failed, ADS needed to consider alternative transactions to accomplish its goal.

107.   In February 3, 2021, the ADS Board was advised that a spinoff of LoyaltyOne was the best option for furthering ADS's objective of improving the prospects of its Card Services business.[65] At the time, the Card Services business had difficulty competing in the market because ADS's weak balance sheet resulted in increased scrutiny from the FDIC and limited capital available for large receivable portfolios. Further, the ADS Board was advised that ADS was leveraged to the point where the Card Services business could not practically operate over time given certain "key ratios." In this regard, a proposed spinoff of the LoyaltyOne businesses would deleverage ADS's corporate balance sheet, thus improving Card Services' prospects.

108.   The ADS Board was advised that a spinoff of LoyaltyOne was the best option because, among other things, (i) ADS would control the entire process itself and remove the scrutiny that inevitably would come with the involvement of a counter party and (ii) no [bank] regulatory approval for the spinoff would be required. The ADS Board was further advised that a

---

[65]   *See* LVR-001-0000011.

spinoff was the best option due to the financial benefits that would flow to the remaining Card Services business.[66]

109.    One such benefit was the improvement to ADS's "TCE/TA" ratio, which – as noted at the outset -- is the ratio of "Tangible Common Equity" divided by "Tangible Assets" ("TCE/TA Ratio"). "Tangible Common Equity" is measured by subtracting intangible assets (including goodwill) and preferred equity from a company's share value. In February 2021, ADS's TCE/TA Ratio was unfavorably low when compared with the TCE/TA Ratios of Card Services' competitors. In particular, the ADS Board was advised at its February 2021 meeting that ADS's 2021 estimated TCE/TA Ratio was 2.8%, which was about one quarter of Card Services' purported peers. However, if the LoyaltyOne business was spun-off (with ADS retaining ~20% of the post-spin equity of the LoyaltyOne business), it was projected that ADS's 2021 TCE/TA Ratio would improve immediately to 6.5%.

110.    At that February 3, 2021 ADS Board meeting, the ADS Board was also advised that a spinoff of the LoyaltyOne businesses could reduce Card Services' leverage by approximately $832 million. As of December 31, 2020, ADS's total debt was $2.806 billion, representing a 2.4x Total Debt to LTM EBITDA ratio. The $2.806 billion debt consisted of (i) its then outstanding 4.75% of senior notes in the amount of $850 million, (ii) its then outstanding 7.00% of senior notes in the amount of $500 million, and (iii) $1.456 billion of existing ADS Term Loan A loans.

111.    As the ADS Board was advised, however, after the spinoff of LoyaltyOne, ADS's total debt would be only $1.872 billion, representing a 1.7x Total Debt to LTM EBITDA ratio, based on 2021E Adjusted EBITDA of $1.08 billion. ADS's remaining post-spin debt would be

---

[66]      *Id.,* at 2.

comprised of (i) its then outstanding 4.75% of senior notes in the amount of $850 million, (ii) its then outstanding 7.00% of senior notes in the amount of $500 million, and (iii) $522 million of ADS Term Loan A loans.

112.    In the proposed spinoff, ADS's debt would be reduced by the proceeds of the funds that ADS would receive in the transaction. More specifically, the form of spinoff discussed at the February 3, 2021 ADS Board meeting provided for LoyaltyOne to borrow (i) $450 million under a New LoyaltyOne Term Loan B facility, and (ii) $382 million under a New LoyaltyOne Term Loan. The $832 million borrowed by LoyaltyOne would be paid to ADS and used to paydown its outstanding indebtedness, and in particular, the majority of the $1.354 billion outstanding Term Loan A.

113.    At the conclusion of the February 3, 2021 ADS Board meeting, the ADS Board authorized ADS's management to explore the spin of LoyaltyOne, including the AIR MILES and BrandLoyalty businesses.

114.    At the February 16, 2021 ADS Board Audit Committee meeting, Ballou, Gerspach, and Theriault "approved management's further work to determine the advisability of a spinoff transaction for the LoyaltyOne segment and directed management to report periodically back to the [Audit] Committee with additional information as that work progressed."[67] ADS management did just that, reporting back to the ADS Board Audit Committee on numerous occasions.[68]

---

[67]    BREAD-LVI-00256447.

[68]    *See, e.g.,* BREAD-LVI-00256434 (March 16, 2021 ADS Board Audit Committee meeting minutes); BREAD-LVI-00256452 (August 2, 2021 ADS Board Audit Committee meeting minutes); BREAD-LVI-00256454 (August 30, 2021 ADS Board Audit Committee meeting minutes); BREAD-LVI-00256458 (September 14, 2021 ADS Board Audit Committee meeting minutes); BREAD-LVI-00256464 (October 26, 2021 ADS Board Audit Committee meeting minutes).

115.    But, at no point after the ADS Board's February 3, 2021 meeting where it was advised that the spinoff of LoyaltyOne was the best option for ADS and its Card Services business, did ADS establish a conflicts committee or establish any ADS Board process to address the affiliate transactions that would ultimately be effectuated in the Spinoff Transaction. Moreover, LVI was not formed for several months after. LVI never even had its own counsel. The members of the LVI Board of Directors whose appointment was effective in conjunction with the closing of the Spinoff Transactions were not empowered to make a single meaningful decision relative to the Spinoff Transaction in the capacities as LVI Directors.

### F.    ADS'S INITIAL PRESENTATION TO THE RATINGS AGENCIES

116.    For purposes of exploring the spinoff of LoyaltyOne, ADS retained BofA Securities to provide guidance on financing options for the proposed transaction. On March 9, 2021, BofA Securities presented "Preliminary Financing Alternatives" for LoyaltyOne.[69] BofA Securities presented several different financing scenarios, with varying amount of Revolving Credit Facility, "Term Loan A", and "Term Loan B" financing, to result in cash available to transfer dividends to ADS ranging from $575 million to $775 million.[70] The presentation also calculated pro forma credit ratios based on December 31, 2020 total revenue and total adjusted EBITDA.[71] And the Liquidating Trustee is unaware of any evidence that BofA Securities knew that Sobeys had advised ADS that it would terminate the Sobeys PPA in 2022, BofA Securities' "Preliminary Financing Alternatives" for LoyaltyOne was, therefore, based on incomplete information.

---

[69]      *See* LVR-001-0000409.

[70]      *Id.*

[71]      *Id.*

117.    ADS initially chose to pursue "Term Loan B" financing for the proposed LoyaltyOne spin, and sought to obtain preliminary, known as "indicative," ratings for both the spinoff entity and the proposed Term Loan B from Moody's and Standard & Poor's ("S&P" and with Moody's, the "Ratings Agencies").

118.    On April 19, 2021, and April 20, 2021, ADS management met via teleconference with Moody's and S&P, respectively. During these telephonic meetings, ADS presented a single presentation, the "April Rating Agency Presentation"[72] to both Ratings Agencies.

119.    The April Rating Agency Presentation stated that the contemplated spinoff was predicated on a $700 million "Term Loan B", all of which would be used to fund a dividend to ADS.[73]

120.    According to the April Rating Agency Presentation, the spun-off LoyaltyOne business would have an opening cash balance of $256 million as of December 31, 2021, as well as access to a new, undrawn $100-125 million secured revolving credit facility.[74] Further, post-spin LoyaltyOne would have $203 million in adjusted EBITDA, which would result in a 3.4x Total Debt to Pro Forma Adjusted EBITDA Ratio and a 2.2x Net Total Debt to Pro Forma Adjusted EBITDA.[75]

121.    The projected financials for the spun-off LoyaltyOne in the April Rating Agency Presentation were based on an assumed a CAD/USD exchange rate of 0.7916 and EUR/USD exchange rate of 1.2075 throughout the projection period," 2021 through 2025.[76]

---

[72]    *See* LVR-001-0000030.

[73]    *See* April Rating Agency Presentation, at 7.

[74]    *Id.*

[75]    *Id.*

[76]    *Id.*, at 52.

122.    Importantly, in the April Rating Agency Presentation, ADS identified BMO and Sobeys as "Key Brands" for the AIR MILES Reward Program,[77] but did not disclose that Sobeys had already relayed its intention to terminate its contract by the end of 2022, and that ADS had not been able to find a replacement. The April Rating Agency Presentation also touted Sobeys as one of the "Premium Sponsors" of AIR MILES and as part of AIR MILES's "Deep and Long-Term Relationships with Customer Base."[78] The only mention of customer renewals in the April Rating Agency Presentation was a reference to "Protecting the Stable Base" in reference to the BrandLoyalty business.[79]

123.    During the telephonic meetings with Moody's and S&P during which ADS presented the April Rating Agency Presentation, follow-up communications focused on, among other things, client relationships and "geographic concentration,"[80] but again ADS did not inform the Ratings Agencies that Sobeys relayed its intention to terminate its contract in 2022. Further, the Liquidating Trustee is unaware of any evidence that Bank of America, N.A. knew that Sobeys had advised ADS that it would terminate the Sobeys PPA in 2022.

124.    On May 3, 2021, Moody's provided an indicative corporate rating for the spun-off LoyaltyOne business of B1 and a Term Loan B rating of B1. On May 4, 2021, S&P provided an indicative corporate rating of B+ and a Term Loan B rating of BB-.

G.    **ADS APPROVES OF THE PUBLIC ANNOUNCEMENT OF THE SPINOFF TRANSACTION**

125.    With the knowledge that Sobeys would not renew its contract and would terminate its existing contract in 2022, the ADS Board, through all of its members and without

---

[77]    *Id.*, at 14.

[78]    *Id.*, at 41.

[79]    *Id.*, at 46.

[80]    *See* LVR-001-0000060.

any input from LVI's prospective board members or other third-party persons, actively participated in the Spinoff Transaction's approval process. At the May 6, 2021 ADS Board meeting, attended by Andretta, Ballou, Gerspach, Theriault, Tucker, Turney, as well as non-ADS Board member Motes, the ADS Board received a briefing on what would become the Spinoff Transaction.[81]

126.   Following the provision of the Moody's and S&P indicative ratings, on May 11-12, 2021, the ADS Board held a regularly scheduled quarterly meeting. Attending that meeting were, *inter alia*, all of the members of the ADS Board, namely, Andretta, Ballou, Gerspach, Natarajan, Theriault, Tucker, and Turney, as well as Motes.[82] Beberman also attended the meeting as a guest.[83]

127.   On the first day of the meeting (on May 11, 2021), the ADS Board Audit Committee meet in person. Attending that meeting were, *inter alia*, the members of the ADS Board Audit Committee.[84]

128.   Following that ADS Board Audit Committee meeting, the ADS Board met in full and approved pursuing the contemplated Spinoff Transaction. Prior to the approval, the ADS Board received a presentation outlining the then proposed transaction (the "May 2021 ADS Board Presentation").[85]

---

[81]   *See* BREAD-LVI-00256485.

[82]   *See* LVR-001-0000063.

[83]   *Id.*

[84]   *See* LVR-001-0000063.

[85]   *See* LVR-001-0000060.

129.    The May 2021 ADS Board Presentation reiterated and repeated the strategic rationale for the proposed spinoff that had been set forth in February 2021, including, among other things, that:

a.    Card Services' weak balance sheet both (a) drew increased scrutiny from the FDIC as to the Card Services' business and (b) "hampered Card[ Services]'s regulatory initiatives;

b.    ADS needed to consider "alternative transactions" in light of the failed sale of LoyaltyOne, and such transactions needed to address ADS's corporate leverage, which exceeded "where Card [Services] wants to operate over time given 'key ratios'";

c.    A spinoff would reduce ADS's leverage by $700 million (thereby improving ADS's leverage ratio and also "improve[] the TCE/TA ratio" so as to "position[] Card [Services] closer to its peers by 2022."

d.    ADS would have complete control over a spinoff of LoyaltyOne, without the need for a counterparty; and

e.    No regulatory approval of the spinoff would be required.[86]

130.    The May 2021 ADS Board Presentation further outlined the pro forma capital structure for the LoyaltyOne spinco.[87] That structure called for a $700 million "Term Loan B", with a 3.5x LTM EBITDA ratio, based on $202 million pro forma 2021 Adjusted EBITDA.[88] That structure also described the "Term Loan B" as having a L+325 bps coupon (i.e., LIBOR plus 3.25%), with 0% LIBOR floor (i.e., resulting in a coupon rate of 3.25%), and a 99.5 OID (representing 99.5% of the principal amount of the "Term Loan B" being actually loaned by the lenders).[89] As set forth in the presentation, the $700 million Term Loan B would be used entirely to fund a dividend to ADS.

---

[86]    *Id.*, at 13.

[87]    *Id.*, at 17.

[88]    *Id.*

[89]    *Id.*

131.    The $700 million dividend would be used to pay down ADS's debt and therefore, as noted above, enable ADS to improve its "key ratios." Specifically, the May 2021 ADS Board Presentation projected that ADS's TCE/TA Ratio would improve from 0.3% (as of December 31, 2020) to 7.1% "Post-Spin 81% L1 (2021E)."[90] Further, ADS's total debt would be reduced from its then $2.8 billion to $2 billion, causing a reduction of the Total Debt to LTM EBITDA ratio from 2.4x to 1.5x.[91] These amounts would then be further improved upon ADS's disposal of its initially retained stake of ~20% of LoyaltyOne.

132.    The May 2021 ADS Board Presentation also projected that the spun-off LoyaltyOne's liquidity would consist of Cash (amount TBD) and new $125 [million] revolver."[92]

133.    Upon the review of the materials and any discussion of the proposed spin at the meeting, the ADS Board approved what would become the Spinoff Transaction. The next day, May 12, 2021, ADS publicly announced its intention to spin off its LoyaltyOne segment.

134.    On May 12, 2021, ADS issued a press release announcing that ADS would separate the Card Services business from the LoyaltyOne businesses.[93]

135.    In the months that followed the formal announcement of what would become the Spinoff Transaction, the ADS Board was periodically informed of the progress of the transaction. But since the ADS Board only met quarterly, with the next scheduled ADS Board meeting to occur on September 14 & 15, 2021, the ADS Board delegated responsibility for the oversight of the progress to the Spinoff Transaction to the ADS Board Audit Committee.

---

[90]    *Id.,* at 18.

[91]    *Id.,* at 16.

[92]    *Id.,* at 20.

[93]    *See*   https://www.prnewswire.com/news-releases/alliance-data-to-separate-card-services-and-loyalty-businesses-301289492.html.

136.    On September 15, 2021, the ADS Board received an update on what would become the Spinoff Transaction.[94] Mr. Beberman led the presentation to the ADS Board regarding the status of the spinoff.[95] According to the minutes of this ADS Board meeting, "Beberman noted that the original transaction thesis remained intact and that the transaction was progressing as-planned and on-target."[96] Also, the minutes of this ADS Board meeting reflect that

> Beberman explained that EY Capital Advisors had been engaged to independently advise [ADS] with respect to the terms and execution of the SpinCo debt raise and related matters. A detailed question-and-answer session followed regarding the spinoff, the risks and benefits associated therewith, the SpinCo debt raise, the tax consequences and allocation of tax-related assets and other transaction-related details.[97]

137.    None of the ADS Board meeting minutes at anytime after January 2021 through the date of the Spinoff Transaction indicate that Sobeys had reversed course and (a) that Sobeys would renew its contract in February 2023, or (B) that Sobeys would **not** terminate its contract by the end of 2022. Additionally, none of the Board meeting minutes indicate that ADS had found a like-kind replacement for Sobeys.

### H.    ADS FORMS LVI WHILE FORCING ITS "SPIN TEAM" TO THE SIDELINES

138.    On June 21, 2021, ADS (through its management) caused LVI to be incorporated in Delaware as ADS's wholly owned, indirect subsidiary.

139.    ADS appointed Motes to be the sole member of the Board of Directors of LVI (the "LVI Board"). Motes was the Executive Vice President, Chief Administrative Officer, General Counsel and Secretary of ADS and had held various senior executive positions at ADS

---

[94]    *See* BREAD-LVI-00256227.

[95]    *Id.*

[96]    *Id.*

[97]    *Id.*

since 2015. Motes remained employed by ADS, and under its control, for the duration of his time as the Director of LVI.

140.    ADS appointed the "Spin Team" on June 21, 2021.[98] The "Spin Team" was comprised of the following persons: (i) Horn as (A) <mark>Executive Vice President and Senior Advisor of ADS and ADS Alliance Data Systems, Inc. through 11:59 p.m. (Eastern Time) on November 5, 2021</mark>, and (B) Chief Executive Officer and President of LVI; (ii) Chesnut as (A) <mark>Senior Vice President and Senior Advisor of ADS and ADS Alliance Data Systems, Inc. through 11:59 p.m. (Eastern Time) November 5, 2021</mark>, and (B) Executive Vice President, Chief Financial Officer of LVI; (iii) Laura Santillian as (A) <mark>Senior Vice President and Chief Accounting Officer of ADS and ADS Alliance Data Systems, Inc. through 11:59 p.m. (Eastern Time) November 5, 2021</mark>, and (B) Senior Vice President, Chief Accounting Officer of LVI; (iv) Jeffrey L. Fair as (A) <mark>Senior Vice President, Tax of ADS and ADS Alliance Data Systems, Inc. through 11:59 p.m. (Eastern Time) November 5, 2021</mark>, and (B) Senior Vice President, Tax of LVI; (v) Hageman as (A) <mark>Senior Vice President, Assistant General Counsel and Assistant Secretary of ADS and ADS Alliance Data Systems, Inc. through 11:59 p.m. (Eastern Time) November 5, 2021</mark>, and (B) Executive Vice President, General Counsel & Secretary of LVI; (v) Jeffrey C. Tusa as (A) an employee of ADS, and (B) Senior Vice President and Treasurer of LVI.[99]

141.    From June 21, 2021 through the date of the Spinoff Transaction, none of Motes or any of the Spin Team members retained any legal or financial advisors on behalf of LVI to advise them concerning the impact of the Spinoff Transaction on LVI, including whether LVI could sustain the heavy debt load that ADS was targeting. Motes disregarded contrary advice from members of ADS's management who were knowledgeable about the LoyaltyOne business

---

[98]    *See* REV-LVI-000000066, at p. 129.

[99]    *See* BREAD-LVI-00256229; REV-LVI-000000066, at p. 129.

segment and never held a single board meeting for the LVI Board. Instead, Motes allowed ADS and its advisors to dominate and drive the process while Motes rubber-stamped ADS's plans through written consents without concern for the interests of LVI.

142.    As early as March 2021, ADS had assembled a team of historical ADS management members to serve as LVI's senior management (the "Spin Team"). Among others, the Spin Team included Horn, who was slated to become LVI's President and Chief Executive Officer. Horn who had been the CFO and later a senior advisor at ADS, and had announced his retirement in 2018. However, he then agreed to continue in a transitional role and assist ADS's efforts to sell the LoyaltyOne businesses. The other Spin Team members were primarily direct reports to ADS's most senior executives.

143.    In the months leading up to the Spinoff Transaction, it became clear that the ADS Board and ADS's senior management did not trust the Spin Team to deliver a Spinoff Transaction that was sufficiently favorable to ADS, and therefore did everything they could to strong arm and dictate the terms of the transaction without regard to its effect on LVI. Given their subordinate and conflicted positions, the Spin Team members who would become LVI's leadership had no power to shape the terms of the transaction in LVI's interests.

144.    ADS retained its own legal advisors for the transaction, led by Davis Polk & Wardwell LLP, and engaged Bank of America, N.A. to be the lead arranger of LVI's debt financing. However, as noted above, ADS (through Andreta, Motes and Beberman) did not permit LVI to have its own legal or financial advisors, refusing to pay for legal and financial advisors to LVI.

145.    Among other unfortunate results of ADS's and Motes's disregard of LVI's interests and LVI's lack of independent advisors, the Spinoff Transaction's structure caused LVI

to borrow money in the United States, denominated in U.S. dollars, despite the fact that practically all of the LVI business is conducted outside the United States, with AIR MILES' revenue in Canadian Dollars and BrandLoyalty's revenue principally in Euros. As a result, LVI's operating subsidiaries would be liable for Canadian and European income taxes but would not be able to deduct any part of the interest expense on the debt from their income for tax purposes in those jurisdictions. In addition, the need to repatriate cash from those jurisdictions to the United States for debt service would cause additional taxes and other cash costs for LVI (*e.g.*, the AIR MILES operating subsidiary in Canada is liable for withholding taxes of 5% to 15% on funds repatriated to the United States), while also exposing it to foreign exchange risks for which no natural hedges existed. ADS nonetheless proceeded with the debt raise in the United States despite the extremely inefficient capital structure it would thrust upon LVI because ADS's ultimate goal was not to secure appropriate financing for LVI but to maximize the pay down of ADS's own U.S.-dollar denominated debt.

### I. ADS ATTEMPTS TO INCREASE AMOUNTS PAID TO ADS IN THE SPINOFF TRANSACTION

146. On July 6, 2021, Beberman joined ADS as its Chief Financial Officer. As noted above, Beberman had been employed by Bank of America Corporation prior to joining ADS.

147. As Andretta declared to the members of the ADS Board Audit Committee, by August 6, 2021, Beberman "established himself as firmly the client and in-charge" of the Spinoff Transaction.[100] ADS Board Audit Committee member Gerspach applauded Beberman's control over the Spinoff Transaction, commenting "[m]uch more in line with my expectations."[101]

---

[100]    BREAD-LVI-00036678.

[101]    BREAD-LVI-00036680.

148.    Over the next two months, Beberman and Andretta unilaterally pushed for terms of the Spinoff Transaction that were even more favorable to ADS in advance of an August 30, 2021 meeting of the ADS Board Audit Committee, where the size of the dividend to be paid at the time of the spin would be discussed.

149.    On July 23, 2021, BofA Securities hosted a "LoyaltyOne Financing Discussion", at which it reviewed written materials (the "July BofA Securities Presentation").[102] At the outset of the presentation, BofA Securities presented a "Transaction Overview", noting that – at that time – "LoyaltyOne expected to raise $700 million of debt financing in the form of a Term Loan B to fund a dividend to ADS."[103] In this regard, BofA Securities summarized the key terms of the proposed transaction as follows in **Table 2**:

**Table 2**

| (USD in millions) | |
|---|---|
| Adj. EBITDA | $203 (LTM 12/31/21E) |
| Gross Leverage | 3.4x (LTM 12/31/21E) |
| Revolver | $100 - $125 (5-year maturity) |
| Term Loan B Gross Debt | $700 (, 7-year maturity) |
| LVI Cash at 12/31/21E | $256 |
| Payment to ADS | $700 |

Source: *See* LVR-001-0000413 (July BofA Securities Presentation), at 4.

150.    On August 2, 2021, the ADS Board and its Audit Committee held a meeting, which Motes and Horn attended. During the meeting, ADS pushed for LVI to both take a higher debt load and provide a cash transfer of $100 million to ADS prior to the spin, thus substantially reducing LVI's initial liquidity below the level that had been assumed both (a) in the April 2021 presentation to the Ratings Agencies, and (b) in the July BofA Securities Presentation provided

---

[102] *See* LVR-001-0000413.

[103] *Id.*, at 6.

just weeks earlier. Horn urged ADS not to increase LVI's contemplated debt load and not to increase the cash transfer to $100 million, as such changes would worsen LVI's capital structure and liquidity.

151.    The August 2, 2021 meeting became confrontational between Horn and Andretta. Gerspach, the chair of the ADS Board Audit Committee and leader of the meeting, ultimately intervened and asked that Horn leave the meeting. From that point on, Horn was effectively sidelined and prohibited from participating in spin-related meetings with ADS leadership. Gerspach informed Horn that Beberman would have oversight of the Spinoff Transaction going forward, including interacting with BofA Securities directly concerning the debt raise.

152.    While the minutes of this ADS Board Audit Committee meeting do not reference the retention of an external consultant to advise ADS on the capital structure and debt capacity of what would become LVI,[104] the ADS Audit Committee resolved to do just that.

153.    One week later, on August 9, 2021, BofA Securities provided ADS with a new set of "Discussion Materials", which now presented three different financing scenarios.[105] The different scenarios included varying amount of revolver ($50 million to $125 million) and "Term Loan B" financing ($600 million to $800 million), with resulting dividends to ADS ranging from $756 million to $906 million.[106] BofA Securities noted that the dividend to ADS was "the size of the Term Loan B [plus] projected cash balance as of 12/31/21E [less] cash on LoyaltyOne balance sheet."[107]

---

[104]    *See* BREAD-LVI-00256452.

[105]    *See* LVR-001-0000417.

[106]    *Id.*

[107]    *Id.*

154.    In the August 9, 2021 Discussion Materials, BofA Securities acknowledged that the customer concentration within the AIR MILES segment posed a "challenge" for Moody's ratings of the SpinCo, in that the "top 5 sponsors represent around 90% of revenue."[108] The BofA Securities presentation further noted that the Moody's ratings would likely drop in response to "declining scale, as a result of either a challenging industry environment or *through the loss of key customers.*" Notwithstanding BofA Securities' understanding of these risks, the written presentation makes no reference to the fact that ADS had known since January 2021 that Sobeys' intended to terminate its contract with LoyaltyOne in 2022.

155.    As ADS continued to investigate ways in which it could increase the amount of the spin-related dividend, Horn emailed Andretta and Beberman on or around August 13, 2021 and informed them that BrandLoyalty's performance was projected to worsen in FY2021. Undeterred by these warning signs, Beberman responded by telling members of the Spin Team that, per Andretta, "the purpose of the spin is to maximize the value for RemainCo, while still putting out a minimum viable [LVI]." Beberman repeated this view several times during meetings in the following days.

156.    On August 27, 2021, BofA Securities hosted an organizational call. On the August 27, 2021 call, BofA Securities reviewed written materials concerning the "Sources and Uses and Pro Forma Capitalization" for the LoyaltyOne segment in connection with the spin. BofA Securities noted that LoyaltyOne now intended to fund a $700 million dividend to ADS in conjunction with the spin through a combination of a new Term Loan B and cash. In so doing, BofA Securities presented the targeted debt raise / cash contribution to the dividend as set forth in **Table 3**:

---

[108]    LVR-001-0000417 at 2.

**Table 3**

| (USD in millions) | |
|---|---|
| Adj. EBITDA | $187 (Pro Forma 12/31/21E) |
| Gross Leverage | 3.2x to 4.5x (LTM 12/31/21E) |
| Revolver | $100 (5-year maturity) |
| Gross Debt | $600-650 (all [Term Loan B], 6-7-year maturity) |
| Cash Swept by Parent | $50-100 |
| LVI Cash at 12/31/21E | $137-187 |
| Payment to ADS | $700 |

Source: LVR-001-0000422 (August BofA Securities Presentation), at 3.

157.     Thus, in a little over a month, LoyaltyOne's projected Adjusted EBITDA for 2021 had decreased by approximately $16 million, and the amount of the Term Loan and Lending Facility that LVI sought had also been decreased. What remained the same, however, was the amount of the planned dividend to ADS, which would necessarily leave LoyaltyOne with less cash to fund its operations and repay its new debt obligations.

158.     Also, around this time, Andretta set his sights on a substantial potential tax litigation proceeds that rightfully belonged to L1 Canada, and thus LVI. L1 Canada, which serves as the primary operating company for AIR MILES, had made certain income tax payments as a result of assessments by Canada Revenue Agency from 2013-2016. There was and is ongoing litigation with the Canadian tax authorities over these payments, and in the time leading up to the Spinoff Transaction, it was believed that the Canadian tax authorities could refund between CAD 75 million and CAD 80 million to L1 Canada in 2024 or thereafter, if L1 Canada is successful in its litigation.[109] This was unacceptable to Andretta and others on the ADS board, and they determined that ADS would take the benefit of these tax litigation proceeds from LVI by creating a tax matters agreement between ADS and LVI (which LVI signed on

---

[109]     Adjudication between L1 Canada and Canada Revenue Agency on the potential tax refund is presently scheduled to be heard in October 2024.

behalf of L1 Canada) for LVI to pay the tax litigation proceeds over to ADS upon receipt, further depriving LVI of much needed cash.

1.    **E&Y Issues a Fundamentally Flawed Report Related to LoyaltyOne's Debt Capacity**

159.    As noted above, on August 2, 2021, the ADS Board Audit Committee resolved to retain an external consultant to advise on the capital structure and debt capacity of what would become LVI. But the work that would be done by such a consultant would be just window-dressing as both the time-frame and the budget for such work was woefully inadequate. The short time-frame and limited budget ultimately impacted the reliability and integrity of the hastily produced work product.

160.    After the August 2, 2021 ADS Board Audit Committee meeting, Beberman asked for recommendations and received several names including Evercore, Guggenheim, and E&Y. Beberman reached out on August 10, 2021, to E&Y about potentially engaging E&Y.[110] And ADS/Bread and E&Y did not even execute an engagement letter until August 18, 2021, at the earliest.[111] Thus, E&Y's work did not begin in earnest until no earlier than August 18, 2021 at 9:46 pm.[112] A deciding factor in Beberman's decision to retain E&Y was price, insofar as E&Y submitted the lowest bid, and was projected to run between $350k and $500k.

161.    In conducting their review, E&Y employees reviewed certain documents and met twice with Chesnut and Tusa to understand the AIR MILES and BrandLoyalty businesses.[113] The first meeting lasted an hour and the second lasted only 30 minutes.[114] In Chesnut's view, "EY

---

[110]    BREAD-LVI-00176493.

[111]    BREAD-LVI-00251810.

[112]    BREAD-LVI-00181648.

[113]    *See* LVR-001-0000105.

[114]    *Id.*

was fundamentally unfamiliar with the L1 [i.e., L1 Canada] segment," and asked basic, foundational questions about relevant terms and aspects of LoyaltyOne's business.[115] At no point during either meeting with Chesnut and Tusa did E&Y's employees ask about the cash levels needed to run the business, or the seasonality associated with the cash flows.[116] According to Chesnut, E&Y "seemed (in the [ADS Board Audit Committee meeting]) to have the impression that the Canadian inflows offset the [BrandLoyalty] outflows, so it was a working capital neutral business, which is not accurate."[117]

162.    On August 25, 2021, Chesnut sent Tusa and Taffe a set of "talking points" for discussions with E&Y.[118] Those talking points reflect that there was "[n]o official downside case." [119] The talking points also reflect that the "[s]evere downside in AMRP [a/k/a AIR MILES] would be a non-renewal by BMO or Sobey's."[120] The talking points also state with respect to Sobeys "[m]ust let us know 12 months out (Feb of 22)," "[w]ould likely be a province by province pull out," and that ""AMRP would patch grocery together through Save-On, IGA, and Metro. Would leave Atlantic Canada without coverage but it's a low-population area…"[121]

163.    On Sunday, August 29, 2021, E&Y issued its final report (the "E&Y Report" or "E&Y Rpt.") to the ADS Board Audit Committee. The E&Y Report was issued a mere eleven calendar days, and only seven business days, after E&Y started its work on the E&Y Report.

---

[115]    *Id.*

[116]    *Id.*

[117]    *Id.*

[118]    LVR-001-0000421.

[119]    *Id.*

[120]    *Id.*

[121]    *Id.*

164.    To begin, the E&Y Report stated that "[t]he capital structure and financial policies of [the LoyaltyOne] SpinCo should ideally result in an initial rating no lower than B1/B+ (with stable outlooks) from Moody's and S&P."[122] The E&Y Report also stated that the LoyaltyOne "SpinCo should have sufficient liquidity at the onset to (a) fund working capital, (b) provide cushion for weaker business conditions, including sponsor exits, and (c) finance future growth," and opined that "the amount of total liquidity (consisting of initial cash balance + available Revolver capacity) that SpinCo needs to service the business is approximately $225-250 [million] based on comparable company analysis, downside financial modeling and prospective inorganic growth strategy."[123]

165.    The E&Y Report ultimately concluded that the LoyaltyOne SpinCo could bear a debt level "in the $650 [million] to $700 [million] range" while both (a) "maintaining sufficient flexibility to run the business" (including "ample cash flow") and (b) providing "an acceptable total dividend amount" to ADS.[124] While the ADS Board later relied on E&Y's opinions, E&Y's analysis was flawed in multiple ways.

166.    <u>First</u>, the E&Y Report's conclusions were based on repeated projections of significant improvements in free cash flow generation, as well as significant improvements of free cash flow as a percentage of EBITDA, during the years 2022 through 2026.[125] Based on those projections the E&Y Report stated that the LoyaltyOne "SpinCo" would have "Significant Free Cash Flow Generation."[126] E&Y even presented a bar chart, reflecting growing 'Free Cash

---

[122]    E&Y Rpt., at 2.

[123]    *Id*., at 3.

[124]    *Id*., at 8.

[125]    *Id*., at 4.

[126]    *Id*., at 5.

Flow' during 2022 through 2026. However, E&Y's free cash flow analysis did not include the required 'Term Loan B' amortization payments or the excess cash flow transfer that ADS projected would be included with the Term Loan B.[127]

167.    Second, while the E&Y Report correctly recognized that "customer concentration," "[u]pcoming major contract renewals", and "lack of comparable companies" represented business and market risks warrant[ing] some conservativism on capital structure,"[128] no mention was made of the fact that ADS's management had advised the ADS Board in January 2021 of Sobeys' intention to terminate by the end of 2022, and the corresponding reduction in cash flows that would result from Sobeys' departure from LoyaltyOne's business – despite internal forecasts that had already been created at the time showing the significantly reduced cash flows discussed above.

168.    Third, E&Y's analysis did not consider any perceived risk in connection with foreign exchange rates, notwithstanding the fact the repatriation of cash from Canada and Europe to the United States for debt service would cause additional taxes and other cash costs for LVI as well as exposing it to foreign exchange risks for which no natural hedges existed.[129]

169.    The E&Y Report did contain what E&Y characterized as a "simulated downside scenario in FY22 and FY23, [where] SpinCo continues to generate cash."[130] In the "downside scenario," E&Y assumed that a 20% year over year drop in 2022 estimated adjusted EBITDA followed by a further 10% year over year drop in 2023 estimated adjusted EBITDA.[131] Here,

---

[127]    See LVR-001-0000109.

[128]    See E&Y Rpt., at 7, 8.

[129]    See id., at 7.

[130]    E&Y Rpt., at 10.

[131]    Id.

E&Y concluded that such a scenario "would have an impact on LoyaltyOne's cash flow," but "the company would remain FCF-positive and continue building liquidity."[132]

170.    The "downside scenario" however, remained flawed in that Sobeys had advised ADS that it would terminate by the end of 2022, robbing the LoyaltyOne business of AIR MILES' second-largest customer. Thus, the base case scenario should have assumed that Sobeys would terminate in 2022, which would have already had a 20%+ year over year impact on adjusted EBITDA, and any reasonable downside scenario would have had to assume a downside from there, but E&Y's "downside scenario" did not. E&Y's "downside scenario" was, at best, a momentum case, where the LoyaltyOne business would keep doing what ADS's management hoped the business would do, but with continuing decreases in revenue.

171.    E&Y's "downside scenario" was also flawed in other respects. First, E&Y's "downside scenario" double counted $31 million in cash to be generated in 4Q 2021, when the build already included $125 million in cash. Second, E&Y's "downside scenario" only included $7 million in amortization payments per year on the "TLB" or the "Term Loan B" indebtedness. This dramatically underestimated the 7.5% annual amortization payments that were ultimately imposed on the $175 million "Term Loan A" and on the $500 million "Term Loan B." During the Q4 2021 alone, LVI was to pay $12,656,250 in amortization payments on account of the Term Loan A and Term Loan B, almost double the $7 million *annual* amortization payment used in the E&Y Report. Additionally, during calendar year 2022, LVI was to pay $48,296,032 in amortization payments on account of the Term Loan A and Term Loan B, almost seven times the $7 million used in the E&Y Report. In this regard, E&Y's downside scenario projections did not

---

[132]    *Id.*

come close to reflecting the terms that LVI was required to accept in the Spinoff Transaction, a point that the ADS Board never revisited prior to its final approval of the Spinoff Transaction.

172.    Additionally, the E&Y Report did not specifically state what figure it was using for 2021E Adjusted EBITDA. When analyzing the report, Chesnut later estimated that E&Y was using $180 million of EBITDA by using the downside scenario estimates.[133] Under Chesnut's reasoning, E&Y calculated that if a 2021E Adjusted EBITDA was reduced by 20% for 2022E, the resulting 2022E Adjusted EBITDA would be $145 million. Thus, E&Y assumed 2021E Adjusted EBITDA of $181.25 million.

173.    Finally, in all cases, the E&Y Report assumed that all of the EBITDA, as well as the corresponding deductions for the interest, taxes, depreciation, and amortization, as well as capital expenditures would be paid in the fourth quarter of 2021. That is nonsensical. Moreover, the E&Y Report did not explain how LVI would start with $125 million in free cash and then add $31 million in cash during 4Q 2021.

### 2.    The Spin Team Voiced Concerns Regarding the E&Y Report

174.    Beberman shared the E&Y Report with Chesnut the day that it was issued, August 29, 2021.[134] Later that day, Chesnut emailed Beberman to share his observations on the E&Y Report. Additionally, on Monday, August 30, 2021, Chesnut spoke with Beberman about those observations on the E&Y Report, including that E&Y was using inflated EBITDA figures that skewed the amount of debt that E&Y was recommending could be incurred while limiting LVI's leverage ratio to 4 times (i.e., 4x).[135]

---

[133]    *See* LVR-001-0000105.

[134]    LVR-001-0000105.

[135]    *Id.*

175.    On the morning of August 29, 2021, Chesnut emailed Jason Morris and Scott Tolchin of BofA Securities, asking for feedback regarding the Term Loan B amortization rate.[136] In his email, Chesnut expressed concern that E&Y's Free Cash Flow analysis was based upon, among other things, a "typical [amortization] level like 1%."[137] Tolchin responded to Chesnut's email (with a copy to Tusa) stating that he "would guess 5% on the amort[ization]" rate, which was substantially higher than the E&Y model (but still less than what was ultimately agreed).[138] Tolchin further advised that "it makes sense to model 5% amortization per annum."[139]

176.    In response to the August 29, 2021 emails regarding a 5% amortization rate, Tusa reminded Chesnut the presentation to the Ratings Agencies showed EBITDA less capex only, and stated that the "[i]ncremental ~$25 [million] of amo[rtization] hurts."[140] Chesnut agreed that the information was "[t]ough but good to know before tomorrow so we can speak to it. Wonder if E[&]Y has factored that in to their analysis."[141]

177.    While Chesnut and Tusa were analyzing the amortization rate, on the afternoon of August 29, 2021, Beberman called Chesnut after conferring with key members of the ADS Board and ADS's management—including Andretta, Gerspach, and Ballou. On the call, Beberman pressured Chesnut to continue pushing for completion of the Spinoff Transaction on the terms that ADS demanded. Beberman told Chesnut "you need to get your guy [i.e., Horn] on board or else you won't like where this goes."

---

[136]    LVR-001-0000241.

[137]    *Id.*

[138]    *Id.*

[139]    *Id.*

[140]    *Id.*

[141]    *Id.*

178.     Chesnut, however, continued to push back on certain of Beberman's demands. Prior to the August 30, 2021 ADS Board Audit Committee meeting, Chesnut asked Beberman to reduce the proposed cash transfer to $50 million (rather than $100 million that E&Y had modeled and which ADS desired).[142] Chesnut further asked Beberman to highlight for the ADS Board Audit Committee that BofA Securities was now "guiding" to a 5% amortization rate ($35 million/year) rather than the 1% ($7 million/year) modeled by E&Y.[143] This change would substantially frontload LVI's debt service obligations and reduce LVI's liquidity during the course of the loan. Chesnut characterized the increase to a 5% amortization rate as a "notable development", and observed that "BofA [Securities] projecting that enhanced amortization may be needed to drive demand and help the deal clear the market."[144] Chesnut also observed that increasing to a 5% amortization rate would cause a drag on free cash flow of $28 million more than what had been modeled.[145] Chesnut acknowledged that increasing the amortization rate to 5% "may help make the TLB more attractive to investors, it will notably reduce Spinco's FCF and liquidity as a result."[146] Chesnut also observed that it was "unclear if/how E[&]Y modeled the typical 1% amortization in their FCF analysis, since it's not included in the calculation on page 5 [of the E&Y Report]."[147] Chesnut also wrote that the step-up in cash outflows required with a 5% amortization rate versus a 1% amortization rate "may impact the assessment of Spinco's cash and liquidity needs."[148]

---

[142]     *See* LVR-001-0000237.

[143]     *Id.*

[144]     *Id.*

[145]     *Id.*

[146]     *Id.*

[147]     *Id.*

[148]     *Id.*

179.    Beberman, however, disregarded Chesnut's concerns, stating that Andretta and the ADS Board's view was that "the point of spinning LoyaltyOne is to maximize the value for RemainCo," and although extracting a dividend of $750 million from LVI concededly "puts the Spin Team in a tough spot," "if [they] wanted a smooth outcome at the [ADS Board] Audit Committee meeting, the Spin Team should line up behind delivering at least $750 million [including] at least $100 million of cash."[149]

180.    In a call with Beberman prior to the ADS Board Audit Committee meeting, Chesnut observed that BofA Securities had repeatedly stated that the market would look to LTM 7/31/21 adjusted EBITDA of $160 million, which using a 4x ratio, would suggest $640 million of debt capacity.[150] However, Chesnut explained that E&Y was using $180 million of Adjusted EBITDA to calculate a debt level of 4x that figure, or $720 million, which framed E&Y's debt recommendation of $650 – 700 million. Chesnut informed Beberman that "[t]he risk of raising more than $640 [million] is that the leverage ratio at-spin will be immediately higher than 4x, unless/until the business' EBITDA grows and the leverage ratio comes down."[151]

181.    On the cash balance for LVI, at spin, Chesnut also noted to Beberman that "E[&]Y likely arrived at their recommendation by taking the average global [LoyaltyOne] cash balance of $225mm, and allocating $100 [million] to ADS, so $125 [million] remaining at spinco."[152] But Chesnut "noted that E[&]Y did not perform diligence with [Chesnut] (or anyone in treasury to [Chesnut's] knowledge) on the cash flows and seasonality of the [BrandLoyalty]

---

[149]    LVR-001-0000105.

[150]    *Id.*

[151]    LVR-001-0000105.

[152]    *Id.*

business in particular."[153] Chesnut noted that "[a]t the date of spin [November 1, 2021], the ADS consolidated cash forecast projects $132 [million] cash at [AIR MILES] and $33 [million] at [BrandLoyalty] (excluding $11 [million] of inaccessible cash in Russia/China/Brazil)."[154] Thus, in Chesnut's view, the global LoyaltyOne cash balance was only $165 million, and not $225 million, at November 1, 2021.[155] In Chesnut's view, a transfer of $100 million in cash from the LoyaltyOne businesses (which would become LVI) would mean that LVI would start trading with only ~$65 million post spin.[156] This was directly contrary to the E&Y Report.

182.    Beberman was unpersuaded and responded that "if we wanted a smooth outcome in the [ADS Board Audit Committee] meeting, the spinco team should line up behind delivering at least $750 [million] and at least $100 [million] of cash" based on the expert advisor rec[ommendation] from E[&]Y."[157] Beberman "also noted that it would be beneficial for [Chesnut] compensation and Jeff T[usa]'s compensation if we aligned and supported that outcome, given that Roger [Ballou] would also be the chairman of [s]pinco and would have influence there."[158] Beberman "also noted that Ralph [Andretta], Perry [Beberman], Motes, Roger [Ballou], and John G[erspach] had met on Sunday afternoon to review the E[&]Y deck after E[&]Y provided it to him. Neither E[&]Y nor Perry shared it with Chesnut or Tusa ahead of the Sunday afternoon meeting so that they could share their viewpoints on it."[159] Chesnut's view

---

[153]    *Id.*

[154]    *Id.*

[155]    *Id.*

[156]    *Id.*

[157]    LVR-001-0000105.

[158]    *Id.*

[159]    *Id.*

was that "[o]nce the report came in and the small group met on Sunday afternoon, the outcome was set (hence Perry's admonition to "line up behind $750mm")."[160]

> **3.    The ADS Board Audit Committee Approves a $750 Million Dividend As Part of the Spinoff Transaction Based on the Flawed E&Y Report and Notwithstanding the Spin Team's Concerns**

183.    The day after the E&Y Report was issued, on August 30, 2021, the ADS Board Audit Committee met to further consider the amount of the "dividend" that ADS should attempt to obtain from LVI. The ADS Board Audit Committee determined that LVI would seek debt in the form of a Term Loan B of $650 million to $700 million and impose a cash transfer on LVI of $100 million to $125 million, in order to generate a "dividend" of at least $750 million for ADS in the Spinoff Transaction. The ADS Board Audit Committee also aimed to secure a revolving credit facility for LVI with a capacity of $125 million. These debt levels were determined without hearing the Spin Team's concerns and based on assumptions about interest and amortization rates that were more favorable than the terms that BofA Securities ultimately delivered.

184.    The ADS Board Audit Committee approved the amount of the "dividend" and the LVI Capital Structure after being provided with a written presentation (the "August ADS Board Audit Committee Presentation").[161] In that presentation, the ADS Board Audit Committee members were advised at the outset that the "[o]riginal transaction thesis for the spin of LoyaltyOne remains intact", which was first that the Spin would **strengthen ADS's balance sheet and improve key ratios** – including the TCE/TA Ratio – for ADS's Card Services

---

[160]    *Id.*

[161]    *See* LVR-001-0000103.

business.[162] The second part of the original thesis was that the Spinoff Transaction could be accomplished in advance of the BMO and Sobeys contract renewal dates.

185.    The August ADS Board Audit Committee Presentation identified E&Y as the advisor with respect to the "Key Separation Decisions" concerning the "Amount of SpinCo Debt" and the "Amount of SpinCo Cash."[163] The presentation stated further that "E&Y ha[d] been engaged to serve as a financial advisor to [ADS] and to the [ADS] Board [] in connection with the spin-off of the LoyaltyOne segment" and that "[t]he purpose of [the E&Y] engagement is for [ADS] Management and the [ADS Board] Audit Committee to receive [E&Y's] independent view regarding financial elements of the SpinCo Transaction including: the terms and execution of SpinCo's debt raise; the amount of cash to be retained at SpinCo versus transferred by dividend to [ADS]…"[164] The ADS Board Audit Committee – which had received the E&Y Report the day before the meeting – was informed that "E[&]Y's advice will consider [ADS]'s goal of reducing debt and improving the Company's post-spin TCE/TA Ratio, while providing SpinCo with a sound capital structure to execute on its business plan."[165]

186.    The August ADS Board Audit Committee Presentation also identified the following additional "Key Advisors" to ADS, namely, BofA Securities as lead arranger for the debt financing, Akin Gump, as legal counsel for ADS with respect to the debt financing, Davis Polk & Wardwell LLP as legal counsel for ADS with respect to the Spinoff Transaction, Morgan Stanley as financial advisor to ADS.[166] The presentation did not identify any spin-related "Key

---

[162]    *Id.*, at 3.

[163]    *Id.*

[164]    *Id.,* at 7.

[165]    *Id.*

[166]    *Id.*, at 6.

Advisors" to what would become LVI in connection with the Spinoff Transaction. This is because there were none.

187.    By the August ADS Board Audit Committee Presentation, the ADS Board Audit Committee members were informed that the Spinoff Transaction would improve ADS's corporate balance sheet and permit ADS's Card Services business to obtain the competitive benefit of having an improved TCE/TA Ratio, as well as other improved "key ratios." More specifically, the ADS Board Audit Committee members were informed that:

- A spin would deliver a stronger ADS corporate balance sheet, which will create more options for stockholder distributions, including share buybacks

    – A weak balance sheet has resulted in increased scrutiny from the FDIC and hampered Card Services' regulatory initiatives

- Spinning [LoyaltyOne] creates a step-change in TCE/TA, pulling improvement forward by approximately two years(1)

    – ADS management wants to increase shareholder returns; however, TCE/TA must be improved first as shareholder returns are a drag on TCE …

- Stronger TCE could lead to lower capital requirements than the 15.5% (for Card deals), making deals easier to win due to lower hurdle rates; important element to achieving an investment grade rating

    – An investment grade rating would put ADS at parity with peers, while enabling parent to issue debt more efficiently[167]

188.    According to the August ADS Board Audit Committee Presentation, the TCE/TA Ratio for ADS as of June 30, 2021 was 3%.[168] Following the Spinoff Transaction, it was projected that TCE/TA Ratio would rise to 6.8% as of year-end 2021, and 8.4% as of year-end

---

[167]    *Id*., at 10 (footnotes excluded).

[168]    *Id.*

2022.[169] All of this improvement was "due to the removal of SpinCo's goodwill and intangible [assets]" from the ADS balance sheet.

189.    As of June 30, 2021, ADS had $1.359 billion of goodwill on its balance sheet.[170] Of that amount, the "LoyaltyOne Segment balance sheet contained $723M of good will, $196 million of which was attributed to the AIR MILES businesses and $526 million of which was attributed to the BrandLoyalty businesses.[171] Thus, through the Spinoff Transaction, ADS's goodwill would be reduced by $726 million to $634 million.[172]

190.    This improved TCE/TA Ratio was critical to ADS and its Card Services business because, as the August ADS Board Audit Committee Presentation explained, ADS's "TCE/TA below peers [had] prevent[ed] ADS from substantially increasing its payout since dividends and share repurchases reduce TCE."[173]

191.    As noted above, in addition to improving the "key ratios" for the ADS Card Services Agreement, the timing of the Spinoff Transaction was advantageous to ADS because contract renewals were upcoming. In this regard, the August ADS Board Audit Committee Presentation explained that BMO and Sobeys' account for approximately two-thirds of total billings of the LoyaltyOne AIR MILES business, namely 47% and 21%, respectively.[174] The August 2021 Audit Committee Presentation notes that "Sobey's re-pricing went into effect in

---

[169]    *Id.*

[170]    *Id.*, at 11.

[171]    *Id.*, at 55.

[172]    *Id.*, at 11.

[173]    *Id.*, at 12.

[174]    *Id.*, at 13.

May 2021; reduction in Sobey's flat fee, impacting out-year revenue and EBITDA by ~C$8M."[175]

192.    With respect to the renewals for these two key customers, the August ADS Board Audit Committee Presentation explained that:

> Both BMO and ***Sobeys operate under contracts that expire in 2023***; ***Sobeys in February 2023*** and BMO in October 2023
>
> –***As contract end dates near, raising debt will be more difficult for SpinCo due to lender and rating agency concerns around renewal risk***
>
> –Despite re-pricing, **both contracts are key strategically due** to nature of collectors' spend on credit cards and grocery and their place as anchor sponsors (~68% of total issuance) with long tenure in the coalition. [176]

193.    The ADS Board Audit Committee was further advised that failing to meet a November 2021 deadline for the Spinoff Transaction could result in the Spinoff Transaction being pushed back to 2022, which would heighten the risks associated with these and other sponsor contract renewals.[177]

194.    Additionally, in an analysis of Post-Spin Opportunities and Risks for the LoyaltyOne Spinco, the ADS Board Audit Committee Presentation identified as risks (a) "Loss of BMO (45%+ of issuance) or Sobey's (20%+) from coalition ***due to non-renewal***; and (b) "Margin compression via BMO/Sobey's renewals in 2022 due to client concentration/market power."[178]

195.    Importantly, however, the August ADS Board Audit Committee Presentation states that these were the extent of the sponsor contract renewal risks notwithstanding the fact

---

[175]    *Id.*

[176]    *Id.*, at 14 (emphasis added).

[177]    *Id.,* at 14.

[178]    *Id.,* at 46.

that the members of the ADS Board Audit Committee had known, since January 2021, that "***Sobey[s'] [had] relayed its intention to terminate by the end of 2022.***" Thus, in furtherance of their scheme, ADS continued to be non-committal about Sobeys renewal when dealing with the lenders, E&Y, Moody's and S&P, even though ADS Management and the ADS Board Audit Committee members knew that renewal risk would make it hard to raise debt if the spin-transaction were not consummated in 2021.

196.    In addition to the failure to grapple with Sobeys' intention to terminate, the August ADS Board Audit Committee Presentation doubled down on errors in the flawed E&Y Report to help justify payment of a substantial dividend to ADS. Thus, the presentation assumed that, post-spin, the "SpinCo. cash position is amplified by low amortization requirements (1%/yr) of Term Loan B."[179] As explained above, this was contrary to what BofA Securities had informed the Spin Team and Chesnut had informed Beberman concerning the likely amortization rate, and far less than the amortization rate LVI ultimately obtained.

197.    At the meeting, the ADS Board Audit Committee also reviewed the post-spin balance sheet leverage for the LoyaltyOne Spinco as it pertained to the size of the dividend and the likely ratings that would attach to the company and the Term Loan B.[180] Restated, the ADS Board Audit Committee assessed the impact of the size of the dividend on the views of the Ratings Agencies. In this regard, the August ADS Board Audit Committee Presentation advised the ADS Board Audit Committee members that "BofA [Securities] has indicated the rating agencies may issue a lower rating if SpinCo exceeds 4.0x leverage."[181] The ADS Board Audit Committee was also reminded that (i) "[p]er BofA [Securities], the rating agencies assigned the

---

[179]    *Id*., at 41.

[180]    *Id.,* at 45.

[181]    *Id.,* at 44.

69

single-B rating based on $250M+ of cash, $100-125M of revolver liquidity, and 3.5x-4.0x gross debt to EBITDA, with a commitment from management of near-term deleveraging and no shareholder returns"[182] and (ii) the ratings could be lowered if the LoyaltyOne SpinCo's financial profile was different from what had been presented to the Ratings Agencies in May, 2021.

198.   To this end, the August ADS Board Audit Committee Presentation advised the ADS Board Audit Committee members that based on a year-end 2021 forecast, a $700 million dividend would result in a 3.5x Total Debt to pro forma Adjusted EBITDA ratio, that a $800 million dividend would result in a 4.0x Total Debt to pro forma Adjusted EBITDA ratio, and a $900 million dividend would result in a 4.5x Total Debt to pro forma Adjusted EBITDA ratio.[183] *Id.*, at 45. These ratios reflected a view that pro forma Adjusted EBITDA would be $187 million.[184]

199.   It was contemplated that forty-eight direct or indirect subsidiaries would be spun-off to form the LoyaltyOne Spinco.[185] One of those subsidiaries was ADI Crown Helix Limited, which at the time held an intercompany note from Rhombus.

200.   Finally, the August ADS Board Audit Committee Presentation also advised the ADS Board Audit Committee regarding other elements of the "dividend" to ADS upon the Spinoff Transaction. <u>First</u>, ADS Board Audit Committee members were advised that, as of June 30, 2021, the AIR MILES business had a potential tax receivable of $84,203,810 on its pro forma post-spin balance sheet" and that "[o]f that amount, $76 million is related to Canadian

---

[182]     *Id.*

[183]     *Id.*

[184]     *Id.*

[185]     *Id.*, at 52.

Litigation where the total exposure is $100M USD."[186] Second, ADS Board Audit Committee members were advised that the "[LoyaltyOne] Segment balance sheet does not include any amounts accrued for collector class action lawsuit in Quebec regarding the former expiry policy as it is not yet probably [sic] nor can [it] be reasonably estimated."[187]

201.   E&Y participated in the August 30, 2021 ADS Board Audit Committee meeting.[188] During that meeting, E&Y recommended that the Spinoff Transaction be structured as a Term Loan B in the amount of $650-700 million, at a 5% to 5.5% coupon and 1% annual amortization payments, along with a cash transfer of $100-125 million, "to land at total proceeds to ADS of $750mm+."[189] The ADS Board Audit Committee accepted E&Y's flawed analysis precisely because it justified ADS's pursuit of a $750+ million dividend.

202.   Chesnut noted that during the August 30, 2021 ADS Board Audit Committee meeting, the ADS Board Audit Committee, Andretta, and Beberman established that any L1 Canada tax receivables "should accrue to the benefit of [ADS] since the taxes were paid in years ago were part of 'enterprise ADS resources.'"[190] Andretta also suggested that remaining DOJ indemnification expenses of $75 million be allocated to the LoyaltyOne Spinco.[191]

203.   When Chesnut raised his concerns to E&Y concerning the LoyaltyOne Spinco's starting cash balance, E&Y responded only that the Spinco would somehow "grow into the cash balance over time."[192] Beberman added that Ralph Andretta and the ADS Board's view was that

---

[186]   *Id.*, at 56.

[187]   *Id.*, at 55.

[188]   LVR-001-0000105.

[189]   *Id.*

[190]   *Id.*

[191]   *Id.*

[192]   LVR-001-0000105.

"the point of spinning [LoyaltyOne] is to maximize the value for [ADS]" even though Beberman understood "it puts the Spinco team in a tough spot."[193]

204.    Following the August 30, 2021 meeting of the ADS Board Audit Committee, on September 1, 2021, BofA Securities presented ADS's management with a summary of indicative terms for financing to support the Spinoff Transaction, which included the terms set forth in **Table 4**.[194]

**Table 4**

| (USD in millions) | |
|---|---|
| Gross Leverage | 3.2x to 4.5x (LTM 12/31/21E) |
| Revolver | $100 (5-year maturity) |
| Term Loan B Gross Debt | $650 (6-7-year maturity) |
| Term Loan B OID | 98.5 |
| Interest Rate | L+ 300-375 bps |
| Term Loan B Amortization | 1% per annum |
| Term Loan B Interest | L+400-425 bps |

Source: LVR-001-0000428, at 3.

205.    Notably, BofA Securities intended to propose a 1% amortization rate in their summary, despite the fact that BofA Securities had instructed Chesnut days earlier to assume that the final rate would be 5%.

**J.    ADS SEEKS UPDATED RATINGS FROM MOODY'S AND S&P**

206.    Once the amount of the dividend to be paid was resolved, ADS's management updated Moody's and S&P on the Spinoff. In this regard, the ADS Board Audit Committee approved a written presentation to be shared with Moody's and S&P.[195] That presentation is

---

[193]    *Id.*

[194]    *See* LVR-001-0000428.

[195]    LVR-001-0000116.

referred to herein as the "September Rating Agency Update Presentation" and was shared with both Moody's and S&P on September 7, 2021.[196]

207.   In the September Rating Agency Update Presentation, ADS's management advised Moody's and S&P that certain of the projections in the Rating Agency Presentation would be revised, as follows in **Table 5**.

**Table 5**

| (USD in millions) | April 2021 | September 2021 |
|---|---|---|
| Revenue | $861 (2021E) | $793 (2021E) |
| Adj. EBITDA | $203 (2021E) | $187 (Pro Forma 12/31/2021E) |
| Gross Leverage | 3.4x (2021E) | 3.6x (Pro Forma 12/31/2021E) |
| Revolver | $100 - $125 (5-year maturity) | $100 - $125 (5-year maturity) |
| Term Loan B Gross Debt | $700 (7-year maturity) | $675 (6-7-year maturity) |
| OID | N/A | N/A |
| Interest Rate | L + 325 | L + 400 |
| Amortization | 1.0% ($7mm/yr) | 1.0% ($7mm/yr) |
| Lenders/Investor Interest in participating | Assumed full demand | Insufficient demand |
| Cash Swept by Parent | $0 | $100 |
| Tax Receivable (approximately $70mm) | Kept at LVI | Claimed by Parent |
| LVI Cash at 12/31/21E | $256 | $132 |
| LVI Closing Liquidity | $381 (assuming $125 revolver) | $257 (assuming $125 revolver) |

Source: LVR-001-0000116 (September Rating Agency Update Presentation), at 3, 5, 6.

208.   In their September 2021 update, ADS's management advised Moody's and S&P that pro forma last twelve-month adjusted EBITDA as of July 31, 2021 would be $163 million and pro forma last twelve-month gross leverage ratio (i.e., total debt to pro forma adjusted EBITDA) would be 4.1x.[197] ADS's management also advised Moody's and S&P that pro forma last twelve-month net leverage ratio (i.e., net total debt to pro forma adjusted EBITDA) would be

---

[196]   *Id.*

[197]   *See* LVR-001-0000116, at 5.

3.5x.[198] ADS's management also advised the rating agencies that based on their August 2021 forecast, Total Revenue and Adjusted EBITDA was forecasted to be lower than in the April Rating Agency Presentation. A summary of the downward revisions is as follows in **Tables 6** and **7** below.

**Table 6**

| (USD in millions) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| April Rating Agency Presentation Total Revenue | 861.2 | 914.1 | 963.4 | 1,019.7 | 1,081.8 |
| September Rating Agency Update Presentation Total Revenue | 793.2 | 832.4 | 905.0 | 978.2 | 1,0533.9 |
| Variance | (68.1) | (81.7) | (58.4) | (41.6) | (27.9) |

Source: LVR-001-0000103, at 93.

**Table 7**

| (USD in millions) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| April Rating Agency Presentation Adjusted EBITDA | 203.4 | 212.5 | 220.2 | 233.9 | 250.9 |
| September Rating Agency Update Presentation Adjusted EBITDA | 181.6 | 198.6 | 213.9 | 230.9 | 250.6 |
| Variance | (21.8) | (13.9) | (6.3) | (3.0) | (0.3) |

Source: LVR-001-0000103, at 93.

209.    The September Rating Agency Update Presentation identified BMO and Sobeys as "Key Brands"[199] for the AIR MILES program, and touted them as examples of AIR MILES' "Deep and Long-Term Relationships with Customer Base."[200] Of course, the presentation made no reference to the fact that ADS had known since January 2021 that Sobeys was planning on terminating its contract with LoyaltyOne in 2022.

---

[198]     *Id.*

[199]     LVR-001-0000116, at 7.

[200]     *Id.*, at 7, 29.

74

210.    The September Rating Agency Update Presentation assumed a CAD/USD exchange rate of 0.7999 and EUR/USD exchange rate of 1.1946 in 2021 and a CAD/USD exchange rate of 0.7916 and EUR/USD exchange rate of 1.2075 in 2022 and beyond.[201]

211.    In the September Rating Agency Update Presentation, ADS presented the revised projected financials for the LoyaltyOne Spinco, as set forth in **Table 8**.

**Table 8**

| (USD in millions) | Previous Forecast | Current Forecast | Change from Prior Forecast |
|---|---|---|---|
| Revenue | 2021E: $861 | 2021E: $793 | ($68) |
|  | 2022E: $914 | 2022E: $832 | ($82) |
|  | 2023E: $963 | 2023E: $905 | ($58) |
| Adj. EBITDA | 2021E: $203 | 2021E: $187 | ($16) |
|  | 2022E: $212 | 2022E: $199 | ($13) |
|  | 2023E: $220 | 2023E: $214 | ($6) |
| Free Cash Flow | 2021E: $179 | 2021E: $162 | ($17) |
|  | 2022E: $188 | 2022E: $174 | ($14) |
|  | 2023E: $194 | 2023E: $188 | ($6) |

Source: LVR-001-0000116 (September Rating Agency Update Presentation), at 16.

212.    Relative to the information in **Table 8**, the September Rating Agency Update Presentation observed that AIR MILES "was performing as expected in 2021; no changes to the 2022-2023 forecast."[202]

213.    The September Rating Agency Update Presentation did not mention customer renewals in any respect.

214.    At no time after the September 2021 meetings that ADS's management held with Moody's and S&P, did ADS's management disclose to Moody's or S&P that there would be (i) a $175 million "Term Loan A" that required a 7.5% per annum in amortization payments, and (ii) a $500 million "Term Loan B" that also required a 7.5% per annum in amortization payments.

---

[201]    *Id.*, at 15.

[202]    LVR-001-0000116, at 16; *see also id.*, at 22.

215.    At Moody's request, a call was held on September 15, 2021, and was attended by three Moody's analysts, the Spin Team (Horn, Chesnut, and Tusa) and the ADS team (Beberman, and certain employees of E&Y).[203] According to Chesnut, the lead Moody's analyst had reviewed the September Rating Agency Update Presentation and was prepared with questions on (i) the "[s]luggish [BrandLoyalty] performance and lower outlook," (ii) "[a]mount of day 1 cash-on-hand," and (iii) "[a]mount of debt leverage / total capitalization."[204]

216.    On issue number ii, "Moody's highlighted the change in Day 1 cash ($50 [million] intraquarter) and said they were evaluating whether LVI would be "undercapitalized on Day 1."[205] Chesnut responded that the expected surge in activity in November and December would help elevate the cash balance from the point of the spin, and provide a well-funded jumping off point for 2022.[206]

217.    Moody's focused on the total gross debt / EBITDA ratio and asked about the maximum permitted levels per the Term Loan B (estimated at 5.0x).[207] Moody's also asked whether LVI would publicly commit to a deleveraging strategy, and Chesnut responded, at Horn's direction, that LVI would make that commitment, and specified deleveraging to less than 3.5x.[208]

218.    In an effort to positively impact Moody's rating, Chesnut offered to advise Moody's that LVI will commit to at least a $50 million paydown in each of 2022 and 2023.[209] At

---

[203]    *See* LVR-001-000116.

[204]    *Id.*

[205]    *Id.*

[206]    *Id.*

[207]    *Id.*

[208]    *Id.*

[209]    *Id.*

the time, Chesnut noted that such an amount would "exceed the expected range of required amortization ($7mm)."[210]

219.    In light of the meeting with Moody's, Chesnut believed that "Moody's guided to a rating lower than the indicative rating provided in April [2021]."[211] Chesnut wrote that "[i]f the rating comes in lower", then a lower rating of "B" versus "B+" will be news to BofA Securities and institutional investors to whom BofA Securities had pre-marketed the Term Loan B on September 13, 2021, and on September 14, 2021.[212] Horn wrote that "[t]he implications of a lower rating are a) LVI will be considered a riskier borrower, b) lenders will expect a higher coupon, c) lenders may not lend as much, d) lenders will expect more paydowns sooner (higher amortization)."[213] Chesnut also wrote that "[a] debt deal could still clear the market, but the higher interest cost / amortization would meter the go-forward investments LVI plans to make which will impact the forecasted financial performance."[214] Horn also noted that "[a] lower rating could also affect the current and prospective clients' interest in working with LVI going forward."[215]

220.    Chesnut also added that "the [ADS] Board could decide to delay the spin" and if so, Horn believed that the following elements could be considered:

-       Near-term renewal of both BMO and Sobeys contracts at [AIR MILES], but without clarity of the ultimate resolution of [AIR MILES]'s ownership

-       Stabilization of BrandLoyalty

---

[210]    *Id.*

[211]    *Id.*

[212]    *Id.*

[213]    *Id.*

[214]    *Id.*

[215]    *Id.*

- Develop a strategy for both businesses to partner and grow around the world (create one business instead of two segments). Might require external advisors.

- Investment in that synergy strategy to create momentum

- Revisit the sell/spin options in 18 months after those initiatives are complete

- The capital markets and macro environment will need to be open at that point (no macro disruptions/black swans)

- Note this may impact a) b/s metric improvements on the contemplated timeline, b) s/h distributions, c) market credibility, d) ADS's near-term shift to BHC-style financial statement presentation[216]

221.    The ADS Board, of course, had no interest in delaying the Spinoff Transaction to address any of Chesnut's concerns, as ADS's only concern was ridding itself of the LoyaltyOne business and obtaining the $750 million dividend to fund the paydown of its own debt. Accordingly, ADS and LVI simply awaited the final judgment of the Ratings Agencies.

### K.    THE AUGUST 2021 PROJECTIONS WERE FLAWED

222.    In August 2021, members of the Spin Team, while still employed by ADS, produced five-year financial projections for the period ending December 31, 2026 (the "August 2021 Projections"). These were the same Spin Team members who saw Beberman tell Chesnut that "you need to get your guy [*i.e.*, Horn] on board or else you won't like where this goes," and understood that they would no longer be employed by ADS or LVI if the Spinoff Transaction was not completed as ADS dictated.

223.    The August 2021 Projections were flawed because they (i) assumed that the Sobeys PPA would be renewed in 2023 or that a replacement grocer sponsor would fill the gap without requiring a ramp up period, (ii) did not reflect pricing concessions that were likely in connection with the renegotiation of sponsor contracts with Shell Canada and the BMO PPA,

---

[216]    LVR-001-0000116.

(iii) reflected unreasonably high projected revenue growth and adjusted EBITDA for both the AIR MILES and BrandLoyalty businesses, and (iv) reflected unreasonably low projected inventory for the BrandLoyalty business.

224. From fiscal year ended December 31, 2014 to fiscal year ended December 31, 2019 (but excluding fiscal year ended December 31, 2020 when the onset of the COVID-19 pandemic began), LoyaltyOne's gross revenue decreased from $1.407 billion to $1.262 billion. From fiscal year ended December 31, 2015 to fiscal year ended December 31, 2020, LoyaltyOne's gross revenue declined in five out of the six years. Despite this, ADS management projected LVI's gross revenue to increase 6.9% annually from fiscal year ended December 31, 2021, to fiscal year ended December 31, 2026. Specifically, ADS management projected LVI's gross revenue to increase from $973 million in fiscal year ended December 31, 2020 to $1.041 billion in fiscal year ended December 31, 2021, to $1.122 billion in fiscal year ended December 31, 2022, to $1.203 billion in fiscal year ended December 31, 2023, to $1.285 billion in fiscal year ended December 31, 2024, to $1.371 billion in fiscal year ended December 31, 2025, to $1.441 billion in fiscal year ended December 31, 2026.

225. From fiscal year ended December 31, 2014 to fiscal year ended December 31, 2019 (but excluding fiscal year ended December 31, 2020 when the onset of the COVID-19 pandemic began), LoyaltyOne's adjusted EBITDA decreased from $339 million to $230 million. From fiscal year ended December 31, 2015 to fiscal year ended December 31, 2020, LoyaltyOne's adjusted EBITDA declined in four out of the six years. Despite this, ADS management projected LVI's adjusted EBITDA to increase over 7.5% annually from fiscal year ended December 31, 2021, to fiscal year ended December 31, 2026. Specifically, ADS management projected LVI's adjusted EBITDA to increase from $171 million in fiscal year

ended December 31, 2020 to $187 million in fiscal year ended December 31, 2021, to $199 million in fiscal year ended December 31, 2022, to $214 million in fiscal year ended December 31, 2023, to $231 million in fiscal year ended December 31, 2024, to $251 million in fiscal year ended December 31, 2025, to $264 million in fiscal year ended December 31, 2026.

226.     For the first half of fiscal year ended December 31, 2021, BrandLoyalty's actual revenue was $79 million, which was substantially (namely 30%) lower than the $113 million that BrandLoyalty had budgeted for during that period. For the first three quarters of fiscal year ended December 31, 2021, BrandLoyalty's actual revenue of $97 million was substantially lower – namely 42.6% lower – than the $169 million that BrandLoyalty had budgeted for during that period. Revenue estimates for the first three quarters of fiscal year ended December 31, 2021 missed projections by 25%.

227.     BrandLoyalty projected revenue growth in each year from fiscal year ended December 31, 2022 to fiscal year ended December 31, 2026, with growth of 5% in fiscal year ended December 31, 2022 to 13% in fiscal year ended December 31, 2023.

228.     From fiscal year ended December 31, 2018 through fiscal year ended December 31, 2020, the average number of days that the BrandLoyalty business held inventory before turning it into sales, known as "Days Inventory," averaged 188 days. But the August 2021 Projections reflected that ADS management projected that the Days Inventory for the BrandLoyalty business would decrease from the 199 days in fiscal year ended December 31, 2020 to 162 days for fiscal year ended December 31, 2021, to 152 days for fiscal year ended December 31, 2022, to 139 days for fiscal year ended December 31, 2023, to 131 days for fiscal year ended December 31, 2024, to 124 days for fiscal year ended December 31, 2025, to 119 days for fiscal year ended December 31, 2026.

L.   **ADS PROCURES FINANCING FOR THE SPINOFF TRANSACTION ON UNFAVORABLE TERMS TO PROTECT ITS $750 MILLION DIVIDEND**

229.   While discussions with the Ratings Agencies were ongoing, on September 3, 2021, Beberman emailed, *inter alia*, Chesnut and Motes, to inform them that if BofA Securities were able to raise only $600 million of debt "there is a high probability that this transaction does not occur."[217] Beberman also wrote "[h]opefully we are able to lean in on terms and effort from BofA Securities to deliver ADS targets."[218] As discussed below, ADS gave BofA Securities marching orders to raise the desired amount of debt to benefit ADS, no matter the terms, because the terms would be LVI's problem post-spin, not ADS's. ADS required $100 million in cash from the LVI businesses as well as net proceeds of $650 million to ADS from a third-party loan, syndicated by BofA Securities and other bank syndication agents.

230.   On September 17, 2021, Chesnut sent Beberman the final term sheet titled "Summary of Terms and Conditions" for $775-800 million Senior Secured Credit Facilities.[219] That final term sheet was sent to the rating agencies on or around September 17, 2021.[220] The "Summary of Terms and Conditions" contained the terms as set forth in **Table 9**.

---

[217]   BREAD-LVI-00198219.

[218]   *Id.*

[219]   *See* LVR-001-0000306.

[220]   *See* LVR-001-0000436.

**Table 9**

| (USD in millions) | |
|---|---|
| Gross Leverage | 3.2x to 4.5x (LTM 12/31/21E) |
| Revolver | $100-125 (5-year maturity) |
| Term Loan B Gross Debt | $675 (, 7-year maturity) |
| Term Loan B Amortization | 1% annually |
| Term Loan B OID | 98.5 |
| Term Loan B Interest Rate | L+ 300-375 bps |
| Cash Swept by Parent | $100 |
| Payment to ADS | $750 = $650 + $100 + 19% of LVI Equity |

Source: LVR-001-0000438 ("Summary of Terms and Conditions"), at 2, 3, 4, 9; LVR-001-0000307.

231.    Under the proposal, (i) Bank of America, N.A. would serve as administrative agent, (ii) Deutsche Bank, MUFG, and RBC served as joint lead arrangers, and (iii) Morgan Stanley, Rabo Bank Regions, and Texas Capital would serve as syndication and documentation agent.[221]

232.    BofA Securities and the LoyaltyOne business planned on launching the Term Loan B debt raise on Thursday, September 24, 2021. During the week prior, BofA Securities arranged pre-launch calls with 20 top institutional Term Loan B investors, with the goal of securing pre-orders in the amount of 50% of the targeted $675 million debt raise by the launch date. However, on September 23, 2021, BofA Securities advised LoyaltyOne that they had not yet reached that goal, and therefore recommended that the launch date for the Term Loan B raise be pushed back to September 28, 2021.[222]

233.    Additionally, due to investor reaction, BofA Securities adjusted their target for Term Loan B downward from $675 million to $500 million.[223] According to Beberman, BofA

---

[221]    See LVR-001-0000433.

[222]    LVR-001-0000293.

[223]    Id.

Securities now "cautiously projected" that the market would absorb only $500 million of Term Loan B on terms more favorable terms to lenders.[224]

234.    Notwithstanding BofA Securities' advising that the market would only bear a $500 million Term Loan B, ADS was determined to receive a $750 million dividend for its own purposes upon the Spinoff Transaction. Meeting that goal required raising the additional $175 million that was previously planned for the Term Loan B. In order to raise that additional amount, BofA Securities and ADS pivoted to seeking a $175 million Term Loan A as part of the offering.[225] Thus, upon the official launch of the debt raise, ADS sought (i) a $500 million Term Loan B on terms less favorable to LoyaltyOne than initially planned and (ii) the even less favorable $175 million Term Loan A.

235.    On September 24, 2021, Beberman reported these developments to the ADS Board Audit Committee members, namely Ballou, Gerspach, and Theriault. Specifically, Beberman told them that during initial calls between BofA Securities and top institutional investors, the investors had voiced concerns about the "customer concentration [for AIR MILES] in Canada (BMO, Sobeys), the near-term contract maturities [for major customers], and the lingering impact of Covid."[226] Because of these concerns, several larger investors declined to participate in the debt raise, and as a result, BofA Securities adjusted the original $675 million Term Loan to $500 million.[227]

---

[224]     *Id.*

[225]     *Id.*

[226]     LVR-001-0000299.

[227]     *Id.*

236.     Beberman also reported that in additional to the original target for the revolver of $150 million, BofA Securities would also seek to raise a $175 million Term Loan A.[228] Further, while the $750 million dividend amount to ADS was to stay the same, that dividend would be funded with (a) $500 million from the Term Loan B, PLUS (b) $175 million Term Loan A, PLUS (c) $100 million in cash, MINUS (d) $25 million in deal fees.[229] According to Beberman, E&Y reached out to BofA Securities, and E&Y agreed with BofA Securities' approach and to continue forward.[230]

237.     On September 27, 2021, BofA Securities provided Chesnut, Tusa, and Horn with a new summary sheet of the offering. The changes were as follows: (a) the length of the Term Loan B was shortened from 7 years to 6 years; (b) amortization rate would be 7.5% for both the $500 million Term Loan B and the $175 million Term Loan A; and (c) the Term Loan B would have no-call protection in year 1 and early payment premiums in years 2-3, protecting the new more onerous terms and making a potential refinancing of the loan more expensive.

238.     On September 28, 2021, the Ratings Agencies published their ratings for both LVI and the Term Loan B.[231] S&P assigned a B+ rating to LVI, and a BB- rating to Term Loan B.[232] Moody's assigned a B1 rating to LVI, the Term Loan B and the Term Loan A.[233]

239.     Even after the issuance of the ratings, however, it was unclear whether BofA Securities would be able to raise the $500 million of Term Loan B commitments. Nonetheless, ADS was determined to raise the amounts necessary to achieve a $750 million dividend upon the

---

[228]     *Id.*

[229]     *Id.*

[230]     *Id.*

[231]     *See* LVR-09-0000007; LVR-09-0000008.

[232]     LVR-09-0000007.

[233]     LVR-09-0000008.

Spin, regardless of the consequences to LVI. As Beberman explained on October 1, 2021, "[i]f funding commitments for [Term Loan B] are short, we will need to lean on the [Revolving Credit Facility] and the [Term Loan A] to achieve full debt requirements of $675 million."[234]

240.    Ultimately, however, BofA Securities received commitments for all $500 million Term Loan B. On October 8, 2021, BofA Securities set the allocations of the $150 million Revolving Credit Facility and $175 million Term Loan A.[235] Beberman celebrated what he characterized as a "successful week on debt raise", and he gave a "[h]uge credit to Chesnut and Tusa in tandem with BofA [Securities], for accomplishing the targeted $750 [million] dividend (net debt ~$650 after OID and lender fees, plus $100 [million] in cash)."[236] Beberman also praised everyone involved in the offering process "I would like to applaud the work done by Spinco / Remainco teams and the support we have had from [E&Y] (validating the targets for us), …"[237]

241.    On October 8, 2021, ADS's management presented an update concerning what would become the Spinoff Transaction.[238] The presentation noted that (i) the lender commitments were expected by the end of the day, (ii) that the ADS Board approval of the Spinoff transaction was scheduled for October 13, 2021, and (iii) the target date for the Transaction was November 5, 2021.[239]

242.    Together with a $100 million pre-spin cash transfer, the contemplated Spinoff Transaction resulted in ADS extracting $750 million from the LoyaltyOne businesses.

---

[234]    LVR-001-0000120.

[235]    *See* LVR-001-0000445.

[236]    LVR-001-0000127.

[237]    *Id.*

[238]    LVR-001-0000128.

[239]    *Id.*

243.    Beberman was never concerned about the impact of the size of the ADS dividend to LVI or the unfavorable terms of the debt that was foisted upon LVI by ADS. When Chesnut and others voiced concerns about these issues, Beberman responded by stating that LVI shouldn't worry, and that, in any event, LVI could refinance the debt later. But Beberman's response ignored the undeniably reality that the failure to refinance would lead to a bankruptcy filing. And any refinancing would carry very substantial execution risk insofar as a refinancing would assume that LVI could overcome LVI's known and anticipated operational challenges as well as the debt market's demonstrated unwillingness to lend LVI $675 million (or even $500 million) on typical 'term loan b' terms.

244.    Alarmed by the amount of cash ADS intended to extract from the LoyaltyOne business in the Spinoff Transaction, as well as the terms of the debt ADS was planning to place on LVI, which would absorb virtually all of the business's cash flow and leave no money for the investments needed to revamp the AIR MILES program and to meet the aggressive competition faced by BrandLoyalty, Horn purportedly spoke privately with ADS Chairman, Ballou. Horn allegedly pleaded to Ballou that the Spinoff Transaction simply required too much debt for LVI to service. According to Horn, Ballou conceded that it was too much debt, but said it was not his decision to make. The Spinoff Transaction was supported by the rest of ADS's Directors, including the ADS Board Audit Committee members. When Horn questioned how he was supposed to run a company in that condition, Ballou purportedly told Horn to think of it like a kidney stone; it's painful, but all you can do is wait for it to pass.

245.    The Terms of the debt financing that ADS ultimately thrust upon LVI in connection with the Spinoff Transaction is as set forth in **Table 10**.

**Table 10**

| (USD in millions) | |
|---|---|
| Revolver | $150 (5-year maturity) |
| Revolver Interest Rate | L+350 bps (0% LIBOR floor) |
| Term Loan A | $175 (5-year maturity) |
| Term Loan A Interest | L+ 350 bps (0% LIBOR floor) |
| Term Loan A Amortization | 7.5% annually |
| Term Loan B | $500 (6-year maturity) |
| Term Loan B Interest | L+ 450 bps (50 bps LIBOR floor) |
| Term Loan B OID | 98 |
| Term Loan B Amortization | 7.5% annually |
| Lender Fees/Costs | ~$21  (lender fees ~$11 + OID of $10) |

Source: LVR-001-0000127; *see also* BofA Securities' Engagement Letter dated September 29, 2021.

246.    One of the changes reflected in **Table 10** is that the Term Loan B's maturity was reduced from seven years to six years.[240] BofA Securities also added no-call protection in year 1 and early-payment premiums in years 2-3 to the Term Loan B, which would have made a potential refinancing of that debt more expensive.[241] Chesnut prepared "a quick [free cash flow] summary so the impact of the higher amortization is clear."[242] That free cash flow summary reflected limited free cash flow, after 7.5% amortization payments, of $53m in 2022, $65m in 2023, $79m in 2024 and $96m in 2025.[243] This quick free cash flow summary revealed that the increased amortization payments would leave LVI on a razors-edge, with projections that did not consider Sobeys' exit.

247.    Meanwhile, the LoyaltyOne segment, and in particular, BrandLoyalty, showed further signs of deterioration during the third quarter of 2021, which ended on September 30,

---

[240]    *See* LVR-001-0000305.

[241]    *Id.*

[242]    *Id.*

[243]    *Id.*

2021. For example, BrandLoyalty's revenues for the first three quarters in 2021 were 25% lower than had been budgeted. LoyaltyOne's total third quarter 2021 revenue declined 8% compared to the prior year, with BrandLoyalty's revenue for the quarter declining 18% year-over-year, despite this being a comparison to 2020 that included COVID impacts. These results reflected substantial declines from what had previously been LoyaltyOne's worst year on record under ADS ownership.

### M. THE ADS BOARD'S FINAL APPROVAL OF THE SPINOFF TRANSACTION

248.    On October 13, 2021, the ADS Board met to make a final "go or no-go" decision on the Spinoff Transaction, including approval of the revised and unfavorable debt terms discussed above. The "go or no-go" decision was originally scheduled to occur on October 8, 2021, but was delayed to October 13, 2021 because of delays in the debt launch with respect to the Term Loan B.

249.    Andretta, Ballou, Gerspach, Natarajan, Tucker, and Turney attended the ADS Board meeting on October 13, 2021.[244] Theriault, did not attend this October 13, 2021 ADS Board meeting.[245] Also attending were, inter alia, Beberman and Motes.[246] The minutes of this ADS Board meeting reflect Ballou noting that "the [ADS Board] Audit Committee, which had been delegated responsibility for oversight of the transaction, had met the previous day (October 12[, 2021]), and formally approved the spinoff and recommended that the full [ADS] Board also approve the spinoff."[247] There minutes of that October 12, 2021 ADS Board Audit Committee meeting evidencing reflect that the ADS Board Audit Committee did indeed recommend what

---

[244]    BREAD-LVI-00256272.

[245]    *Id.*

[246]    *Id.*

[247]    BREAD-LVI-00256272.

would become the Spinoff Transaction to the ADS Board for final approval.[248] The minutes of the October 13, 2021 ADS Board meeting also state that "Ballou noted that the presentation to the full [ADS] Board during [the October 13, 2021 ADS Board] meeting would largely track the presentation given to the [ADS Board] Audit Committee the previous day."[249]

250.    During the meeting, the ADS Board was informed that the rationale for the Spinoff Transaction remained unchanged from May and August 2021, which was primarily that the Spin would improve ADS's TCE/TA Ratio, "pulling [that] improvement forward by approximately two years."[250] The minutes for the October 13, 2021 ADS Board meeting attribute these statements to Beberman.[251] The improvement in ADS's TCE/TA Ratio would, in turn, lead to an increased ability for the Card Services business to achieve an investment grade rating that "would put ADS at parity with its peer, while enabling [ADS] to issue debt more efficiently."[252] All of the improvement in the TCE/TA Ratio was attributable to the removal of LVI's goodwill and intangible assets from the ADS balance sheet. Tellingly, the written presentation to the ADS Board for the October 13, 2021 meeting makes no reference to either any benefit that LVI might obtain as a result of being spun off or challenged LVI faces due to, *inter alia*, the more onerous lending terms.

251.    Consistent with the August ADS Board Audit Committee Presentation, the ADS Board recognized that timing the Spin for early November 2021 would be ideal—from *ADS*'s perspective—because it preceded the critical upcoming attempted sponsor contract renewals.

---

[248]    BREAD-LVI-00257645.

[249]    BREAD-LVI-00256272.

[250]    BREAD-LVI-00233672.

[251]    BREAD-LVI-00256272.

[252]    *Id.*

The presentation materials used during the ADS Board's October 13, 2021 meeting states in its "Executive Summary" that the "transaction thesis" for the spin of LoyaltyOne remains intact…" and that "***Favorable Timing: Sponsor contract renewal dates are upcoming***."[253] This was critical because Medline, on behalf of Sobeys, had not retracted Sobeys' statement that it intended to terminate the Sobeys PPA in 2022. Thus, if the spin could be completed in the immediate near term, then the consequences of a failure of Sobeys to renew its respective contract would fall solely on LVI, with ADS having already pocketed the proceeds of LVI's debt.

252.     Significantly, "Horn summarized the performance outlook for LVI ***through 2023***, including expectations for revenue, adjusted EBITDA, and free cash flow, and provided additional detail on the LVI debt raise and liquidity projections post-spin."[254] But the minutes of the October 13, 2021 ADS Board meeting do not reflect any discussion concerning sponsor contract renewal, Sobeys proclaimed 2022 early termination of the Sobeys PPA, or any efforts to replace them with a like-kind sponsor.[255] Also, the minutes of the October 13, 2021 ADS Board meeting do not explain why the ADS Board only focused on performance outlook through 2023 rather than through 2026, which was the period employed by ADS when presenting projections that formed the basis for the E&Y Report, the presentations to the Rating Agencies, and to lenders who went on to make Term Loan B loans. ADS's focus on a two-year period was driven by advice about the tax-free treatment that it would receive on the divestiture of the 19% of

---

[253]     BREAD-LVI-00233669 (emphasis added); *see also* BREAD-LVI-00233662 (email to Beberman with BREAD-LVI-0023367-714 attached).

[254]     BREAD-LVI-00256273.

[255]     BREAD-LVI-00256272-74.

retained equity in LVI within two years of the Spinoff Transaction rather than a genuine concern for the viability of LVI and LVI's medium and long-term prospects.

253.    During the October 13, 2021 ADS Board meeting, the ADS Board was informed that the Internal Revenue Service had issued a letter on October 4, 2021 confirming that the Spinoff Transaction would be tax-free to both ADS and ADS's shareholders. Tellingly, Gerspach then purportedly asked ADS's tax advisors present at the meeting what would happen to the tax-free treatment of the transaction if LVI went bankrupt within the first year. It is staggering that Gerspach was openly contemplating a near-term bankruptcy of LVI pre-spin. But after the tax advisors responded that LVI's bankruptcy would not jeopardize the tax-free treatment of the spinoff (*i.e.*, would not result in tax liability for ADS) and would actually generate a worthless-stock deduction for ADS on account of its retained equity interest in LVI, Gerspach, satisfied with that answer, cast his vote in favor along with the rest of the ADS Board, excluding Theriault who did not attend this meeting, but had given his proxy to vote in favor of approving the Spinoff Transaction.[256]

### N.    THE ABSENCE OF A BRING-DOWN E&Y REPORT AND THE ABSENCE OF A SOLVENCY OPINION WITH RESPECT TO LVI

254.    There are two simple facts that underscore that the Spinoff Transaction was completed to benefit ADS, but without regard for LVI and its creditors. First, while the E&Y Report purportedly formed the basis for approval of the Spinoff Transaction, and for the transfer of $750 million to ADS, the E&Y Report was never updated after the market rejected the initial proposed lending package, and the terms as sweetened to entice lenders to provide the funds necessary to finance the Term Loan B. Thus, the absence of a bring-down report from E&Y in

---

[256]    BREAD-LVI-00256274.

light of the significantly more expensive Term Loan B than originally contemplated, is a huge 'red flag.'

255.     Second, ADS never sought a solvency opinion to confirm that LVI would be balance sheet solvent upon the completion of the Spinoff Transaction. A solvency opinion is usually sought to provide the board of directors with comfort that a particular transaction will not leave an entity insolvent and open up the transaction parties to, *inter alia*, fraudulent transfer claims. Similarly, ADS never sought a "Reasonably Equivalent Value" opinion to protect ADS from fraudulent transfer claims. Rather, ADS, under the direction of its counsel at Davis Polk & Wardwell LLP, focused only on ADS's solvency with respect to the dividend of 81% of LVI's equity to ADS's shareholders. Thus, ADS's only solvency-related calculations were produced for that portion of the transaction.

256.     ADS, Andretta, Beberman, and the members of the ADS Board Audit Committee didn't seek a solvency opinion, or even a "reasonably equivalent value" opinion because they didn't want to know what the opinions would say. ADS had no reason to commission a report or solvency opinion that could scuttle the end game – a $750 million payment, with the additional right to any tax litigation proceeds, while at the same time, substantially deleveraging the ADS balance sheet and ridding it of ratio-busting goodwill, which goodwill was itself in jeopardy of requiring a balance sheet impairment (in accounting treatment) due to BrandLoyalty's declining performance. ADS wanted the path of least resistance and approved the Spinoff Transaction in willful ignorance instead of informed knowledge of the foreseeable financial condition of LVI post-spin.

257.    The first draft Separation and Distribution Agreement was dated June 24, 2021.[257] That draft Separation and Distribution Agreement provided that as a 'Condition Precedent' to the 'Distribution,'

> a nationally recognized valuation advisory firm acceptable to ADS shall have delivered one or more opinions to the Board of Directors of ADS concerning the solvency and capital adequacy matters related to each of (A) ADS and its Group and (B) Loyalty Ventures and its Group after consummation of the Distribution, and such opinions shall be acceptable to the Board of Directors of ADS in its sole and absolute discretion and such opinions shall not have been withdrawn or rescinded;[258]

258.    On September 12, 2021, a revised draft Separation and Distribution Agreement dated September 10, 2021, was sent by Hageman.[259] The draft Solvency Opinion Condition Precedent makes clear that the solvency condition insures solely for the benefit of the ADS Board, not LVI, the members of the LVI Board, or LVI's Officers. The draft Solvency Opinion Condition Precedent only requires that it be acceptable to the ADS Board "in its sole and absolute discretion."

259.    Motes agreed that the preparation and receipt of a solvency opinion from a nationally recognized valuation advisory firm concerning the solvency and capital adequacy matters related to LVI after consummation of the Spinoff Transaction was unnecessary and would cause ADS to incur unnecessary cost and would cause a delay in the consummation of the Spinoff Transaction. Thus, as LVI's sole Director, Motes did not act in the best interests of LVI when he agreed to remove the Solvency Opinion Condition Precedent from the SDA.

---

[257]    BREAD-LVI-00168716.

[258]    BREAD-LVI-00207543. This text is referred to as the "Solvency Opinion Condition Precedent."

[259]    BREAD-LVI-00207513.

260.   Motes never suggested, requested, or demanded that the SDA contain a condition precedent requiring a nationally recognized valuation advisory firm acceptable to LVI to deliver one or more opinions to the Board of Directors of LVI concerning the solvency and capital adequacy matters related to LVI after consummation of the Spinoff Transaction, and that such opinion be acceptable to him, as the sole LVI Director, in his sole and absolute discretion. Thus, as LVI's sole Director, he did not act in the best interests of LVI when he never sought that the SDA contain a solvency-related condition precedent related to his service as the sole LVI Director.

O.   **EXECUTION OF THE SPINOFF TRANSACTION**

1.   **Indebtedness Incurred in Connection with the Spinoff Transaction**

261.   On November 3, 2021, Motes, acting in his capacity as sole director of LVI, signed a written consent in lieu of a LVI Board meeting, authorizing and directing LVI's entry into the Spinoff Transaction-related agreements effectuating it on ADS's desired terms, including the hundreds of millions of dollars in distributions to ADS through the $650M Transfer and the $100M Transfer, the plundered potential tax litigation proceeds, and the offloading of litigation liabilities associated with the LVI business to LVI, while imposing $675 million of debt on LVI on the onerous terms required to generate the desired proceeds for ADS. The principal agreements giving effect to the spinoff were the Credit Agreement, the Separation and Distribution Agreement, and the Contribution Agreement (each defined below), as follows.

262.   The Credit Agreement was dated November 3, 2021, and was between LVI, Bank of America, N.A., as Administrative Agent, and the lenders party thereto ("Credit Agreement"). The Credit Agreement provides for a $175 million "Term Loan A" facility, a $500 million "Term Loan B" facility and a revolving credit facility in the maximum amount of $150 million "Revolver"). As a result of a 2% original issue discount on Term Loan B and ADS's requirement

that LVI bear the debt issuance costs incurred in the transaction, LVI obtained net proceeds of only $650 million on the $675 million of Term Loan A and Term Loan B indebtedness. What follows is a diagram ("Diagram A") reflecting the inflow of money from the lenders under the Credit Agreement.

### Diagram A



263.    Under the Credit Agreement, LVI received $653,562,843.07 on account of the $675 million in Term Loan A and Term Loan B borrowings.[260] The Term Loan B was issued at 98% OID, meaning that LVI received $490 million, representing 98% of the $500 million under the Term Loan B.[261]

264.    The Term Loan A and Revolving Credit Facility were scheduled to mature on November 3, 2026. The Term Loan B was scheduled to mature on November 3, 2027. The proceeds of the Term Loan A and Term Loan B were used to finance the substantial majority of the $750 million distribution by LVI and its affiliates on November 3, 2021, to ADS in connection with the Spinoff Transaction

265.    The Credit Agreement imposes amortization payment obligations on LVI that severely constrained its available cash flows. Specifically, the Credit Agreement requires LVI to make amortization payments in equal quarterly installments in an aggregate amount of 7.5% per annum of the initial aggregate principal balances of both Term Loan A and Term Loan B until their respective maturities in 2026 and 2027. These amortization payment obligations amount to approximately (i) $12.7 million in 2021, (ii) $48.3 million in 2022, (iii) $44.8 million in 2023, (iv) $41.5 million in 2024, (v) $38.5 million in 2025.

266.    In addition, beginning with the year 2022, the Credit Agreement requires LVI to prepay the Term Loan B principal, on an annual basis, with either 0%, 25% or 50% of the company's excess cash flow (defined in the agreement as essentially all cash income in excess of changes in working capital and cash payments in respect of interest, principal, taxes, and capital expenditures), depending on the company's secured leverage ratio (defined in the agreement as the ratio of the company's secured debt to EBITDA for the last four quarters).

---

[260]    LVR-003-0000007.

[261]    *Id.*

### 2.    The Separation and Distribution Agreement and Other Related Agreements

267.    As another part of the Spinoff Transaction, at Motes' direction, LVI entered into a Separation and Distribution Agreement with ADS, dated as of November 3, 2021 (the "SDA").

268.    The SDA provided, among other things, for the completion of the "Restructuring" prior to the distribution of 81% of LVI's stock to ADS's shareholders. The "Restructuring" was defined to include the payment of the $650 million in net debt proceeds by LVI to ADILC, and the distribution of $100 million of cash held by the LoyaltyOne operating subsidiaries to ADILC, all to be distributed up the corporate chain to and used to pay down ADS's outstanding debt.

269.    The SDA also provided, among other things, that LVI would be liable for certain litigation matters, including certain class action lawsuits that arose out of pre-spin ADS board actions and decisions.

270.    Pursuant to a Contribution Agreement, dated as of November 3, 2021 (the "Contribution Agreement"), between LVI and ADILC (signed on its behalf by Motes, who thus stood on both sides of the agreement as ADS's General Counsel, Secretary, Executive Vice President, and Chief Administrative Officer), LVI agreed to transfer the $650 million in net debt proceeds referenced above to ADILC in exchange for all outstanding stock of the ADILC subsidiaries that comprised the LoyaltyOne Business (the "Contributed Shares"). The $650 million that LVI transferred to ADILC together with the $100M Transfer (comprised of $100 million of cash swept from the LoyaltyOne operating subsidiaries) was then distributed up ADS's corporate chain from ADILC, to ADFH, to ADSFH, and finally to ADS. Motes executed a Distribution Agreement dated November 3, 2021, and related written consents on behalf of each of ADILC, ADFH, ADSFH, and ADS/Bread, authorizing and directing each of those distributions. ADS then used the funds to pay down its outstanding debt. What follows is a

diagram ("Diagram B") reflecting the inflow of money from Rhombus, as well as the movement of money and consideration under the Spinoff Transaction.

**Diagram B**



271.    At a fair valuation, the Contributed Shares received by LVI were worth less than $450 million at the time of the transfer on November 3, 2021. The $650 million that Motes caused LVI to pay for the Contributed Shares by directing its entry into the Contribution

Agreement, therefore greatly exceeded the range of values that the Contributed Shares would have sold for in an arms' length transaction. LVI thus received less than a reasonably equivalent value in exchange for the $650M Transfer.

272.    Finally, as if saddling LVI with hundreds of millions of dollars in debt and litigation liabilities related to the LoyaltyOne businesses were not enough, ADS caused LVI to transfer to ADS the right to receive L1 Canada's potential tax litigation proceeds of CAD 75-80 million. As another part of the Spinoff Transaction, Motes authorized and directed LVI to enter into a Tax Matters Agreement with ADS, dated as of November 5, 2021, which provides for L1 Canada's tax litigation proceeds, as well as another substantial anticipated tax refund payable to a BrandLoyalty subsidiary, to be paid over to ADS within 30 days of receipt.

273.    On November 4, 2021, once all the material terms of the Spinoff Transaction had been agreed to by Motes on behalf of LVI, Motes resigned from the LVI Board. His failure as a director to act on LVI's behalf and complete capitulation to ADS's demands during the "negotiations" of the Spinoff Transaction made perfect sense—he never intended to stay on as a director and instead he and ADS intended for the incoming LVI Board to deal with the consequences of the financially crippled state in which he and ADS left the company.

274.    The Spinoff Transaction was completed on November 5, 2021. The Spinoff Transaction was achieved through the transfer of all assets and liabilities of the LoyaltyOne business segment to LVI and the distribution of 81% of the outstanding shares of LVI to holders of ADS stock. ADS retained a 19% ownership interest in LVI, seeking to potentially further monetize the 19% in the future, if possible, to further benefit ADS in its efforts to de-leverage.

### 3.   LVI Tried to Cause LVI to Indemnify ADS/Bread for any and all claims arising out of the SDA

275.    Pursuant to the SDA, LVI became obligated to Indemnify ADS/Bread, as set forth

in SDA Section 5.02. That section reads as follows:

(a) Effective as of and after the Distribution Time, Loyalty Ventures shall indemnify, defend and hold harmless each member of the ADS Group, each Affiliate thereof and each of their respective past, present and future directors, officers, employees and agents and the respective heirs, executors, administrators, successors and assigns of any of the foregoing (the "**ADS Indemnitees")** from and against any and all Liabilities incurred or suffered by any of the ADS Indemnitees arising out of or in connection with (i) any of the Loyalty Ventures Liabilities, or the failure of any member of the Loyalty Ventures Group to pay, perform or otherwise discharge any of the Loyalty Ventures Liabilities, (ii) any breach by Loyalty Ventures or any member of the Loyalty Ventures Group of this Agreement or any Ancillary Agreement, (iii) the ownership or operation of the LoyaltyOne Business or the Loyalty Ventures Assets, whether prior to, on or after the Distribution Date, (iv) any payments made by ADS or any member of the ADS Group in respect of any Guarantee given or obtained by any member of the ADS Group for the benefit of any member of the Loyalty Ventures Group or the LoyaltyOne Business, or any Liability of any member of the ADS Group in respect thereof, and (v) any use of any ADS Names and Marks by Loyalty Ventures.

(b) Except to the extent set forth in Section 5.03(b), effective as of and after the Distribution Time, Loyalty Ventures shall indemnify, defend and hold harmless each of the ADS Indemnitees and each Person, if any, who controls any ADS Indemnitee within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all Liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Form 10 or any amendment thereof, the Information Statement (as amended or supplemented if Loyalty Ventures shall have furnished any amendments or supplements thereto), the Equity Compensation Registration Statement or any offering or marketing materials prepared in connection with the Loyalty Ventures Financing Arrangements or caused by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

276.    For the purposes of this action, LVI's obligation to indemnify ADS as provided

for in SDA section 5.02 is referred to as the "ADS Indemnification Obligation."

4.      **The Rhombus Promissory Note**

277.     In September 2019, ADS undertook an initiative to realign its foreign holding company structure. This was a realignment due to changes in treatment/recognition of certain hybrid debt/equity instruments (the Luxembourg "CPECs") in the ADS international foreign holding structure.

278.     In connection with this initiative, ADS caused Rhombus to issue a Promissory Note (the "Rhombus Promissory Note") dated September 26, 2019. Pursuant to the Rhombus Promissory Note, Rhombus promised to pay Alliance Data Lux Holdings S.àr.l. CAD 1.5 billion. The Rhombus Promissory Note provided that interest was payable per annum equal to 5.5%, and was required to be paid "at least once per calendar year on a date to be mutually agreed by [Rhombus] and Alliance Data Lux Holdings S.àr.l."[262] The amount due from Rhombus under the Rhombus Promissory Note was due on September 25, 2029.[263] The Rhombus Promissory Note permitted prepayments at any time, without premium or penalty.[264] The records of ADI Crown Helix Limited show payments from Rhombus on account of the Rhombus Promissory Note in March 2020 and January 2021.

279.     While the realignment used words like "distribution", Rhombus never received any value in exchange for the obligations incurred under the Rhombus Promissory Note. In fact, the Rhombus Promissory Note represented a vehicle to require Rhombus to upstream previously taxed and untaxed "E&P," *i.e.*, earnings and profit, akin to locking in a future obligation to upstream money distribution. In 2021, the Rhombus Promissory Note was called upon to serve

---

[262]     Rhombus Promissory Note, §1.2.

[263]     *Id.*, §1.1, preamble.

[264]     *Id.*, §1.3.1.

that purpose when ADS demanded that $750 million be paid to it in the Spinoff Transaction, with $100 million coming from Rhombus in the $100M Transfer.

280.    The $100 million that Rhombus transferred to ADI Crown Helix Limited was first transferred to ADILC, and then distributed up ADS's corporate chain from ADILC, to ADFH, to ADSFH, and finally to ADS, all as part of a single scheme to move $100 million from Rhombus (and what would become LVI's operating subsidiaries) to ADS.

281.    As part of the corporate reorganization that occurred in connection with the Spinoff Transaction, but after the $100M Transfer occurred, ADI Crown Helix Limited became a wholly owned subsidiary of LVI. ADI Crown Helix Limited was dissolved immediately prior to the Debtors' Petition Date. Upon ADI Crown Helix Limited's dissolution, its rights under the Rhombus Promissory Note passed to LVI.

### 5.    The Liability Assumption Under the SDA

282.    Under the SDA, LVI was forced to assume the Liability Assumption. The Liability Assumption is comprised of obligations identified on Schedule 4.02(a) of the SDA.

283.    While the SDA was filed publicly with the U.S. Securities and Exchange Commission, the Schedules to the SDA were not filed publicly. Thus, Schedule 4.02(a), titled "Loyalty Ventures Assumed Actions," was not publicly filed. That Schedule 4.02(a) lists eleven (11) 'actions' allegedly related to either AIR MILES or BrandLoyalty businesses. The lack of public disclosure of this Schedule 4.02(a) had the effect of obscuring the liabilities assumed by LVI as part of the Spinoff Transaction.

### 6.    The Tax Matters Agreement

284.    As part of the Spinoff Transaction, LVI and ADS also entered into the "Tax Matters Agreement", dated as of November 5, 2021 (the "TMA"). The TMA addresses the rights and obligations of ADS/Bread, LVI and, purportedly, their respective subsidiaries with respect to

various tax obligations, tax litigation proceeds, and tax refunds. Under the TMA, ADS/Bread caused LVI to agree to pay over to ADS/Bread any tax litigation proceeds which could be as much as approximately CAD 75-80 million to which L1 Canada may become entitled within thirty (30) days of receipt thereof.

285.    Section 8(a) of the TMA provides that "ADS shall be entitled to all Tax Refunds received by any member of the ADS Group or any member of the Loyalty Ventures Group, including but not limited to Tax Refunds resulting from the matters set forth on Schedule C."[265] TMA Schedule C specifically lists "[L1 Canada] income tax payments made in order to appeal and litigate the 2013 tax assessments (and additional assessments in 2014-2016) issued by both Canadian federal and provincial tax authorities."[266]

286.    The TMA was executed by Jeff Fair, as Senior Vice President of "Loyalty Ventures on its own behalf and on behalf of the members of the Loyalty Ventures Group." Fair also co-signed the TMA, as Senior Vice President of "ADS on its own behalf and on behalf of the members of the ADS Group."

**P.    THE SPINOFF TRANSACTION LEFT LVI LEGALLY AND EQUITABLY INSOLVENT, AND WITH UNREASONABLY SMALL CAPITAL FOR THE BUSINESS IN WHICH IT WAS ENGAGED, UPON THE COMPLETION OF THE DISTRIBUTIONS TO ADS ON NOVEMBER 3, 2021**

287.    As a result of LVI's transfer of $650 million to ADILC (which it then distributed upstream to ADS) on November 3, 2021, LVI became legally insolvent. Upon the completion of that transfer, (a) LVI's debts totaled no less than the $675 million of Term Loan A and Term Loan B indebtedness, but (b) its only assets and property were the Contributed Shares of the entities comprising the LoyaltyOne Business, and at a fair valuation, the LoyaltyOne Business

---

[265]    TMA, §8(a).

[266]    TMA, Schedule C.

was worth less than $450 million at the time of the transfer. Thus, the sum of LVI's debt was greater than all of its property and assets, at a fair valuation, upon the completion of the transfers to ADS on November 3, 2021.

288.   Upon the completion of the $650M Transfer, LVI now owed that amount and more under the Credit Agreement, as stated above:

    a.   LVI became obligated to make the amortization and interest payments described above on the Term Loan A and Term Loan B indebtedness on a quarterly basis until their stated maturities (November 3, 2026 and November 3, 2027, respectively). Those amortization payments were to be made in equal quarterly installments in an aggregate amount of 7.5% per annum of the initial aggregate principal balance of the Term Loan A and Term Loan B indebtedness. Pursuant to those terms, LVI was require to make annual amortization payments of over $48 million in 2022 alone, and over $45 million of such payments in 2023.

    b.   LVI became obligated to make interest payments on the Term Loan A and Term Loan B indebtedness at certain floating rates (which would increase if certain leverage ratios were exceeded) each quarter until their respective maturity dates in 2026 and 2027, amounting to several million dollars.

    c.   LVI became obligated to make additional amortization payments with respect to the Term Loan B on an annual basis starting in 2022, of either 0%, 25% or 50% of LVI's Excess Cash Flow (as defined in the Credit Agreement), depending on LVI's Consolidated Secured Leverage Ratio (as defined in the Credit Agreement).

289.   The Spinoff Transaction, engineered by ADS and rubber-stamped by Motes as LVI's sole director, rendered LVI equitably insolvent, *i.e.*, unable to pay its debts as they become due in the usual course of business, as of the time on November 3, 2021 when the distribution of the $650 million in net debt proceeds and the cash transfer to ADS was completed. At that point, LVI could not generate sufficient cash flows to pay certain of the quarterly and annual obligations that will become due on the Term Loan A and Term Loan B indebtedness in the usual course of LVI's business, and it therefore also had unreasonably small capital for the business in which it was engaged.

290.    Taking into account only facts that were known or knowable as of November 3, 2021, including (i) the long-term historical declines in the revenues and earnings of the AIR MILES and BrandLoyalty businesses (including declines for several years prior to the COVID pandemic) and the continuing underlying reasons for those declines, (ii) the statements of Sobeys' senior leadership prior to the Spinoff Transaction, advising that Sobeys' contract would not be renewed in 2023, and could be terminated earlier pursuant to its early termination rights prior to the expiration of its contract, and (iii) the expected margin compression that would result from the price concessions BMO and Shell Canada would require in the near term to renew their participation in the AIR MILES program as well as poor industry conditions, several things were likely to happen.

291.    First, LVI's cash balance would steadily decrease throughout the period from the first quarter of 2022 through the fourth quarter of 2026 and beyond.

292.    Second, by no later than the third quarter of 2025, LVI's cash balance would fall below $100 million, which was the minimum amount of cash liquidity needed to operate its business, because its operations could not generate sufficient net cash flows to maintain its cash balance at or above that level.

293.    Third, at that time, however, LVI would not be able to draw on the Revolving Credit Facility to meet its minimum cash liquidity need. That is because by no later than the third quarter of 2024 and in all quarters thereafter through the fourth quarter of 2026 and beyond, LVI's Consolidated Total Leverage Ratio would exceed the maximum levels permitted by the Credit Agreement (*e.g.*, in the third quarter of 2024, LVI's Total Consolidated Leverage Ratio would equal at least 4.32x, an amount exceeding the maximum level of 4.25x permitted under the Credit Agreement for that quarter). As a consequence of the covenant breaches in the third

quarter of 2024 through the fourth quarter of 2026 and beyond, under the Credit Agreement's terms, LVI would be prohibited from borrowing under the Revolving Credit Facility in any of those quarters, and therefore the Revolving Credit Facility would not be available to LVI to provide the minimum $100 million amount of cash liquidity needed to operate its business, much less make the Term Loan A and Term Loan B amortization payments of at least $12.6 million and the interest payments of at least $7.5 million, in each of those quarters.

294.     Moreover, the ongoing breach of the Consolidated Total Leverage Ratio, with no ability to cure the breach through a paydown of debt with cash generated by its operations, would result in an Event of Default under the Credit Agreement, leading to an acceleration of the more than $500 million in principal outstanding on the Term Loan A and Term Loan B indebtedness in the third quarter of 2024.

295.     Fourth, upon acceleration, LVI would have no ability to pay such principal, either with cash generated by its operations, or by liquidating its operating assets, or by rolling over the debt into new loans from existing or new lenders. With an outlook of further declining cash flows and increasing leverage ratios through the fourth quarter of 2026 and beyond, LVI would have no access to funding in the capital markets sufficient to replace the defaulted loans.

296.     Consistent with its statement in late 2020 regarding its early termination rights, Sobeys announced on June 7, 2022 that it would discontinue its participation in the AIR MILES program beginning in August 2022, terminating its contract early and would join the "Scene+" program.[267] LVI gave a different explanation, stating that "disclosed that its AIR MILES Reward Program segment and AIR MILES' Sponsor, Sobeys were unable to align on extension terms;

---

[267]     https://www.empireco.ca/news/empire-becomes-co-owner-of-scene-unveils-refreshed-loyalty-strategy. Empire Company Limited, Sobeys' parent company, disclosed that it had become a co-owned of Scene +, along with Scotiabank and Cineplex. *Id.*

consequently, Sobeys provided notice of its intent to exit the program on a region-by-region basis, beginning with Atlantic Canada, between August and the first quarter of 2023."[268] Sobeys' departure had the previously expected consequence of empowering the remaining two of AIR MILES' top three customers (BMO and Shell Canada) to demand and obtain substantial price concessions upon renewal of their contracts. Those price concessions substantially compressed AIR MILES earnings margin, exactly as the Spin Team had cautioned ADS during the lead-up to the spin. Nothing has occurred after November 3, 2021 to lift LVI out of the insolvent condition in which Motes and ADS left it. To the contrary, subsequent events only accelerated the timetable for LVI's defaults under the Term Loans, requiring it to file the present Chapter 11 case.

297.    ADS, on the other hand, is thriving now that its debt load is lightened thanks to the ill-gotten dividend it extracted from LVI with Motes's assistance. Indeed, ADS's Chief Executive Officer Andretta boasted to the press soon after the spin that ADS's balance sheet had "just got a shot of adrenaline."[269] That figurative shot of adrenaline came at a steep price for LVI—LVI's balance sheet insolvency. For his part in the scheme, ADS showered Motes, as LVI's sole Director approving the Spinoff Transaction, with over $4 million in cash and stock-based compensation for 2021, specifically recognizing his role in effectuating the transaction for ADS in setting his bonus for the year. That was more than double what Motes had earned in any prior year and made him ADS's highest paid executive after its Chief Executive Officer. Motes and ADS should not be allowed to continue to benefit from their wrongdoing and should be

---

[268]    *See*    https://www.globenewswire.com/news-release/2022/06/08/2458545/0/en/Loyalty-Ventures-Inc-Provides-Update-on-its-AIR-MILES-Reward-Program-Business.html

[269]    *See*    https://www.bizjournals.com/columbus/news/2022/01/27/slimmed-down-alliance-data-triples-profit-in-2021.html.

required to fully redress the damage they have caused LVI, its creditors, and other stakeholders, including the Trust's beneficiaries.

298.    Due to ADS's insufficient capitalization of LVI, and LVI's resulting inability to fund investments needed to reverse BrandLoyalty's long shrinking market share, LVI sold BrandLoyalty for $6 million on March 1, 2023, prior to the filing of the Chapter 11 petition. The sale required a $25 million "bridge" loan because of the business' dire condition. The sale price was a fraction of the aggregate $707.7 million price for which ADS had purchased BrandLoyalty's ownership interests between seven and nine years earlier. LVI was forced to sell BrandLoyalty to a competitor for virtually no proceeds, in order to (i) avoid an imminent insolvency proceeding for that business in the Netherlands and more than a dozen other countries thereafter (due to BrandLoyalty's position as a guarantor of the Credit Agreement, and (ii) preserve jobs for its hundreds of employees.

## VI.    THE DEBTORS' BANKRUPTCY FILING AND PLAN OF REORGANIZATION

299.    On March 10, 2023, the "Petition Date," the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for the Southern District of Texas.[270]

300.    The Debtors' bankruptcy filing followed several months of negotiations with an ad hoc group of Term Loan B lenders.[271] Counsel for the Credit Agreement's Administrative Agent and the Term Loan A lenders also participated in these discussions.[272]

---

[270]    *See In re LOYALTY VENTURES INC., et al.*, Case No. 23-90111 (CML) (Bankr. S.D. Tex.) (jointly administered).

[271]    *See* Combined DS and Plan, at 23.

[272]    *Id.*

301.    On March 10, 2023, the Debtors and their non-Debtor subsidiaries and affiliates and lenders holding more than 72% of the loans outstanding under the Credit Agreement entered into a Transaction Support Agreement.[273] Pursuant to the Transaction Support Agreement, the parties agreed to work cooperatively to implement the sale of the AIR MILES business, the consummation of what would become the Plan.[274] The parties agreed that the Plan would provide for the Debtors transfer of the claims and causes of action against the "Bread Parties" (as defined in the Plan) and the "Spinoff Claims and Cause of Actions" (as defined in the Plan) to a liquidating trust.[275] The parties also agreed to wind-down their assets and operations and to sell the BrandLoyalty business.[276]

302.    The Debtors ultimately sold substantially all of their assets during the course of the Debtors' bankruptcy cases. Thereafter, the Bankruptcy Court confirmed the Plan. The Plan later became "effective."

303.    The Plan provided for the preservation of the "Preserved Estate Claims," as such term is defined in Plan Article I.A.112. "Preserved Estate Claims" include

(i)     the Spinoff Claims and Causes of Action and (ii) all Causes of Action of the Debtors that are not released or waived pursuant to the Plan and are identified in the Plan Supplement, including, for the avoidance of doubt, all Causes of Action against the Bread Parties, whether or not described in the Schedule of Preserved Estate Claims or in Article III.A. [t]hereof, …[277]

304.    The "Spinoff Claims and Causes of Action" are defined in the Plan as

---

[273]    *Id.*

[274]    *Id.*, at 23-24.

[275]    *Id.*

[276]    *Id.*

[277]    Plan, Art. I.A.112.

means any Claim or Cause of Action that may be or can be asserted against (i) any individual or (ii) any Entity (other than the Lenders or the Administrative Agent), for his, her, or its involvement in, directly or indirectly, the Spinoff Transaction or any transaction related to the Spinoff Transaction; *provided however,* that any such Spinoff Claims and Causes of Action shall not include claims or causes of action against any individual that meets both of the following: (y) who served as a director, manager or officer for any Debtor or non-Debtor direct or indirect subsidiary of a Debtor at any time after the completion of the Spinoff Transaction (as defined and described below) and (z) did not serve in any such capacity for Bread or its Affiliates (except for the Debtors and the Debtors' direct and indirect non-Debtor subsidiaries) at any time after completion of the Spinoff Transaction.[278]

305.    Exhibit B to the Plan Supplement contains the "Schedule of Preserved Estate Claims."[279] Exhibit B to the Plan Supplement specifically expressly preserves

- any and all Spinoff Claims and Causes of Action against Bread Parties, including without limitation:

  - claims for avoidance of the $650 million transfer made by LVI to Alliance Data International LLC ("ADILC") on November 3, 2021 (the "$650 Million Transfer") as an actual or constructive fraudulent transfer, and for recovery of such transfer from Bread, under the Bankruptcy Code (including but not limited to sections 544, 548 and 550 thereof), under the Texas Uniform Fraudulent Transfer Act and/or under the fraudulent conveyance, fraudulent transfer or voidable transactions acts, or similar acts or laws, of other jurisdictions, as applicable;

  - claims for breach of fiduciary duty in connection with the Spinoff Transaction by or in the right of LVI against any Bread Party, including Bread and Joseph L. Motes III;

  - claims for aiding and abetting breach of fiduciary duty in connection with the Spinoff Transaction by or in the right of LVI against Bread and/or any current or former director or officer of Bread who is not a Released Party;

  - claims for disallowance in accordance with Bankruptcy Code section 502(d) of any Claim held by Bread or any other Bread Party against any of the Debtors (or of any Liquidating Trust

---

[278]    *Id.,* Art. I.A.137.

[279]    *See* Case No. 23-90111, Docket No. 186.

Interests that may be exchanged for such Claims upon the occurrence of the Effective Date);

o   claims for equitable subordination under Bankruptcy Code section 510(c) of any Claim held by any Bread Party (or of any Liquidating Trust Interests that may be exchanged for such Claims upon the occurrence of the Effective Date);

o   claims for avoidance of all or any part of $100 Million Cash Sweep as an actual or constructive fraudulent transfer, and for recovery of such transfer from Bread, under the Bankruptcy Code (including but not limited to sections 544, 548 and 550 thereof), under the Texas Uniform Fraudulent Transfer Act, or under the fraudulent conveyance, fraudulent transfer or voidable transactions acts, or similar acts or laws, of other jurisdictions, as applicable; and

o   any and all Spinoff Claims and Causes of Action against the Bread Parties that may be assigned to the Debtors or to the Liquidating Trust by [L1 Canada], Brand Loyalty Group B.V. or any of their respective direct or indirect subsidiaries;[280]

306.   The Plan Supplement defines the "$100 Million Cash Sweep" as

the series of transfers conducted from on or about October 20, 2021 through November 3, 2021 by which cash totaling approximately $100 million was collected and transferred, through dividends, distributions, payments, returns of capital and/or other forms of transfer, from Brand Loyalty Group B.V. and/or its Affiliates, Loyalty One, Co., Apollo Holdings B.V., LVI Lux Financing S.àr.l., Rhombus Investments L.P. and ADI Crown Helix Limited, to ADILC.[281]

307.   Exhibit B to the Plan Supplement specifically expressly preserves

•   any and all objections and defenses to any Preserved Challenge that may be asserted by a Bread Party pursuant to Article IV.K.2;

•   any and all Spinoff Claims and Causes of Action against any Entity that was a legal, financial, tax, accounting or other advisor to Bread or any other Bread Party in connection with the Spinoff Transaction and that is not a Released Party, whether based on common law, equity or violation of a statutory or regulatory duty or obligation, including but not limited to such Causes of Action based on theories of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, gross negligence,

---

[280]   Case No. 23-90111, Docket No. 186. Exhibit B, at 3-4.

[281]   Case No. 23-90111, Docket No. 186. Exhibit B, at 4, n.2.

111

fraud, prima facie tort, unjust enrichment, constructive trust or any other theory whatsoever;

- any and all Causes of Action against any Entity that is not a Bread Party and is not a Released Party for recovery under Bankruptcy Code section 550 of all or any part of the $650 Million Transfer or of the $100 Million Cash Sweep, to the extent that such transfer(s) are avoided under Bankruptcy Code sections 544 and/or 548 and such Entity was a mediate transferee of such transfer or part thereof; …

- any and all settlement or other agreements (or similar documents) involving any of the Debtors; …

- unless otherwise explicitly released under the Plan, any and all actual or potential Avoidance Actions that may be brought by or on behalf of the Debtors, their Estates, or authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including Bankruptcy Code sections 502, 510, 542, 544, 545, 547 through and including 553 and 724(a), or under similar or related state or federal statutes and common law, including fraudulent transfer laws;

- any and all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Liquidating Trustee, including, but not limited to, obligations owing to taxing authorities included in Exhibit B(i); …

- any and all Causes of Action against any Entity that owed any legal duty, no matter how arising, to any Debtor; … and

- any and all Causes of Action against any Entity against whom a Preserved Estate Claim is discovered after the confirmation of the Plan.[282]

308. The Plan provides that the Debtors irrevocably transferred and were deemed to transfer the Liquidating Trust Assets to the Liquidating Trust.[283]

309. A critical element of the Plan was for the Credit Agreement's lenders, whose claims were classified as "Class 3" "Loan Claims" under the Plan, to receive, *inter alia*, the right

---

[282]   Case No. 23-90111, Docket No. 186. Exhibit B, at 4-7.

[283]   *See* Plan, Art.VIII.N.1.

to net proceeds of "Preserved Estate Claims," and that a vehicle would be established to pursue such "Preserved Estate Claims." That vehicle was the Liquidating Trust.

310.    Under the Plan, Intercompany Claims are "cancelled, settled and released without any distribution." [284] The Plan defines "*Intercompany Claim*" to mean:

> any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor, in each case other than a DIP Facility Claim. In no event shall any claim held by the Debtors against any of the Bread Parties or any Spinoff Claim and Cause of Action be considered an Intercompany Claim."[285]

## VII.    ADDITIONAL FACTUAL ALLEGATIONS

311.    On November 3, 2021, a date within two years before the filing of its Chapter 11 petition, LVI transferred $650 million to ADILC, i.e., the $650M Transfer. The $650M Transfer occurred pursuant to the terms of the Contribution Agreement, and was comprised of $650 million in net cash proceeds received by LVI on account of the Term Loan A and Term Loan B indebtedness.

312.    By virtue of the knowledge and intent of the members of the ADS Board and ADS's officers who controlled LVI at the time, including Andretta, Ballou, Beberman, Gerspach, and Motes, LVI involuntarily made the $650M Transfer with actual intent to hinder, delay, or defraud LVI's then present and future creditors, including the Credit Agreement's lenders. The intent of the members of the ADS Board and ADS's officers who controlled LVI at the time of the $650M Transfer to hinder, delay, or defraud LVI's then present and future creditors can be reasonably inferred from numerous badges of fraud surrounding the transfer and the Spinoff Transaction of which it was an essential part.

---

[284]    Plan, Art. VII.B (g)(2).

[285]    Plan, Art. I.A.81.

313.   **The $650M Transfer was a transfer to an insider of LVI**. The $650M Transfer was made to an insider, namely, ADS's wholly-owned indirect subsidiary ADILC. ADILC was a person in control of LVI at the time of the transfer by virtue of its direct ownership of 100% of the voting common stock of LVI. And the transfer was made for the benefit of another insider, namely, ADS. ADS was a person in control of LVI at the time of the transfer by virtue of both its indirect ownership of 100% of voting common stock of LVI and its appointment of its own General Counsel, Motes, as the sole Director of LVI. Motes acted solely in the interest of and in accordance with the directions of ADS and the ADS Board, the latter of which acted through its members. Motes authorized and directed the $650M Transfer from LVI to ADILC with the intent that the $650 million transferred to ADILC would be distributed up the corporate chain to ADS on November 3, 2021, in accordance with a previously determined plan and scheme to put that cash in ADS's hands.

314.   **The value of the consideration received by LVI in respect of the $650M Transfer was not reasonably equivalent to the $650 million transferred to ADILC.** LVI received inadequate and less than reasonably equivalent value in exchange for the $650M Transfer to ADILC because the Contributed Shares of the entities comprising the LoyaltyOne Business that LVI received from ADILC, at a fair valuation, at the time of the $650M Transfer, were worth less than $450 million.

315.   **LVI was insolvent or became insolvent shortly after the $650M Transfer to ADILC.** The $650M Transfer rendered LVI insolvent because, upon completion of the $650M Transfer, (a) the sum of LVI's debts was no less than the $675 million then owing on the Term Loans, but (b) LVI's only property was the Contributed Shares of the entities comprising the LoyaltyOne Business, and the LoyaltyOne Business was worth less than $650 million.

316. **The $650M Transfer occurred shortly after LVI incurred a substantial debt.** The $650M Transfer occurred shortly after LVI incurred a substantial debt in the amount of $675 million under the Credit Facilities, including Term Loan A debt and Term Loan B debt.

317. The financial condition of LVI's business was distressed before the Spinoff Transaction and became even more so after the Spinoff Transaction. The LoyaltyOne businesses that ADS caused LVI to take in exchange for the $650M Transfer had been continuously deteriorating for several years before the Spinoff Transaction. After, and as a direct result of the $650M Transfer, LVI was left in an extremely vulnerable financial condition—with unreasonably small capital to operate its business. Based on the facts that were known or knowable to ADS, the members of the ADS Board, Andretta, Beberman, and Motes at the time of the Spinoff Transaction, LVI would exhaust all available sources of liquidity and would be unable to pay its debt obligations as they became due in the usual course of business.

318. **The extent of the incurrence of the Liability Assumption was concealed.** SDA Schedule 4.02(a), titled "Loyalty Ventures Assumed Actions," was not publicly filed. Similarly, none of the other SDA schedules were publicly filed.

319. **LVI had been sued at the time of the $650M Transfer.** As outlined in SDA Schedules 4.02(a), and 4.02(b), ADS and the businesses that would become LVI as a result of the Spinoff Transaction had been sued at the time of the $650M Transfer.

320. The chronology of events leading up to the $650M Transfer further confirms the actual intent of Motes, the members of the ADS Board, as well as Andretta (in his capacity as ADS's Chief Executive Officer) and Beberman --who together controlled LVI--to delay, hinder, and defraud LVI's present and future creditors, including most immediately the Credit Agreement's lenders who lent the $650 million transferred to ADS.

321.    Over the course of three years prior to the Spinoff Transaction, ADS had tried and failed to sell the BrandLoyalty and AIR MILES businesses. In 2019, ADS's efforts to sell BrandLoyalty, with the assistance of a prominent investment banking firm, led only to a single verbal offer of a mere $30 million. ADS's efforts to sell the AIR MILES business in 2020 and 2021, with the assistance of another prominent investment banking firm, yielded no offers to purchase the business for anything approaching $650 million, except on conditions that required commitments and participation of third parties that ADS did not control and whose agreement to those terms ADS had no ability to deliver.

322.    When ADS's years' long efforts to unload the ailing and unwanted LoyaltyOne businesses failed, ADS hatched the scheme to get rid of them in the leveraged Spinoff Transaction, the principal object of which was to generate the $750 million in immediate cash proceeds for ADS that it could not obtain through an arms'-length sale of the businesses to any third party.

323.    ADS pursued the Spinoff Transaction with singular urgency to complete it before the even more disappointing fourth quarter 2021 results became known, and the intended departure of Sobeys from the AIR MILES program—of which the members of the ADS Board and ADS's senior executives were well aware—materialized. ADS knew that once those facts became known, prospective lenders would likely shun the transaction, even on the onerous terms that ADS, the ADS Board's members, Beberman, and Motes caused LVI to agree to in order to entice the Credit Agreement's lenders. Consistent with this, the E&Y Report, August ADS Board Audit Committee Presentation, and the final presentation for the October 13, 2021 "go or no go" Board meeting each acknowledged the importance of the timing of the Spinoff Transaction because "[s]ponsor contract renewal dates are upcoming."

116

324.     The members of the ADS Board, as well as Beberman, Motes, and others, contemplated the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction, including the $650M Transfer that Plaintiff hereby seeks to avoid, and privately conceded that the transaction required LVI to bear too much debt.

325.     ADILC was the initial transferee of the $650M Transfer from LVI. ADILC then distributed the $650 million of cash to its immediate parent, ADFH. ADFH then distributed the $650 million of cash to its immediate parent, ADSFH. And finally, ADSFH then distributed the $650 million of cash to its immediate parent, ADS. Thus, each of ADFH, ADSFH, and ADS (now known as Bread) was a subsequent transferee of the initial transfer of $650 million from LVI to ADILC. Moreover, ADS was the entity for whose benefit such initial transfer was made, since ADILC and ADS intended that ADILC would distribute the transferred property up to ADS so that ADS could use it to pay down ADS's outstanding debt. That, indeed, was the ultimate purpose and design of the entire Spinoff Transaction.

326.     **At the time of $650M Transfer, LVI was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was unreasonably small capital.** As a result of the Spinoff Transaction, LVI was burdened with required amortization payments equal to 7.5% of the initial $675 million principal balance per annum under the Credit Agreement plus additional annual prepayments equal to up to 50% of LVI's excess cash. These large required payments significantly constrained LVI's available cash flows and deprived LVI of cash needed to remain viable after the Spinoff Transaction. Based on information known or knowable at the time of the Spinoff Transaction, with the increased amortization payments, LVI faced a predictable and steady decline in available cash, which would inevitably lead to the breach of covenants

contained in the Credit Agreement and the acceleration of amounts due to the Credit Agreement's lenders. Further, the inadequate capitalization led to LVI's having to sell the Brand Loyalty business for pennies on the dollar on the eve of filing for bankruptcy. Thus, the Spinoff Transaction occurred when LVI was engaged in a business for which its remaining assets were unreasonably small in relation to the business or transaction.

327.    Based on cash and revolving loan balances, and realistic projections of LVI's cash needs, LVI would run out of cash in the second quarter of 2026, and would have exceeded the maximum consolidated total leverage ratio during the fourth quarter of 2024.

328.    On September 26, 2019, Rhombus executed the Rhombus Promissory Note. Rhombus received no consideration for its execution of the Rhombus Promissory Note, let alone reasonably equivalent value for doing so. The Rhombus Promissory Note represented a vehicle to require Rhombus to upstream previously taxed and untaxed "E&P", i.e., earnings and profit, akin to locking in a future obligation to upstream money distribution.

329.    On October 25, 2021, a date within two years before the filing of its Chapter 11 petition, Rhombus transferred $100 million to ADI Crown Helix Limited, *i.e.*, the $100M Transfer. The $100M Transfer was one step in the multi-step Spinoff Transactions, and was done in contemplation of the completion of the Spinoff Transaction following the incurrence of the indebtedness under the Credit Agreement.

330.    By virtue of the knowledge and intent of the members of the ADS Board and ADS's officers who controlled Rhombus at the time, including Andretta, Ballou, Beberman, and Motes, Rhombus involuntarily made the $100M Transfer with actual intent to hinder, delay, or defraud Rhombus's creditors, namely LVI, and indirectly LVI's creditors. The intent of the members of the ADS Board and ADS's officers who controlled Rhombus at the time of the

$100M Transfer to hinder, delay, or defraud Rhombus's future creditor, LVI can be reasonably inferred from numerous badges of fraud surrounding the transfer itself and the Spinoff Transaction as a whole.

331. **The $100M Transfer was a transfer to an insider, ADI Crown Helix Limited, for ultimate distribution to ADS, also an insider**. The $100M Transfer was made to ADI Crown Helix Limited, then to ADILC, for ultimate distribution to ADS, all of which were insiders of ADS's wholly-owned indirect subsidiary Rhombus. ADI Crown Helix Limited, ADILC, and ADS were persons in control of Rhombus at the time of the transfer. At the time of the $100M Transfer, (i) ADI Crown Helix Limited was a wholly owned direct subsidiary of ADILC, (ii) ADILC was a wholly owned subsidiary of Alliance Data Foreign Holdings, Inc., (iii) Alliance Data Foreign Holdings, Inc. was a wholly owned subsidiary of ADS Foreign Holdings, Inc., (iv) ADS Foreign Holdings, Inc. was a wholly owned subsidiary of ADS, (v) Alliance Data Lux Holdings S.àr.l was a wholly owned subsidiary of ADILC, and (vi) Rhombus, whose general partner Alliance Data Lux Holdings S.àr.l.

332. Thus, ADS was in control of Rhombus with respect to the $100M Transfer through its voting control of ADILC, which itself held voting control of both ADI Crown Helix Limited and Alliance Data Lux Holdings S.àr.l., the general partner of Rhombus. Moreover, Motes authorized and directed the $100M Transfer from Rhombus to ADI Crown Helix Limited with the intent that the $100 million transferred to ADI Crown Helix Limited would be distributed up the corporate chain to ADS, in accordance with a previously determined plan and scheme to put that cash in ADS's hands. Further, at the time of the transfer, Motes was the President of Alliance Data Foreign Holdings, Inc., which was the sole member of ADILC.

333.     **The value of the consideration received by Rhombus in respect of the $100M Transfer was not reasonably equivalent to the $100 million transferred to ADI Crown Helix Limited, as the intermediate transferee of ADS.** Rhombus received inadequate and less than reasonably equivalent value in exchange for the $100M Transfer to ADI Crown Helix Limited because the Rhombus Promissory Note was not given in 2019 in exchange for reasonably equivalent value.

334.     **Rhombus became insolvent shortly after the $100M Transfer to ADI Crown Helix Limited.** Following the $100M Transfer, Rhombus remained liable under the Rhombus Promissory Note, but Rhombus's only assets were its shares of LVI Lux Financing S.àr.l., the parent of Apollo Holdings B.V. and LoyaltyOne Co., each of which were Guarantors of the $675 million Term Loans extended to LVI. Because both (a) Apollo Holdings B.V. and its direct and indirect subsidiaries through which the BrandLoyalty business was conducted and (b) L1 Canada were guarantors under the Credit Agreement, the insolvency of those entities as a result of the Spinoff Transaction rendered Rhombus's assets, namely the stock in its subsidiaries, worthless.

335.     The chronology of events leading up to the $100M Transfer further confirms the actual intent of Motes, the members of the ADS Board, as well as Andretta (in his capacity as ADS's Chief Executive Officer) and Beberman, who controlled Rhombus at the time, to delay, hinder, and defraud Rhombus's future creditors and LVI's future creditors, including most immediately the Credit Agreement's lenders which would extend the $675M combined Term Loan A and Term Loan B to LVI shortly after the $100M Transfer was made.

336.     Over the course of three years prior to the Spinoff Transaction, ADS had tried and failed to sell the BrandLoyalty and AIR MILES businesses. In 2019, ADS's efforts to sell BrandLoyalty, with the assistance of a prominent investment banking firm, led only to a single

120

verbal offer of a mere $30 million. ADS's efforts to sell the AIR MILES business in 2020 and 2021, with the assistance of another prominent investment banking firm, yielded no offers to purchase the business for anything approaching $650 million, except on conditions that required commitments and participation of third parties that ADS did not control and whose agreement to those terms ADS had no ability to deliver.

337.    When ADS's years' long efforts to unload the ailing and unwanted LoyaltyOne businesses failed, ADS hatched the scheme to get rid of them in the leveraged Spinoff Transaction, the principal object of which was to generate the $750 million in proceeds for ADS that it could not obtain through an arms'-length sale of the businesses to any third party.

338.    ADS pursued the Spinoff Transaction with singular urgency to complete it before the even more disappointing fourth quarter 2021 results became known, and the intended departure of Sobeys from the AIR MILES program—of which the members of the ADS Board and ADS's senior executives were well aware—materialized. ADS knew that once those facts became known, prospective lenders would likely shun the transaction, even on the onerous terms that ADS, the ADS Board's members, Beberman, and Motes caused LVI to agree to in order to entice the Credit Agreement's lenders. Consistent with this, the E&Y Report, August ADS Board Audit Committee Presentation, and the final presentation for the October 13, 2021 "go or no go" Board meeting each acknowledged the importance of the timing of the Spinoff Transaction because "[s]ponsor contract renewal dates are upcoming."

339.    The members of the ADS Board, as well as Beberman, Motes, and others, contemplated the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction (indicative of the low value of Rhombus), including the $100M Transfer that

Plaintiff hereby seeks to avoid, and privately conceded that the transaction required LVI to bear too much debt.

340.    Plaintiff is the assignee and transferee of Rhombus's Preserved Estate Claims (as defined in the Plan).

341.    ADI Crown Helix Limited was the initial transferee of the $100M Transfer from Rhombus. ADI Crown Helix Limited then distributed the $100 million of cash to its immediate parent, ADILC. ADILC then distributed the $100 million of cash to its immediate parent, ADFH. ADFH then distributed the $100 million of cash to its immediate parent, ADSFH. And finally, ADSFH then distributed the $100 million of cash to its immediate parent, ADS. Thus, each of ADILC, ADFH, ADSFH, and ADS, was a subsequent transferee of the initial transfer of $100 million from Rhombus to ADI Crown Helix Limited. Moreover, ADS was the entity for whose benefit such initial transfer was made, because ADI Crown Helix Limited, ADILC, ADFH, ADSFH, and ADS all intended that ADI Crown Helix Limited would distribute the transferred property up to ADS so that ADS could use it to pay down ADS's outstanding debt. That, indeed, was the ultimate purpose and design of the entire Spinoff Transaction.

342.    **Rhombus became insolvent shortly after the $100M Transfer to ADI Crown Helix Limited.** Following the $100M Transfer, Rhombus remained liable under the Rhombus Promissory Note, but Rhombus's only assets were its shares of LVI Lux Financing S.a.r.l., the parent of Apollo Holdings B.V. and LoyaltyOne Co., each of which were Guarantors of the $675 million Term Loans extended to LVI. Because both (a) Apollo Holdings B.V. and its direct and indirect subsidiaries through which the BrandLoyalty business was conducted and (b) L1 Canada were guarantors under the Credit Agreement, the insolvency of those entities as a result of the Spinoff Transaction rendered Rhombus's assets, namely the stock in its subsidiaries, worthless.

343.   **At the time of the $100 million transfer to ADI Crown Helix Limited, Rhombus was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was unreasonably small capital.** As an indirectly-held, non-operating subsidiary of LVI, Rhombus's ability to "engage in a business or transaction" was tied to LVI's ability to do so. As noted above, as a result of the Spinoff Transaction, LVI was burdened with required amortization payments equal to 7.5% of the initial $675 million principal balance per annum under the Credit Agreement plus additional annual prepayments equal to up to 50% of LVI's excess cash. These large required payments significantly constrained LVI's available cash flows and deprived LVI of cash needed to remain viable after the Spinoff Transaction. Based on information known or knowable at the time of the Spinoff Transaction, with the increased amortization payments, LVI faced a predictable and steady decline in available cash, which would inevitably lead to the breach of covenants contained in the Credit Agreement and the acceleration of amounts due to the lenders. Further, the inadequate capitalization led to LVI's having to sell the Brand Loyalty business (an indirect subsidiary of Rhombus) for pennies on the dollar on the eve of filing for bankruptcy. Thus, the Spinoff Transaction occurred when Rhombus was engaged in a business for which its remaining assets were unreasonably small in relation to the business or transaction.

344.   As part of the corporate reorganization that occurred in connection with the Spinoff Transaction, but after the $100M Transfer occurred, ADI Crown Helix Limited became a wholly owned subsidiary of LVI. ADI Crown Helix Limited was dissolved immediately prior to the Debtors' Petition Date. Upon ADI Crown Helix Limited's dissolution, its rights under the Rhombus Promissory Note passed to LVI. Thus, LVI as successor-in-interest to ADI Crown

Helix Limited with respect to the rights under the Rhombus Promissory Note, is an "eligible creditor" as such term is defined in Bermuda Conveyancing Act of 1983, § 36A(1).

345.    On November 3, 2021, a date within two years before the filing of its Chapter 11 petition, LVI incurred the Tax Litigation Proceeds Transfer Obligation – *i.e.*, the right of L1 Canada to recover up to CAD 75-80 million resulting from ongoing litigation between L1 Canada and Canadian taxing authorities – to ADS pursuant to the Tax Matters Agreement, which was entered into at the same time as and in conjunction with the SDA. The incurrence of the Tax Litigation Proceeds Transfer Obligation was one step in the multi-step Spinoff Transactions, and was done in contemplation of the completion of the Spinoff Transaction following the incurrence of the indebtedness under the Credit Agreement.

346.    By virtue of the knowledge and intent of the members of the ADS Board and ADS's officers who controlled LVI at the time, including Andretta, Ballou, Beberman, and Motes, LVI involuntarily incurred the Tax Litigation Proceeds Transfer Obligation with actual intent to hinder, delay, or defraud LVI's then present and future creditors, including the Credit Agreement's lenders. The intent of the members of the ADS Board and ADS's officers who controlled LVI at the time of the incurrence of the Tax Litigation Proceeds Transfer Obligation to hinder, delay, or defraud LVI's then present and future creditors can be reasonably inferred from numerous badges of fraud surrounding the transfer and the Spinoff Transaction of which it was an essential part.

347.    **The incurrence of the Tax Litigation Proceeds Transfer Obligation was a transfer to ADS, an insider of LVI**. The incurrence of the Tax Litigation Proceeds Transfer Obligation was made to an insider, namely, ADS. ADS was a person in control of LVI at the time of the transfer by virtue of both its indirect ownership of 100% of voting common stock of

124

LVI and its appointment of its own General Counsel, Motes, as the sole Director of LVI. Motes acted solely in the interest of and in accordance with the directions of ADS and the ADS Board, the latter of which acted through its members. Motes authorized and directed the incurrence of the Tax Litigation Proceeds Transfer Obligation from LVI to ADS on the day of the transfer, in accordance with a previously determined plan and scheme to put the Tax Litigation Proceeds Transfer Obligation in ADS's hands.

348.    **The value of the consideration received by LVI was inadequate and not reasonably equivalent to the incurrence of the Tax Litigation Proceeds Transfer Obligation transferred to ADS.** LVI entered into the Tax Matters Agreement as one step in the multi-step Spinoff Transaction, and in contemplation of the completion of the Spinoff Transaction. LVI received no additional value from ADS under the Tax Matters Agreement aside from the value that LVI otherwise received in the Spinoff Transaction, which consisted of the Contributed Shares. As noted above, the Contributed Shares received by LVI were far less in value than $650 million in cash transferred to ADILC at the time of the Spinoff Transaction,[286] and the additional incurrence of the Tax Litigation Proceeds Transfer Obligation to ADS only served to increase the discrepancy in value between the Contributed Shares and the transfers made by LVI in the Spinoff Transaction.

349.    **LVI was insolvent or became insolvent shortly after the incurrence of the Tax Litigation Proceeds Transfer Obligation to ADS.** LVI was insolvent at the time of the incurrence of the Tax Litigation Proceeds Transfer Obligation as a result of the $650 million payment it made to ADILC (which was ultimately transferred to ADS).[287] The Tax Litigation

---

[286]    *See* ¶ 314, *supra*.

[287]    *See* ¶ 315, *supra*.

Proceeds Transfer Obligation was additional property that ADS took from LVI in the Spinoff Transaction.

350.   **The incurrence of the Tax Litigation Proceeds Transfer Obligation occurred shortly after LVI incurred a substantial debt.** The incurrence of the Tax Litigation Proceeds Transfer Obligation to ADS occurred shortly after LVI incurred a substantial debt in the amount of $675 million under the Credit Facilities, including the Term Loan A debt and the Term Loan B debt.

351.   The financial condition of LVI's business was distressed both before the Spinoff Transaction and became even more so after the Spinoff Transaction.[288] The incurrence of the Tax Transfer Refund Obligation meant that LVI lost a potential source of additional funds as part of the Spinoff Transaction.

352.   The chronology of events leading up to the incurrence of the Tax Litigation Proceeds Transfer Obligation as part of the Spinoff Transaction confirms the actual intent of Motes, the members of the ADS Board, as well as Andretta (in his capacity as ADS's Chief Executive Officer) and Beberman --who together controlled LVI--to delay, hinder, and defraud LVI's present and future creditors, including most immediately the Credit Agreement's lenders who lent the $650 million transferred to ADS.

353.   Prior to the Spinoff Transaction, ADS had tried and failed to sell the BrandLoyalty and AIR MILES businesses over the course of three years from 2019 to 2021. ADS's efforts to sell BrandLoyalty in 2019, with the assistance of a prominent investment banking firm, led only to a single verbal offer of a mere $30 million. ADS's efforts to sell the AIR MILES business in 2020 and 2021, with the assistance of another prominent investment

---

[288]   *See* ¶ 317, *supra*.

banking firm, yielded no offers to purchase the business for anything approaching $650 million, except on conditions that required commitments and participation of third parties that ADS did not control and whose agreement to those terms ADS had no ability to deliver.

354.  When ADS's years' long efforts to unload the ailing and unwanted LoyaltyOne businesses failed, ADS hatched the scheme to get rid of them in the leveraged Spinoff Transaction, the principal object of which was to generate the $750 million in proceeds for ADS that it could not obtain through an arms'-length sale of the businesses to any third party.

355.  ADS pursued the Spinoff Transaction with singular urgency to complete it before the even more disappointing fourth quarter 2021 results became known, and the intended departure of Sobeys from the AIR MILES program—of which the members of the ADS Board and ADS's senior executives were well aware—materialized. Once those facts became known, prospective lenders would likely shun the transaction even on the onerous terms that ADS, the ADS Board's members, Beberman, and Motes had caused LVI to agree to in order to entice the Lenders. Consistent with this, the E&Y Report, August ADS Board Audit Committee Presentation, and the final presentation for the October 13, 2021 "go or no go" Board meeting each acknowledged that the timing of the Spinoff Transaction would be "favorable" because "[s]ponsor contract renewal dates are upcoming."

356.  The members of the ADS Board, as well as Beberman, Motes, and others, contemplated the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction, including the incurrence of the Tax Litigation Proceeds Transfer Obligation that Plaintiff hereby seeks to avoid, and privately conceded that the transaction required LVI to bear too much debt.

357.     **At the time of the incurrence of the Tax Litigation Proceeds Transfer Obligation to ADS, LVI was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was unreasonably small capital.** LVI incurred the Tax Litigation Proceeds Transfer Obligation to ADS at the time of the Spinoff Transaction. As a result of the Spinoff Transaction, LVI was burdened with required amortization payments equal to 7.5% of the initial $675 million principal balance per annum under the Credit Agreement <u>plus</u> additional annual prepayments equal to up to 50% of LVI's excess cash. These large required payments, which had not been contemplated in prior forecasts related to LVI's post-spinoff financial health, significantly constrained LVI's available cash flows and deprived LVI of cash needed to remain viable after the Spinoff Transaction. Based on information known or knowable at the time of the Spinoff Transaction, with the increased amortization payments, LVI faced a predictable and steady decline in available cash, which would inevitably lead to the breach of covenants contained in the Credit Agreement and the acceleration of amounts due to the lenders. Further, the inadequate capitalization led to LVI's having to sell the Brand Loyalty business for pennies on the dollar on the eve of filing for bankruptcy. Having incurred the Tax Litigation Proceeds Transfer Obligation to ADS in the Spinoff, tax litigation proceeds were no longer available to help delay this decline. Thus, the Spinoff Transaction occurred when LVI was engaged in a business for which its remaining assets were unreasonably small in relation to the business or transaction.

## VIII.   CAUSES OF ACTION

**<u>COUNT I</u>**
**Breach of Fiduciary Duty of Loyalty**
**(Against Motes)**

358.     Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

359.    When the Spinoff Transaction occurred, Motes was the sole director of LVI, while also serving as the Executive Vice President, Chief Administrative Officer, General Counsel and Secretary of ADS.

360.    Accordingly, Motes was not independent when the Spinoff Transaction occurred.

361.    As its sole director, Motes owed fiduciary duties of loyalty to LVI, including a duty to act in good faith and in the best interest of LVI at all times.

362.    The facts surrounding the Spinoff Transaction indicate that Motes did not act with loyalty to LVI with a view toward advancing LVI's best interests. ADS sought to effectuate the Spinoff Transaction to maximize a dividend payable to ADS and thereby improve ADS's balance sheet for the benefit of its Card Services business. ADS was also motivated to effectuate the Spinoff Transaction because of "favorable" timing, meaning that ADS could rid itself of the LoyaltyOne businesses prior to the contract renewal dates for key AIR MILES sponsors, including Sobeys. Motes attended ADS Board meetings where these motivations for the Spinoff Transaction were discussed, including the meetings on May 11-12, 2021, and October 13, 2021.

363.    Motes failed to make even the most cursory efforts to consider the impact of the Spinoff Transaction on LVI and instead deferred to his employer, ADS. In the months prior to the Spinoff Transaction, Motes did not retain counsel or any other third-party advisors on behalf of LVI to independently assess either whether the Spinoff Transaction was fair to LVI or whether LVI would be solvent upon the spinoff. This was true despite the fact that Motes knew that ADS had retained attorneys, financial advisors and consultants to ensure that ADS could maximize the dividend to be paid by LVI upon the Spinoff Transaction.

364.    As early as January 2021, Motes (along with the ADS Board and certain other members of ADS management) knew that Sobeys not only intended not to renew its AIR MILES

contract in 2023, but also that Sobeys intended to exercise early termination rights under its contract so that Sobeys would leave the AIR MILES program by the end of 2022. Motes accepted the financial projections for LVI created by ADS and its advisors, including the "downside scenario" projections, despite knowing that the projections did not account for Sobeys departure from the AIR MILES program.

365.    On November 3, 2021, Motes caused LVI to enter into the Spinoff Transaction, which required LVI to (a) borrow money under the Credit Agreement in Term Loan A and Term Loan B indebtedness in the aggregate amount of $675 million ($650 million of which was immediately paid to ADS, with the remainder covering debt issuance costs and other transaction costs); (b) pay the $100M Transfer to ADS; (c) incur the Tax Litigation Proceeds Transfer Obligation to ADS, and (d) accept the assignment of certain class action litigation liabilities related to the business. These terms, imposed by Motes' employer, rendered LVI insolvent following the Spinoff Transaction. The $650M Transfer rendered LVI insolvent, because following the Spinoff Transaction, LVI's only property was the Contributed Shares of the entities comprising the LoyaltyOne Business, and the LoyaltyOne Business was worth less than $450 million. Moreover, the Term Loans which Motes' employer forced LVI to accept contained onerous terms that constrained LVI cash flows and thereby left LVI inadequately capitalized to conduct its business.

366.    Based on information known or knowable as of November 3, 2021, Motes knew or should have known that the terms of the Spinoff Transaction imposed upon LVI were likely to render LVI insolvent and/or leave it inadequately capitalized to engage in business going forward.

367.    Based on his attendance at the October 13, 2021 Board Meeting, Motes knew that members of the ADS Board contemplated the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction, and privately conceded that the transaction required LVI to bear too much debt.

368.    In the run-up to and execution of the Spinoff Transaction, Motes did not act in good faith and in a manner he could have reasonably believed to be in, or not opposed to the best interests of LVI.

369.    Motes placed the financial interests of ADS and ADS's shareholders above the interests of LVI and its stakeholders, including LVI's creditors, particularly the Credit Agreement's lenders who provided LVI with $675 million in Term Loan A debt and Term Loan B debt s on November 3, 2021.

370.    Motes breached of his fiduciary duties owed to LVI through the Spinoff Transaction, and such breaches in connection with (i) the $650M Transfer, (ii) the $100M Transfer, (iii) the incurrence of the Tax Litigation Proceeds Transfer Obligations, and (iv) the incurrence of the ADS Indemnification Obligation, were the proximate cause and/or a substantial factor in causing LVI, its estate, LVI's creditors, and other stakeholders, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

## COUNT II
### Breach of Fiduciary Duties of Care and Loyalty
### (Against Bread)

371.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

372.    ADS (now known as Bread) was the controlling shareholder of LVI, indirectly owning 100% of its stock through intermediate wholly owned subsidiaries. Prior to the completion of the Spinoff Transaction on November 5, 2021, ADS therefore owed LVI and its

stakeholders (including the Credit Agreement's lenders who extended $675 million in Term Loan B debt and Term Loan A debt to LVI on November 3, 2021) a fiduciary duty of loyalty, including a duty of good faith and to act in LVI's best interests. Implicit was in this duty was a duty not to take actions that would render LVI insolvent.

373.    ADS controlled the Spinoff Transaction by appointing Motes as the sole director of LVI, who ADS knew would act for its benefit, rather than the benefit of LVI.

374.    The facts surrounding the Spinoff Transaction indicate that ADS breached their fiduciary duties to LVI with a view toward advancing LVI's best interests. ADS sought to effectuate the Spinoff Transaction to maximize a dividend payable to ADS and thereby improve ADS's balance sheet for the benefit of its Card Services business. ADS was also motivated to effectuate the Spinoff Transaction because of "favorable" timing, meaning that ADS could rid itself of the LoyaltyOne businesses prior to the contract renewal dates for key AIR MILES sponsors, including Sobeys. Numerous presentations from ADS Board meetings and meetings of the ADS Board Audit Committee make these motivations clear.

375.    As early as January 2021, the ADS Board and certain members of ADS's management knew that Sobeys not only intended not to renew its AIR MILES contract in 2023, but also that Sobeys intended to exercise early termination rights under its contract so that Sobeys would leave the AIR MILES program by the end of 2022. ADS nonetheless prepared financial projections for LVI and/or had its advisors prepare such projections, including "downside scenarios," despite knowing that the projections did not account for Sobeys' departure from the AIR MILES program.

376.    On November 3, 2021, ADS, through Motes, caused LVI to enter into the Spinoff Transaction, which required LVI to (a) borrow money under the Credit Agreement in Term Loan

A and Term Loan B indebtedness in the aggregate amount of $675 million ($650 million of which was immediately paid to ADS, with the remainder covering debt issuance costs and other transaction costs); (b) pay the $100M Transfer to ADS; (c) incur the Tax Litigation Proceeds Transfer Obligation to ADS, and (d) accept the assignment of certain class action litigation liabilities related to the business. The $650M Transfer rendered LVI insolvent, because following the Spinoff Transaction, LVI's only property was the Contributed Shares of the entities comprising the LoyaltyOne Business, and the LoyaltyOne Business was worth less than $450 million. Moreover, the Term Loans which Motes' employer forced LVI to accept contained onerous terms that constrained LVI's cash flows and thereby left LVI inadequately capitalized to conduct its business.

377.    Based on information known or knowable as of November 3, 2021, ADS knew or should have known that the terms of the Spinoff Transaction imposed upon LVI were likely to render LVI insolvent and/or leave it inadequately capitalized to engage in business going forward.

378.    At the October 13, 2021 Board Meeting, members of the ADS Board, as well as Beberman, Motes, and others, contemplated the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction, and privately conceded that the transaction required LVI to bear too much debt.

379.    As a controlling shareholder, ADS also owed LVI a fiduciary duty of care, which required, among other things, that it obtain and/or consider available information from which it would be informed of the financial impact of the Spinoff Transaction on LVI. However, the information that ADS obtained regarding the Spinoff Transaction focused on the impact of the

transaction on *ADS*, and in particular how to maximize the dividend payable to ADS, while leaving only a "minimally viable" LVI.

380.    In attempting to show that LVI would clear a "minimally viable" threshold, ADS relied on financial forecasts prepared by its advisors, including E&Y, that ADS knew were flawed and incomplete. For example, ADS knew, as early as January 2021, that Sobeys intended to exercise its early termination rights with respect to its AIR MILES contract and would exit the AIR MILES program by the end of 2022. However, when ADS retained E&Y to provide an analysis of the financial impact of the spin as to LVI, ADS did not inform E&Y of the Sobeys departure and thereby withheld information that should have been incorporated in any "downside scenario." Further, following the publication of the E&Y report, ADS ignored the feedback and information provided by the members of the Spin Team that in any way questioned the E&Y analysis. The E&Y Report was also flawed in other ways that ADS knew or should have known, including that it did not incorporate information that BofA Securities had provided to ADS concerning likely amortization rates for a Term Loan B. ADS thus failed to obtain information that was available to it that would have painted a complete picture of the impact of the Spinoff Transaction on LVI. ADS relied on other similarly flawed and one-sided projections throughout the process leading up to the Spinoff Transaction.

381.    ADS's breached of its fiduciary duties owed to LVI in the Spinoff Transaction, and such breaches in connection with (i) the $650M Transfer, (ii) the $100M Transfer, (iii) the incurrence of the Tax Litigation Proceeds Transfer Obligations, and (iv) the incurrence of the ADS Indemnification Obligation, were the proximate cause and/or a substantial factor in causing LVI, its estate, LVI's creditors, and other stakeholders, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty by Motes
### (Against Bread) (Pled in the Alternative)

382.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

383.    In the alternative, to the extent that Bread disputes that it was a fiduciary of LVI (and to the extent it is ultimately determined that Bread was not a fiduciary of LVI), then Bread is nonetheless liable for aiding and abetting Motes's breaches of fiduciary duties.

384.    As its sole director, Motes owed fiduciary duties of loyalty to LVI, including a duty to act in good faith and in the best interest of LVI at all times.

385.    Motes was not independent when the Spinoff Transaction occurred.

386.    Motes breached his fiduciary duties of loyalty owed to LVI.[289]

387.    In addition, as LVI's sole director, Motes owed a fiduciary duty of care to LVI. He breached that duty in connection with the Spinoff Transaction by wholly failing to obtain accurate, available information from which he would be informed of the financial impact of the Spinoff Transaction on LVI. To the extent Motes made any effort to inform himself of the financial impact of the Spinoff Transaction, the information was provided from the self-serving perspective of ADS and focused on the financial impact of the transaction on ADS. Motes's breaches of the duty of care were also a proximate cause and/or a substantial factor in causing LVI, its estate, LVI's creditors, and other stakeholders, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

388.    ADS (now known as Bread), aided and abetted Motes's breaches. First, ADS appointed Motes as the sole director of LVI while also allowing Motes to remain employed by

---

[289]    *See ¶¶ 359-70, supra.*

ADS as its Executive Vice President, Chief Administrative Officer, General Counsel and Secretary. In doing so, ADS knew that Motes's continued employment by ADS and service as an ADS officer would make Motes place ADS's interests in the Spinoff Transaction ahead of LVI's interests. ADS thus knowingly created the conflicted relationships between Motes, on the one hand, and ADS and LVI, on the other hand, that served as the basis for Motes's breaches of his fiduciary duties.

389.    Second, ADS knowingly participated in Motes's breaches of fiduciary duties by orchestrating the Spinoff Transaction and directing Motes to authorize LVI's entry into the transaction, while ADS knew or should have known that the Spinoff Transaction would likely render LVI insolvent and/or inadequately capitalized to engage in its business going forward. ADS also knowingly participated in Motes's breaches of fiduciary duties by, among other things, including Motes in ADS Board meetings where written materials made clear that the primary goals of the Spinoff Transaction were (a) to bolster the ADS Card Services business by improving ADS's balance sheet and (b) to extract ADS from the LoyaltyOne business at a "favorable" time, meaning before upcoming contract renewals for key sponsors of the AIR MILES program, including Sobeys. Further, ADS procured written projections of LVI's post-spin financial health, both internally and from its consultants, upon which Motes could ostensibly rely, even though ADS knew or should have known that those financial projections were flawed.

390.    ADS's aiding and abetting of Motes's breaches of fiduciary duties owed to LVI in the Spinoff Transaction, including his breaches in connection with (i) the $650M Transfer, (ii) the $100M Transfer, (iii) the incurrence of the Tax Litigation Proceeds Transfer Obligations, and (iv) the incurrence of the ADS Indemnification Obligation, were the proximate cause and/or

a substantial factor in causing LVI, its estate, LVI's creditors, and other stakeholders, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

## COUNT IV
**Aiding and Abetting Breaches of Fiduciary Duties by Motes and Bread
(Against Andretta, Ballou, Gerspach, Kimbrough,
Natarajan, Theriault, Tucker, and Turney)**

391.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

392.    Defendants Andretta, Ballou, Gerspach, Kimbrough, Natarajan, Theriault, Tucker, and Turner (together, the "Director Defendants") are liable for aiding and abetting the breaches of fiduciary duties by Motes and Bread.

393.    As its sole director, Motes owed fiduciary duties of care and loyalty to LVI, including a duty to act in good faith and in the best interest of LVI at all times.

394.    Motes was not independent when the Spinoff Transaction occurred.

395.    Motes breached his fiduciary duties of care and loyalty to LVI in connection with the Spinoff Transaction.[290]

396.    As LVI's controlling shareholder, indirectly owning 100% of its stock through intermediate wholly owned subsidiaries, ADS (now known as Bread) owed fiduciary duties care and loyalty to LVI, including a duty of good faith and to act in LVI's best interests. Implicit in these duties was a duty to not take actions that would render LVI insolvent.

397.    ADS stood on both sides of the Spinoff Transaction. While owing fiduciary duties to LVI, ADS sought to maximize the dividend that it would receive from LVI in the Spinoff Transaction and to extract other pecuniary benefits.

---

[290]    *See* ¶¶ 359-370, *supra.*

398.    ADS breached its fiduciary duties of care and loyalty to LVI in connection with the Spinoff Transaction.[291]

399.    The Director Defendants aided and abetted both Motes's and ADS's breaches of their fiduciary duties by knowingly causing ADS to appoint Motes as the sole director of LVI. In doing so, the Director Defendants knew that Motes's continued employment by ADS and service as an ADS officer would make Motes place ADS's interests in the Spinoff Transaction ahead of LVI's interests. The Director Defendants thus knowingly caused ADS to create the conflicted relationships between Motes, on the one hand, and ADS and LVI, on the other hand, that served as the basis for Motes's breaches of his fiduciary duties.

400.    The Director Defendants also knew that ADS stood on both sides of the Spinoff Transaction, and directed ADS to pursue the Spinoff Transaction for the purpose of maximizing the dividend that it would receive from LVI and extracting other pecuniary benefits.

401.    The Director Defendants participated in Motes's and ADS's breaches of fiduciary duties by orchestrating the Spinoff Transaction and then approving the Spinoff Transaction on behalf of ADS at the October 13, 2021 ADS Board meeting. In doing so, the Director Defendants knew that Motes approve the Spinoff Transaction on behalf of LVI, and that Motes would do so because he would place ADS's interests above the interests of LVI.

402.    At the time of the Spinoff Transaction, the Director Defendants knew or should have known that the Spinoff Transaction would likely render LVI insolvent and/or inadequately capitalized to engage in its business going forward. Indeed, prior to approving the Spinoff Transaction, members of the ADS Board, as well as Beberman, Motes, and others, contemplated

---

[291]    *See ¶¶ 372-381, supra.*

the prospect of a near-term bankruptcy of LVI as a result of the Spinoff Transaction, and privately conceded that the transaction required LVI to bear too much debt.

403.    The Director Defendants approved the Spinoff Transaction for ADS despite their knowledge, by no later than January 2021 and continuously thereafter, that Sobeys not only intended to terminate its AIR MILES contract upon renewal in 2023 but also intended to exercise the early termination rights under its contract so as to exit the AIR MILES program by the end of 2022. The Director Defendants knew that the fact that Sobeys was exiting the AIR MILES program was not factored into any projections of the financial health of LVI following the spin, including the projections contained in the E&Y Report.

404.    The Director Defendants knew that Motes had not retained counsel or any third-party advisors to assess the effects of the Spinoff Transaction on LVI at the time that they approved the Spinoff Transaction, and never encouraged Motes to do so.

405.    The Director Defendants knowingly participated in Motes's breach of fiduciary duties by holding ADS Board Meetings with Motes in attendance, where written materials made clear that the that the primary goals of the Spinoff Transaction were (a) to maximize a dividend paid to ADS to bolster its Card Services business and (b) to extract ADS from the LoyaltyOne Business at a "favorable" time, meaning before upcoming contract renewals for key sponsors of the AIR MILES program, including Sobeys.

406.    The Director Defendants' aiding and abetting of Motes's and ADS's breaches of fiduciary duties owed to LVI in the Spinoff Transaction, including the breaches in connection with (i) the $650M Transfer, (ii) the $100M Transfer, (iii) the incurrence of the Tax Litigation Proceeds Transfer Obligation, and (iv) the incurrence of the ADS Indemnification Obligation, were the proximate cause and/or a substantial factor in causing LVI, its estate, LVI's creditors,

and other stakeholders, including the beneficiaries of the Liquidating Trust, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

## COUNT V
### Aiding and Abetting Breach of Fiduciary Duty by Motes and Bread
### (Against Andretta and Beberman)

407.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Defendants Andretta and Beberman are liable for aiding and abetting the breaches of fiduciary duties by Motes and Bread.

409.    As its sole director, Motes owed fiduciary duties of care and loyalty to LVI, including a duty to act in good faith and in the best interest of LVI at all times.

410.    Motes was not independent when the Spinoff Transaction occurred.

411.    Motes breached his fiduciary duties of care and loyalty to LVI in connection with the Spinoff Transaction.[292]

412.    As LVI's controlling shareholder, indirectly owning 100% of its stock through intermediate wholly owned subsidiaries, ADS (now known as Bread) owed fiduciary duties care and loyalty to LVI, including a duty of good faith and to act in LVI's best interests. Implicit in these duties was a duty to not take actions that would render LVI insolvent.

413.    ADS stood on both sides of the Spinoff Transaction. While owing fiduciary duties to LVI, ADS sought to maximize the dividend that it would receive from LVI in the Spinoff Transaction and to extract other pecuniary benefits.

414.    ADS breached its fiduciary duties of care and loyalty to LVI in connection with the Spinoff Transaction. [293]

---

[292]    *See* ¶¶ 372-81, *supra.*

415.    The conduct of each of Andretta and Beberman in connection with the Spinoff Transaction demonstrates each of their knowledge of and participation of the breaches of fiduciary duties by Motes and ADS.

416.    Each of Andretta and Beberman knew that Motes was not independent in the run-up to and execution of the Spinoff Transaction and that Motes was working to implement the intentions of ADS, with no respect to the best interests of LVI. As senior officers of ADS, each of Andretta and Beberman knew that Motes served as LVI's sole director while continuing to be employed by ADS as its Executive Vice President, Chief Administrative Officer, General Counsel and Secretary. Each of Andretta and Beberman knew that, while Motes owed fiduciary duties to LVI, he would ultimately put ADS's interests above the interests of LVI. Each of Andretta and Beberman knew this because of their relationships and interactions with Motes.

417.    Each of Andretta and Beberman knew that ADS stood on both sides of the Spinoff Transaction, in that while ADS owed fiduciary duties to LVI, ADS sought to maximize the dividend that it would receive from LVI in the Spinoff Transaction and to extract other pecuniary benefits.

418.    As senior officers of ADS who participated in the Spinoff Transaction, Andretta and Beberman were able to exercise control over LVI and shape the terms of the transaction to ADS's benefit.

419.    As President and CEO of ADS at the time of the Spinoff Transaction, Andretta participated in Motes and ADS's breaches of their fiduciary duties by, among other things, setting the goal for the Spinoff Transaction of maximizing value to ADS, while leaving only a minimally viable LVI. Andretta then caused ADS's management and its third-party advisors to

---

[293]    *See* ¶¶ 372-81, *supra.*

pursue the Spinoff Transaction with these objectives. Andretta participated in ADS board meetings on May 11-12, 2021, and October 13, 2021 where these objectives were shared. In the October 13, 2021 meeting, of course, the Spinoff Transaction was approved, such that LVI was forced to assume the onerous liabilities associated with the Spinoff Transaction that rendered it insolvent and inadequately capitalized to engage in its business on a going forward basis.

420.    Andretta also knowingly participated in Motes's and ADS's breaches of fiduciary duties when he caused ADS to pursue the assignment of the Tax Litigation Proceeds Transfer Obligation as part of the Spinoff Transaction.

421.    As ADS's Executive Vice President and Chief Financial Officer at the time of the Spinoff Transaction, Beberman knowingly participated in Motes's and ADS's breaches of fiduciary duties by, among other things, using his influence to obtain terms in the Spinoff Transaction that would meet Andretta's goal of maximizing value for ADS while leaving only a minimally viable LVI. Beberman participated in the ADS Audit Committee meetings in August of 2021 where the size of the dividend was debated. Throughout August, Beberman made clear to the Spin Team members, including Chesnut and Horn, that their concerns regarding the impact of the Spinoff Transaction on LVI were secondary at best, and at worst were impeding the goal of maximizing the return to ADS in the spin. Indeed, Beberman went so far as to threaten the Spin Team members for voicing concerns about the terms of the Spinoff Transaction, telling Chesnut on an August 29, 2021 to "get [Horn] on board or you won't like how this goes."

422.    Further, Beberman also knowingly participated in Motes and ADS's breaches of fiduciary duties by "establish[ing] himself as firmly the client and in-charge" of the Spinoff Transaction,[294] and the other conduct alleged herein.  Beberman ensured that LVI would raise

---

[294]    BREAD-LVI-00036678.

$675 million in debt, even if it meant imposing more onerous terms for LVI on 'term loan B' debt or requiring LVI to take out unplanned 'term loan A' debt.

423.    Each of Andretta and Beberman aided and abetted Motes's and ADS's breaches of fiduciary duties owed to LVI in the Spinoff Transaction, including the breaches in connection with (i) the $650M Transfer, (ii) the $100M Transfer, (iii) the incurrence of the Tax Litigation Proceeds Transfer Obligation, and (iv) the incurrence of the ADS Indemnification Obligation, were the proximate cause and/or a substantial factor in causing LVI, its estate, and LVI's creditors, and other stakeholders, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $750 million.

## IX.    PRAYER FOR RELIEF

A.  On the First Cause of Action, entry of a judgment against Defendant Motes by this Court in an amount to be determined at trial, but in an amount of at least $753,562,843.07, plus pre-judgment interest;

B.  On the Second Cause of Action, entry of a judgment against Defendant Bread by this Court in an amount to be determined at trial, but in an amount of at least $753,562,843.07, plus pre-judgment interest;

C.  On the Third Cause of Action, entry of a judgment against Defendant Bread by this Court in an amount to be determined at trial, but in an amount of at least $753,562,843.07, plus pre-judgment interest;

D.  On the Fourth Cause of Action, entry of a judgment against Defendants Andretta, Ballou, Gerspach, Kimbrough, Natarajan, Theriault, Tucker, and Turney by this Court in an amount to be determined at trial, but in an amount of at least $753,562,843.07, plus pre-judgment interest;

E.  On the Fifth Cause of Action, entry of a judgment against Defendants Andretta and Beberman by this Court in an amount to be determined at trial, but in an amount of at least $753,562,843.07, plus pre-judgment interest;

F.  Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

G.  Awarding Plaintiff post-judgment interest at the maximum rate permitted by law; and

H.  Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: February 20, 2024

**GRANT & EISENHOFER P.A.**

By: */s/* Vivek Upadhya
Gordon Z. Novod (*pro hac* vice application to be filed)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8523
Fax: 646-722-8501
gnovod@gelaw.com

Frank H. Griffin (*pro hac vice* application to be filed)
Vivek Upadhya (Delaware Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
fgriffin@gelaw.com
vupadhya@gelaw.com

*Special Counsel for Pirinate Consulting Group, LLC, as Trustee of the Loyalty Ventures Liquidating Trust*